No. 26-1665

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

GREGG AMORE, in the official capacity as Secretary of State of Rhode Island;
COMMON CAUSE; CATHERINE SAUNDERS; STUART WALDMAN;
JULIA SANCHES; SEIU DISTRICT 1199NE; RHODE ISLAND ALLIANCE FOR
RETIRED AMERICANS; CAROLYN BETENSKY; MICHAEL ZACK MEZERA,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**APPENDIX**

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

# TABLE OF CONTENTS

**PAGE**

District Court Docket ............................................................................... 1

Complaint,
    filed December 2, 2025
    (Doc. 1) ...................................................................................... 7

Letter from the DOJ to Secretary Amore,
    dated September 8, 2025
    (Doc. 2-2, Exh. 1) ................................................................... 21

Letter from Secretary Amore to the DOJ,
    dated September 16, 2025
    (Doc. 2-2, Exh. 2) ................................................................... 25

Declaration of John Marion,
    filed December 9, 2025
    (Doc. 5-2, Exh. 2) ................................................................... 28

Declaration of Catherine W. Saunders,
    filed December 9, 2025
    (Doc. 5-3, Exh. 3) ................................................................... 34

Declaration of Stuart Waldman,
    filed December 9, 2025
    (Doc. 5-4, Exh. 4) ................................................................... 38

Declaration of Julia Sanches,
    filed December 9, 2025
    (Doc. 5-5, Exh. 5) ................................................................... 41

DOJ Proposed Memorandum of Understanding,
    filed January 13, 2026
    (Doc. 25-1, Exh. A).................................................................. 45

**TABLE OF CONTENTS (continued):**                    **PAGE**

Transcript of Hearing Re: Motion to Dismiss in *United States v.*
        *Weber*, No. 2:25-cv-9149 (C.D. Cal. Dec. 4, 2025),
        filed January 13, 2026
        (Doc. 25-2, Exh. B).......................................................................55

Protective Order entered in *Coalition For Open*
        *Democracy v. Scanlan*, No. 1:24-cv-312 (D.N.H.),
        filed February 3, 2026
        (Doc. 35-1, Exh. A).......................................................................89

Protective Order, Schedule A, in *Coalition For Open*
        *Democracy v. Scanlan*, No. 1:24-cv-312 (D.N.H.),
        filed February 3, 2026
        (Doc. 35-2, Exh. B).....................................................................109

Notice of Clarification,
        filed March 27, 2026
        (Doc. 46) ....................................................................................113

Transcript of Hearing Re: Motion to Compel and Motion
        to Dismiss,
        filed March 30, 2026
        (Doc. 47) ....................................................................................116

Notice of Appeal,
        filed June 3, 2026
        (Doc. 53) ....................................................................................230



## *1:25cv639, United States Of America V. Amore*

US District Court Docket

United States District Court, Rhode Island

(Providence)

**This case was retrieved on 07/15/2026**

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 12/02/2025 | COMPLAINT (No fee paid, USA, Waived by Statute, or IFP.), filed by United States of America. (Attachments: # 1 Civil Cover Sheet, # 2 Supplement Attachment to civil cover sheet, # 3 Supplement Summons)(Tucker, James) (Entered: 12/02/2025) | |
| 2 | 12/02/2025 | MOTION to Compel Production of documents  filed by All Plaintiffs. Responses due by 12/16/2025. (Attachments: # 1 Supporting Memorandum In support of motion to compel production of documents, # 2 Exhibit Declaration of Riordan and Exhibits 1-3, # 3 Supplement Proposed Order)(Tucker, James) (Entered: 12/02/2025) | |
| | 12/02/2025 | Case assigned to District Judge Mary S. McElroy and Magistrate Judge Patricia A. Sullivan. (Gonzalez Gomez, Viviana) (Entered: 12/02/2025) | |
| 3 | 12/02/2025 | CASE OPENING NOTICE ISSUED. (Gonzalez Gomez, Viviana) (Entered: 12/02/2025) | |
| 4 | 12/02/2025 | Summons Issued as to Gregg Amore. (Gonzalez Gomez, Viviana) (Entered: 12/02/2025) | |
| 5 | 12/09/2025 | MOTION to Intervene as defendants filed by COMMON CAUSE, CATHERINE SAUNDERS, STUART WALDMAN, JULIA SANCHES. Responses due by 12/23/2025. (Attachments: # 1 Exhibit 1.Motion to Dismiss with attachment A, # 2 Exhibit 2.Declaration of John Marion, # 3 Exhibit 3.Declaration of Catherine W. Saunders, # 4 Exhibit 4.Declaration of Stuart Waldman, # 5 Exhibit 5.Declaration of Julia Sanches)(Labinger, Lynette) (Entered: 12/09/2025) | |
| 6 | 12/09/2025 | Corporate Disclosure Statement by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 7 | 12/09/2025 | MOTION for Ari J. Savitzky to Appear Pro Hac Vice for Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches as Defendant-Intervenors ( filing fee paid $ 100.00, receipt number ARIDC-2218854 ) filed by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 8 | 12/09/2025 | MOTION for Patricia J. Yan to Appear Pro Hac Vice for Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches as Defendant-Intervenors ( filing fee paid $ 100.00, receipt number ARIDC-2218858 ) filed by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 9 | 12/09/2025 | CERTIFICATE OF SERVICE by United States of America Proof of | |

App. 1

US_DIS_RID_1_25-cv-00639__DocketUpdate: __

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Service (Tucker, James) (Entered: 12/09/2025) | |
| 10 | 12/09/2025 | MOTION for Sophia L. Lakin to Appear Pro Hac Vice for Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches as Defendant-Intervenors ( filing fee paid $ 100.00, receipt number ARIDC-2218861 ) filed by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 11 | 12/09/2025 | CERTIFICATE OF SERVICE by United States of America Proof of Service (Tucker, James) (Entered: 12/09/2025) | |
| 12 | 12/09/2025 | MOTION for Theresa J. Lee to Appear Pro Hac Vice for Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches as Defendant-Intervenors ( filing fee paid $ 100.00, receipt number ARIDC-2218864 ) filed by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 13 | 12/09/2025 | MOTION for William Hughes to Appear Pro Hac Vice for Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches as Defendant-Intervenors ( filing fee paid $ 100.00, receipt number ARIDC-2218867 ) filed by COMMON CAUSE, JULIA SANCHES, CATHERINE SAUNDERS, STUART WALDMAN. (Labinger, Lynette) (Entered: 12/09/2025) | |
| 14 | 12/09/2025 | SUMMONS and Process Return and Receipt Returned EXECUTED by United States Marshal, filed by United States of America. Gregg Amore served on 12/5/2025, answer due 12/26/2025. (Attachments: # 1 Gregg Amore Summons Returned Executed with USM-285 Form as to RI AG's Office) (Gonzalez Gomez, Viviana) (Entered: 12/09/2025) | |
| 15 | 12/09/2025 | MOTION to Intervene as Defendants filed by SEIU District 1199NE, Rhode Island Alliance for Retired Americans, Carolyn Betensky, Michael Zack Mezera. Responses due by 12/23/2025. (Attachments: # 1 Supporting Memorandum, # 2 Exhibit Declaration of Rob Baril, # 3 Exhibit Declaration of Roger Boudreau, # 4 Exhibit Declaration of Carolyn Betensky, # 5 Exhibit Declaration of Michael "Zack" Mezera, # 6 Exhibit Proposed Answer)(Romero, Amy) (Entered: 12/09/2025) | |
| 16 | 12/09/2025 | Corporate Disclosure Statement by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: 12/09/2025) | |
| | 12/10/2025 | TEXT ORDER granting 10 Motion to Appear Pro Hac Vice of Sophia L. Lakin. So Ordered by District Judge Mary S. McElroy on 12/10/2025. (Gonzalez Gomez, Viviana) (Entered: 12/10/2025) | |
| | 12/10/2025 | TEXT ORDER granting 12 Motion to Appear Pro Hac Vice of Theresa J. Lee. So Ordered by District Judge Mary S. McElroy on 12/10/2025. (Gonzalez Gomez, Viviana) (Entered: 12/10/2025) | |
| | 12/10/2025 | TEXT ORDER granting 13 Motion to Appear Pro Hac Vice of William Hughes. So Ordered by District Judge Mary S. McElroy on 12/10/2025. (Gonzalez Gomez, Viviana) (Entered: 12/10/2025) | |
| | 12/10/2025 | TEXT ORDER granting 7 Motion to Appear Pro Hac Vice of Ari J. Savitzky. So Ordered by District Judge Mary S. McElroy on 12/10/2025. (Gonzalez Gomez, Viviana) (Entered: 12/10/2025) | |
| | 12/10/2025 | TEXT ORDER granting 8 Motion to Appear Pro Hac Vice of Patricia J. Yan. So Ordered by District Judge Mary S. McElroy on 12/10/2025. (Gonzalez Gomez, Viviana) (Entered: 12/10/2025) | |
| 17 | 12/10/2025 | MOTION for Marisa A. O'Gara to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2219792 ) filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: 12/10/2025) | |

App. 2

US_DIS_RID_1_25-cv-00639__DocketUpdate: __

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 18 | 12/10/2025 | MOTION for Robert Golan-Vilella to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2219794 ) filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: 12/10/2025) | |
| 19 | 12/10/2025 | MOTION for Walker McKusick to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2219796 ) filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) Modified Attorney name on 12/11/2025 (Hill, Cherelle). (Entered: 12/10/2025) | |
| 20 | 12/10/2025 | MOTION for Qizhou Ge to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2219797 ) filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: 12/10/2025) | |
| 21 | 12/10/2025 | MOTION for David R. Fox to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2219798 ) filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: 12/10/2025) | |
| | 12/11/2025 | TEXT ORDER granting 17 Motion to Appear Pro Hac Vice of Marisa A. O'Gara. So Ordered by District Judge Mary S. McElroy on 12/11/2025. (Hill, Cherelle) (Entered: 12/11/2025) | |
| | 12/11/2025 | TEXT ORDER granting 20 Motion to Appear Pro Hac Vice of Qizhou Ge. So Ordered by District Judge Mary S. McElroy on 12/11/2025. (Hill, Cherelle) (Entered: 12/11/2025) | |
| | 12/11/2025 | TEXT ORDER granting 21 Motion to Appear Pro Hac Vice of David R. Fox. So Ordered by District Judge Mary S. McElroy on 12/11/2025. (Hill, Cherelle) (Entered: 12/11/2025) | |
| | 12/11/2025 | TEXT ORDER granting 19 Motion to Appear Pro Hac Vice of Walker McKusick. So Ordered by District Judge Mary S. McElroy on 12/11/2025. (Hill, Cherelle) (Entered: 12/11/2025) | |
| | 12/11/2025 | TEXT ORDER granting 18 Motion to Appear Pro Hac Vice of Robert Golan-Vilella. So Ordered by District Judge Mary S. McElroy on 12/11/2025. (Hill, Cherelle) (Entered: 12/11/2025) | |
| 22 | 12/15/2025 | NOTICE of Appearance by James J. Arguin on behalf of Gregg Amore (Arguin, James) (Entered: 12/15/2025) | |
| 23 | 12/15/2025 | Joint STIPULATION re 2 MOTION to Compel Production of documents , 1 Complaint and Proposed Scheduling Order filed by Gregg Amore. (Arguin, James) (Entered: 12/15/2025) | |
| | 01/06/2026 | TEXT ORDER. The unopposed Motion to Intervene of Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches (ECF No. 5 ) and the unopposed Motion to Intervene of SEIU District 1199 NE, Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Michael Zack Mezera (ECF No. 15 ) are GRANTED and those parties may intervene as of right pursuant to Fed. R. Civ. P. 24(a). So Ordered by District Judge Mary S. McElroy on 1/6/2026. (Potter, Carrie) (Entered: 01/06/2026) | |
| | 01/06/2026 | TEXT ORDER entering 23 Joint STIPULATION. 1. The Secretary shall file his motion to dismiss the Complaint and response to the Motion to Compel on or before January 13, 2026;2. The United Statess response to the Secretary's motion to dismiss shall be filed within the time permitted by Local Rule 7(a)(3);3. The United Statess reply to the Secretary's response to the Motion to Compel shall be filed within time permitted by Local Rule 7(a)(4)'4. The Secretary's reply to the United Statess response to his motion to dismiss shall be filed within time permitted by Local Rule 7(a)(4). So Ordered by District Judge Mary S. McElroy on 1/6/2026. | |

App. 3

US_DIS_RID_1_25-cv-00639__DocketUpdate: __

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | (Potter, Carrie) (Entered: 01/06/2026) | |
| 24 | 01/12/2026 | NOTICE of Appearance by Kyla Duffy on behalf of Gregg Amore (Duffy, Kyla) (Entered: 01/12/2026) | |
| 25 | 01/13/2026 | MOTION to Dismiss and RESPONSE In Opposition to 2 MOTION to Compel Production  filed by Common Cause, Julia Sanches, Catherine Saunders, Stuart Waldman. Responses due by 1/27/2026. (Attachments: # 1 Exhibit A. Department of Justice Memorandum of Understanding, # 2 Exhibit B. US v. Weber December 4 Transcript Excerpts)(Savitzky, Ari) Modified on 1/14/2026 (Potter, Carrie). (Entered: 01/13/2026) | |
| 26 | 01/13/2026 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM  filed by Gregg Amore. Responses due by 1/27/2026. (Attachments: # 1 Supporting Memorandum)(Arguin, James) (Entered: 01/13/2026) | |
| 27 | 01/13/2026 | RESPONSE In Opposition to 2 MOTION to Compel Production of documents   filed by Gregg Amore. Replies due by 1/20/2026. (Arguin, James) (Entered: 01/13/2026) | |
| 28 | 01/13/2026 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM  filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. Responses due by 1/27/2026. (Romero, Amy) (Entered: 01/13/2026) | |
| 29 | 01/13/2026 | RESPONSE In Opposition to 2 MOTION to Compel Production of documents   filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. Replies due by 1/20/2026. (Romero, Amy) (Entered: 01/13/2026) | |
| 30 | 01/15/2026 | NOTICE by Common Cause, Julia Sanches, Catherine Saunders, Stuart Waldman of Supplemental Authority (Attachments: # 1 Exhibit Ex. 1 (Decision in U.S. v. Weber))(Savitzky, Ari) (Entered: 01/15/2026) | |
| 31 | 01/22/2026 | First MOTION for Virginia A. Williamson to Appear Pro Hac Vice  ( filing fee paid $ 100.00, receipt number ARIDC-2234143 ) filed by State of Maryland. (Bianchi, Gil) Modified Text on 1/23/2026 (Hill, Cherelle). (Entered: 01/22/2026) | |
| | 01/23/2026 | TEXT ORDER granting 31 Motion to Appear Pro Hac Vice of Virginia Anne Williamson. So Ordered by District Judge Mary S. McElroy on 1/23/2026. (Hill, Cherelle) (Entered: 01/23/2026) | |
| 32 | 01/23/2026 | MOTION for Leave to File Amicus Brief  filed by State of Maryland. Responses due by 2/6/2026. (Attachments: # 1 Tendered Amicus Brief)(Williamson, Virginia) (Entered: 01/23/2026) | |
| 33 | 01/27/2026 | RESPONSE In Opposition to 25 MOTION to Dismiss , 28 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM   filed by United States of America. Replies due by 2/3/2026. (Attachments: # 1 Exhibit Order, # 2 Exhibit GA Complaint, # 3 Exhibit Consent Decree, # 4 Exhibit MOU, # 5 Exhibit IPA)(Gardner, Christopher) (Entered: 01/27/2026) | |
| 34 | 02/03/2026 | REPLY to Response re 33 Response to Motion,  filed by Gregg Amore. (Arguin, James) (Entered: 02/03/2026) | |
| 35 | 02/03/2026 | REPLY to Response re 33 Response to Motion,  filed by Common Cause, Julia Sanches, Catherine Saunders, Stuart Waldman. (Attachments: # 1 Exhibit A, Coalition for Open Democracy v. Scanlan, No. 1:24-cv-00312-SE-TSM, Dkt. No. 87, # 2 Exhibit B, Coalition for Open Democracy v. Scanlan, No. 1:24-cv-00312-SE-TSM, Dkt. No. 87-1)(Savitzky, Ari) (Entered: 02/03/2026) | |
| 36 | 02/03/2026 | REPLY to Response re 33 Response to Motion,  filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. (Romero, Amy) (Entered: | |

App. 4

US_DIS_RID_1_25-cv-00639__DocketUpdate: __

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 02/03/2026) | |
| 37 | 02/06/2026 | NOTICE by Gregg Amore re 34 Reply to Response of Supplemental Authority (Arguin, James) (Entered: 02/06/2026) | |
| 38 | 02/06/2026 | MOTION to Withdraw as Attorney Marisa O'Gara filed by Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE. Responses due by 2/20/2026. (Romero, Amy) (Entered: 02/06/2026) | |
| | 02/12/2026 | NOTICE of Hearing on Motion : 25 MOTION to Dismiss, 2 MOTION to Compel, 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 28 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM: Motion Hearing set for 3/26/2026 at 10:00 AM in Courtroom 2 before District Judge Mary S. McElroy. (Potter, Carrie) (Entered: 02/12/2026) | |
| 39 | 03/18/2026 | NOTICE of Appearance by Miriam Weizenbaum on behalf of Carolyn Betensky, Michael Zack Mezera, Rhode Island Alliance for Retired Americans, SEIU District 1199NE (Weizenbaum, Miriam) (Entered: 03/18/2026) | |
| 40 | 03/23/2026 | NOTICE of Appearance by Eric Neff on behalf of United States of America (Neff, Eric) (Entered: 03/23/2026) | |
| | 03/26/2026 | Minute Entry for proceedings held before District Judge Mary S. McElroy: Motion Hearing held on 3/26/2026 re 25 MOTION to Dismiss, 2 MOTION to Compel Production of documents, 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, 28 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. E. Neff, C. Gardner, J. Arguin, K. Duffy, L. Labinger, R. Golan-Vilelle, D. Fox, M. Weizenbaum, W. Hughes and A. Savitzky. Court addresses the parties. Court hears arguments on Motions to Dismiss ( 25 , 26 & 28 ) and Motion to Compel ( 2 ). Court questions the parties; parties respond. Court to take motions under advisement. Recess. (Court Reporter D. Veitch in Courtroom 2 at 10:00 am.) (Potter, Carrie) (Entered: 03/26/2026) | |
| 41 | 03/26/2026 | TRANSCRIPT ORDER for proceedings held on 3/26/2026 before Judge Mary S. McElroy. 14-Day Transcript selected. Transcript to be delivered within 14 calendar days.. (Fox, David) (Entered: 03/26/2026) | |
| 42 | 03/26/2026 | TRANSCRIPT ORDER for proceedings held on 3/26/2026 before Judge Mary S. McElroy. 14-Day Transcript selected. Transcript to be delivered within 14 calendar days.. (Arguin, James) (Entered: 03/26/2026) | |
| 43 | 03/26/2026 | TRANSCRIPT ORDER for proceedings held on 3/26/2026 before Judge Judge Mary S. McElroy. 14-Day Transcript selected. Transcript to be delivered within 14 calendar days.. (Savitzky, Ari) (Entered: 03/26/2026) | |
| 44 | 03/27/2026 | TRANSCRIPT ORDER for proceedings held on 03/26/2026 before Judge Judge Mary S. McElroy. 14-Day Transcript selected. Transcript to be delivered within 14 calendar days.. (Gardner, Christopher) (Entered: 03/27/2026) | |
| 45 | 03/27/2026 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 43 Transcript Order, 42 Transcript Order, 44 Transcript Order, 41 Transcript Order. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 03/27/2026) | |
| 46 | 03/27/2026 | NOTICE by United States of America Notice of Clarification (Gardner, Christopher) (Entered: 03/27/2026) | |
| 47 | 03/30/2026 | TRANSCRIPT of Motion Hearing, held on March 26, 2026, before District Judge Mary S. McElroy. Court Reporter Denise P. Veitch, Telephone number (401)752-7031. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. | |

App. 5

US_DIS_RID_1_25-cv-00639__DocketUpdate: __

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option. Redaction Request due 4/20/2026. Redacted Transcript Deadline set for 4/30/2026. Release of Transcript Restriction set for 6/29/2026. (Veitch, Denise) (Entered: 03/30/2026) | |
| 48 | 04/09/2026 | NOTICE by Common Cause, Julia Sanches, Catherine Saunders, Stuart Waldman of Supplemental Authority (Attachments: # 1 Exhibit Order in United States v. Galvin)(Savitzky, Ari) (Entered: 04/09/2026) | |
| 49 | 04/09/2026 | NOTICE by Gregg Amore re 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM  of Supplemental Authority (Arguin, James) (Entered: 04/09/2026) | |
| 50 | 04/14/2026 | RESPONSE IN OPPOSITION by United States of America re 49 Notice (Other), 48 Notice (Other) . (Attachments: # 1 Exhibit Exhibit 1 - Transcript of Oral Arguments)(Tucker, James) (Entered: 04/14/2026) | |
| 51 | 04/17/2026 | MEMORANDUM AND ORDER : The Court DENIES the United States' Motion to Compel Production (ECF No. 2 ) and GRANTS Defendants' Motions to Dismiss (ECF Nos. 25 ; 26 ; 28 ). So Ordered by District Judge Mary S. McElroy on 4/17/2026. (Potter, Carrie) (Entered: 04/17/2026) | |
| 52 | 04/22/2026 | JUDGMENT enters in accordance with the Memo and Order of 4/17/2026. So Ordered by District Judge Mary S. McElroy on 4/22/2026. (Potter, Carrie) (Entered: 04/22/2026) | |
| 53 | 06/03/2026 | NOTICE OF APPEAL by United States of America as to 51 Memorandum and Order, 52 Judgment (No fee paid, USA, Waived by Statute, or IFP.) NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf Appeal Record due by 6/10/2026. (Gardner, Christopher) (Entered: 06/03/2026) | |
| 54 | 06/03/2026 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated Record on Appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 53 Notice of Appeal,,. (Attachments: # 1 Record on Appeal)(Hill, Cherelle) (Entered: 06/03/2026) | |
| | 06/03/2026 | USCA Case Number 25-1665 for 53 Notice of Appeal filed by United States of America. (Simoncelli, Michael) (Entered: 06/03/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

App. 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

<table>
<tr><td>

UNITED STATES OF AMERICA,

       Plaintiff,

v.

GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island,

       Defendant.

</td><td>

Civil No.  1:25-cv-00639

</td></tr>
</table>

## **COMPLAINT**

Plaintiff United States of America brings this action against Gregg M. Amore, in his official capacity as Secretary of State for the State of Rhode Island, and alleges:

## **INTRODUCTION**

1. Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve… *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (emphasis added).

2. Title III likewise grants the Attorney General of the United States the sweeping power to obtain these records: "Any record or paper required by section 301 to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed

App. 7

to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative….” 52 U.S.C. § 20703. The written demand “shall contain a statement of the basis and the purpose therefor.” *Id.*

3.     If the custodian to whom the written demand refuses to comply, the CRA requires “a special statutory proceeding in which the courts play a limited, albeit vital, role” in assisting the Attorney General’s investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a Federal court to issue an order directing the officer of election to produce the demanded records, akin to “a traditional order to show cause, or to produce in aid of an order of an administrative agency.” *Id.*

4.     In this “summary” proceeding, *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963), the Attorney General need only show that she made a “written demand” for records covered by Section 301 of the CRA and that “the person against whom an order for production is sought… has failed or refused to make such papers ‘available for inspection, reproduction, and copying,’” *Lynd*, 306 F.2d at 226 (quoting 42 U.S.C. § 1974b, transferred to 52 U.S.C. § 20703). The court does not adjudicate “the factual foundation for, or the sufficiency of, the Attorney General’s ‘statement of the basis and the purpose’ contained in the written demand” or “the scope of the order to produce.” *Id.*

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); and 52 U.S.C. § 20705.

6.     Venue for this action is proper in the United States District Court for the District of Rhode Island because all actions giving rise to the suit occurred within this district, the Defendant

App. 8

is a resident of the State of Rhode Island, and the records that are demanded are located in this district. 28 U.S.C. § 1391(b)(1), (c)(2); *see also* 28 U.S.C. § 120 (the state of Rhode Island constitutes a single federal district court).

## **PARTIES**

7.  Plaintiff is the United States of America. The United States, through the Attorney General, has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20510(a); and Title III of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21111.

8.  Defendant Gregg M. Amore ("Secretary Amore") is the Secretary of State of Rhode Island and is sued in his official capacity as an "officer of election" as defined by Section 306 of the CRA. *See* 52 U.S.C. § 20706. Secretary Amore is the chief state election official responsible for coordinating Rhode Island's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; R.I. Gen. Laws § 17-6-1.3 ("The secretary of state is designated as the chief state election official under section 10 of the National Voter Registration Act of 1993…."). As the chief election official, Secretary Amore is required to retain and preserve election records, including the Federal election records identified in Section 301 of the CRA. *See* 52 U.S.C. § 20701.  Secretary Amore is sued in his official capacity only.

## **BACKGROUND**

9.  This proceeding arises from the Attorney General's investigation into Rhode Island's compliance with Federal election laws, particularly the NVRA and HAVA.

10.  Both the NVRA and HAVA require States to maintain accurate voter registration lists. The NVRA requires states to preserve certain records and papers that fall within the scope of Section 301 of Title III of the CRA.

3

App. 9

11. The NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509. Secretary Amore is the chief election official of the State of Rhode Island.

12. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4)(A)-(B).

13. The NVRA also requires States to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1).

14. HAVA requires all States to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State…" 52 U.S.C. § 21083(a)(1)(A).

15. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits States from processing voter-registration applications without obtaining and verifying certain identifying information from the applicants. 52 U.S.C. § 21083(a)(5)(A).

## FACTUAL ALLEGATIONS

16. The United States Election Assistance Commission ("EAC") – "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process" – conducts a biennial Election

App. 10

Administration and Voting Survey ("EAVS"). EAC, *About the EAC*, http://eac.gov/about (last visited Nov. 14, 2025).

17. For the EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, 2024 EAVS Report at iv.[1]

18. Based on a review of the 2024 EAVS Report, the Attorney General, acting through her representative, the Assistant Attorney General for Civil Rights, sent a letter to Secretary Amore on September 8, 2025, seeking information regarding Rhode Island's compliance with federal election law. Ex. 1 to Decl. of Maureen Riordan ("Riordan Decl."), Ltr. from the Asst. Att'y Gen. to Sec'y Gregg M. Amore (Sept. 8, 2025) ("September 8 Letter").

19. The September 8 Letter requested – pursuant to Section 8(i) of the NVRA – that Rhode Island provide a current electronic copy of its computerized statewide voter registration list ("SVRL"), required under Section 303 of HAVA. *Id.*

20. The September 8 Letter also contained a written demand made pursuant to Section 301 of the CRA, 52 U.S.C. § 20703, demanding "an electronic copy of Rhode Island's complete and current VRL" and advised that "[t]he purpose of the request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." *See* Ex. 1 to Riordan Decl. at 2 (describing the scope of records and papers demanded). The letter directed that the SVRL should contain all fields, which includes the registrant's full name, date of birth,

---

[1] https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (last visited Nov. 24, 2025).

App. 11

residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required by HAVA to register individuals for federal elections. *Id.* at 1, 3 & n.3.

21.     The September 8 Letter explained that "HAVA specifies that the 'last 4 digits of a social security number… shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974.'" *Id.* at 2 (citing 5 U.S.C. § 552a note; 52 U.S.C. § 21083(c)). In addition, it explained that any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Attorney General is now doing. *See id.*

22.     Finally, the September 8 Letter also made clear that the requested records will be maintained consistent with Privacy Act protections as explained on the Department's website.[2] *See id.*

23.     The full list of routine uses for this collection of information can be found in the System of Records Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). The statutes cited for routine use in the SORN include the NVRA, HAVA, and the CRA. The records in the SORN are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50,

---

[2] https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

App. 12

0.51. This information is included in the Privacy Act link that was provided to Secretary Amore in the September 8 Letter.

24. The September 8 Letter asked Secretary Amore to produce the requested information and records by encrypted email or via the secure file-sharing system, Justice Enterprise File Sharing (JEFS). Ex. 1 to Riordan Decl. at 3.

25. In response, on September 16, 2025, Secretary Amore sent a letter refusing to provide the requested SVRL, stating Rhode Island "objects to providing" information that the Secretary Amore asserted constitutes "personally identifiable information (PII) such as 'state driver's license number or the last four digits of the registrant's social security number.'" Ex. 2 to Riordan Decl., Ltr. from Sec'y Gregg M. Amore to the Asst. Att'y Gen. (Sept. 16, 2025) ("September 16 Letter") (quoting September 8 Letter).

26. Through the September 16 Letter, Secretary Amore refused the Attorney General's written demand made through her representative, the Assistant Attorney General for Civil Rights.

## COUNT ONE
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703

27. On September 8, 2025, the Attorney General, acting through her representative the Assistant Attorney General for Civil Rights, sent a written demand to Secretary Amore for the production of specific election records, as authorized by Section 303 of the CRA, 52 U.S.C. § 20703.

28. The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

29. Secretary Amore refused to provide the records requested as described in his September 16 Letter.

7

App. 13

Wherefore, the United States respectfully requests this Court:

A. Declare that Secretary Amore's refusal to provide the Federal election records upon a demand by the Attorney General, acting through her representative the Assistant Attorney General for Civil Rights, violates Section 303 of the Civil Rights Act, 52 U.S.C. § 20703;

B. Order Secretary Amore to provide to the Attorney General's representative, the Assistant Attorney General for Civil Rights, an electronic copy of Rhode Island's statewide Voter Registration List within five days, to include each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number, or the unique HAVA identifier, *see* 52 U.S.C. § 21083; and

C. Award such additional relief as the interests of justice may require.

8

App. 14

Dated: December 2, 2025.

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*/s/ James Thomas Tucker*
MAUREEN RIORDAN
Acting Chief, Voting Section
TIMOTHY F. MELLETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

App. 15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2025, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.


*/s/ James Thomas Tucker*

James Thomas Tucker

App. 16

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island

County of Residence of First Listed Defendant   Providence County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[x] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
52 U.S.C. §§ 20701-20706

Brief description of cause:
Action by the Attorney General of the United States to compel production of Federal election records

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   Dec 2, 2025

SIGNATURE OF ATTORNEY OF RECORD   /s/ James Thomas Tucker

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

App. 17

Attachment to Civil Cover Sheet
(Attorney Names, Addresses, and Phone Numbers)


I.(c)

Counsel for Plaintiff United States of America:
MAUREEN S. RIORDAN
TIMOTHY F. MELLETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 307-2767
Facsimile: (202) 307-3961
E-mail addresses:
Maureen.Riordan2@usdoj.gov
Timothy.F.Mellett@usdoj.gov
James.T.Tucker@usdoj.gov

App. 18

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Rhode Island

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No.   25-639 |
| | ) | |
| GREGG M. AMORE, in his official capacity as | ) | |
| Secretary of State for the State of Rhode Island | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

**SUMMONS IN A CIVIL ACTION**

To: _(Defendant's name and address)_   Hon. Gregg M. Amore
State of Rhode Island, Department of State
Office of the Secretary of State
82 Smith Street, Room 218
Providence, Rhode Island 02905

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   James Thomas Tucker
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____                    _____
                                              _Signature of Clerk or Deputy Clerk_

App. 19

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

App. 20

# Exhibit 1



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Gregg Amore
Secretary of State
82 Smith Street, Room 218
Providence, RI 02903-1120
secretary@sos.ri.gov;
secretaryamore@sos.ri.gov

Re:     **Request for Complete Rhode Island's Voter Registration List with All Fields**

Dear Secretary Amore:

We write to you as the chief election official for the State of Rhode Island concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 _et seq._, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, _et seq._  Please provide a copy of Rhode Island's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain _all fields_, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  _See_ 52 U.S.C. § 21083(a)(5)(A)(i).

We request Rhode Island's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. _See_ 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

App. 22

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Rhode Island's complete and current VRL. The purpose of this request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

App. 23

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Rhode Island would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Miguel Nuñez
Executive Director
State Board of Elections
148 West River Street
Providence, RI 02904-2615
elections@elections.ri.gov

---

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

App. 24

# Exhibit 2



State of Rhode Island

## Department of State | Office of the Secretary of State

**Gregg M. Amore,** *Secretary of State*

September 16, 2025

Voting.section@usdoj.gov

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
950 Pennsylvania Avenue, NW - 4CON
Washington, D.C. 20530

Re: September 8, 2025 Request for Rhode Island's Voter Registration List

Dear Ms. Dhillon:

The Rhode Island Department of State is in receipt of your September 8, 2025 letter requesting "a copy of Rhode Island's statewide voter registration list."

Although we will provide you with a copy of the publicly available voter registration list, we recognize that your request also seeks "*all fields*" including personally identifiable information (PII) such as "state driver's license number or the last four digits of the registrant's social security number."

The Rhode Island Department of State objects to providing PII. In support of your request for PII, you rely on section 11 of the National Voter Registration Act (NVRA), which allows the Attorney General to bring a civil action for enforcement of the act. Outside that specific context, the NVRA does not allow for requests of voter PII. Indeed, the First Circuit Court of Appeals has expressly recognized that NVRA's public disclosure provision provides safeguards against disclosure of voter PII. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). Other federal courts have likewise held that the NVRA protects against disclosure of sensitive, private information contained within a voter registration list. *See PILF v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) ("Other courts have also held that in complying with the Public Disclosure Provision, States may limit the revelation of highly sensitive information.") (citing *Project Vote v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) ("Section 8(i) requires the disclosure of individual voter registration records, but it does not require the disclosure of sensitive information that implicates special privacy concerns."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) ("There is no indication in the NVRA's legislative history that Congress intended to open up for inspection information within those records that is otherwise protected as personal information under other Federal or State laws.").

Furthermore, your request for Rhode Island voters' PII does not comply with the Privacy Act of 1974 or the e-Government Act of 2004. You fail to show that any of the statutory prerequisites for the protection of PII under those acts is in place.

App. 26

Additionally, you rely on the Help America Vote Act (HAVA) and the Civil Rights Act of 1960 (CRA). Yet, HAVA does not grant the Attorney General any right to obtain data from states outside the context of litigation; and CRA allows access to voter records only in connection with an investigation into the infringement or denial of constitutional voting rights, which is not the basis cited in your letter.

As Secretary of State, I am proud of the work we have done in Rhode Island to increase voter participation, maintain accurate voter rolls, and conduct fair elections. Since 2023, we have removed over 105,000 voters from our voter list, all carefully following state and federal law. Indeed, Rhode Island is one of the few states that conducts post-election risk-limiting audits, with paper ballots, to ensure the accuracy of our elections.

While I am pleased to voluntarily provide you with the public voter rolls, as you requested, as Secretary of State, I must protect the personally identifiable information of Rhode Island voters. Accordingly, and for the reasons stated herein, I will not be providing that information to you absent a demonstration of a proper legal basis to do so or a court order.

Thank you for your attention to this matter.

Sincerely,

Gregg M. Amore
Secretary of State

State House, Room 218, Providence, RI 02903
Phone: 401-222-2357 | Fax: 401-222-1356 | secretaryamore@sos.ri.gov | www.sos.ri.gov

App. 27

# Exhibit 2

App. 28

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>GREGG M. AMORE, in his official capacity as<br>Secretary of State for the State of Rhode Island,<br><br>      Defendant. | Case No. 1:25-cv-00639<br>(Hon. Mary McElroy) |

**DECLARATION OF JOHN MARION**

App. 29

**DECLARATION OF JOHN MARION**

I, John Marion, hereby declare as follows:

1) I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.

2) I live in Rhode Island, and I am an eligible registered voter. Voting is the most fundamental form of democratic participation, and I am proud to be a Rhode Island voter. I am the Rhode Island State Director of Common Cause. I am also a member of Common Cause. I serve as the primary spokesperson and lobbyist for Common Cause in Rhode Island, working to protect voting rights, promote ethical government, and to hold power accountable. In my role as State Director I also lead the Rhode Island Voting Access Coalition–a group of more than twenty organizations that serves as the state's only permanent voting rights coalition. I work with the coalition to advance pro-voter reforms and increase civic engagement including through events such as National Voter Registration Day.

3) Common Cause is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia and registered to do business in Rhode Island. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and brings this action in a representative capacity on behalf of its members.

4) Pursuant to its bylaws, Common Cause has defined who qualifies as a member. Under its definition, a "member" of Common Cause is any individual who, within the past two years, (a) made a financial contribution to the organization; or (b) has taken meaningful action in support of Common Cause's advocacy work. Such meaningful action includes, but is not limited to, signing petitions directed to government officials; participating in letter-writing or phone-banking campaigns; attending town halls, workshops, or rallies organized by Common Cause; or otherwise engaging in activities designed to advance the organization's mission. There are 4503 Common Cause Rhode Island members.

5) Common Cause's mission is to uphold the core values of American democracy by creating an open, honest, and accountable government that serves the public interest, promotes equal rights, opportunity, and representation for all, and empowers people to make their voices heard in the political process.

6) In Rhode Island, Common Cause ensures that Rhode Islander's voices are heard in the political process. Common Cause's Rhode Island members live throughout the state and include registered voters whose personal information is maintained in the statewide voter registration database held by the Rhode Island Secretary of State. If the Secretary discloses the unredacted voter registration file to DOJ, these members' sensitive personal information—including driver's license numbers, and portions of social security

App. 30

numbers—would be unlawfully released, causing an invasion of privacy, chilling participation in the electoral process, and undermining confidence in the integrity of Rhode Island elections.

7) Common Cause believes the right to vote is the cornerstone of a functioning democracy. We are committed to ensuring that every eligible Rhode Islander can register and cast their ballot. Through our advocacy, in the last two decades Rhode Island has adopted a number of pro-voter reforms, including pre-registration for 16- and 17-year-olds, online voter registration and automatic voter registration. Our advocacy has also resulted in a number of reforms, including post-election audits, that seek to ensure the security and accuracy of our elections. These efforts are not just about increasing participation—they are about ensuring that every voice is heard, and every vote is protected.

8) Common Cause has a history of fighting to protect voter privacy in Rhode Island. In 2017 Common Cause supported then-Secretary of State Nellie Gorbea's decision to begin withholding the month and day of birth when releasing electronic copies of the full voter file.

9) As a nonpartisan democracy reform organization, Common Cause, our volunteers, and coalition allies, regularly assist eligible Rhode Islanders in registering to vote through community education and outreach. The voters we help are now part of the state's official voter file, and we consider it our duty to safeguard the trust they place in us and in the democratic process.

10) At public engagement events, we invite Rhode Islanders not only to register but also to verify and update their voter information. As a result, many voters we assist become part of the official statewide voter file. We have a vested interest in protecting the integrity and privacy of that data. Any threat to the security of the voter file, especially one that could result in the misuse of personal information, directly undermines our work, damages public trust, and risks chilling voter participation. We also run targeted communications campaigns, including through social media, to keep Rhode Islanders informed about key election deadlines and updates. These efforts amplify official messages from the Office of the Secretary of State and other election officials, helping ensure voters have accurate, timely information to participate confidently in our democracy.

11) Disclosure of the entire, unredacted Rhode Island voter file would undermine Common Cause's work and risk harm to our members. We rely on public confidence in the security and integrity of voter data to encourage participation. If voters fear their personal information, like a partial Social Security number or driver's license number, could be misused or exposed, they may avoid registering to vote, decline to update their current voter registration record, or withdraw from civic engagement activities altogether. Such results undermine Common Cause's mission to expand access and participation, especially among historically marginalized communities. Knowing that their personal data could be weaponized to question their eligibility to vote would chill engagement

App. 31

with the democratic process. This is especially true for voters in marginalized communities who already face systemic barriers and distrust government surveillance. Common Cause expends significant resources conducting on-the-ground voter engagement and assistance efforts seeking to register voters and engage voters in the democratic process.

12) Disclosure of the full Rhode Island voter file would facilitate unsubstantiated voter challenges, a concern especially for vulnerable communities. Improper and flawed mass challenge programs disproportionately target voters without stable housing or traditional addresses. Common Cause actively works to register and protect these very same disenfranchised Rhode Islanders. Mass challenges, often filed in bulk by activists, can overwhelm local election officials, divert resources from voter outreach and education, delay or obstruct legitimate registrations and ballot processing. This undermines the infrastructure that Common Cause and our partners rely upon to ensure smooth, inclusive elections. Diverting resources to address these improper activities weakens our capacity to run voter registration drives, educate voters, and mobilize communities. These sorts of challenges also work to revive historical tactics of voter suppression. Private voter challenges have roots in post-Reconstruction laws used to disenfranchise Black voters. Today, they are increasingly used to target voters of color, Indigenous Peoples, young voters, and those who are unhoused or in transient living situations; all of whom Common Cause prioritizes in our voter registration work and lobbying/advocacy supporting the inclusion of their voting rights. If voters' sensitive data is turned over to the federal government and used to promote mass disenfranchisement, Common Cause will be forced to redirect resources to mitigating the disenfranchisement of existing voters and away from its core activities of registering voters and engaging new voters in the democratic process.

13) Common Cause also runs a nonpartisan Election Protection program in Rhode Island, which provides critical information and assistance to voters around primary and general elections. These include helping voters navigate the vote-by-mail process, encouraging voters to participate, and assisting voters when they experience problems in trying to vote. It is the largest nonpartisan voter protection effort in the state. The success of this program and our ability to effectively identify and respond to issues that hinder voters depend on voters' trust in the election system. When voters fear their personal information could be misused for partisan or punitive reasons, especially under a federal administration known for voter suppression rhetoric and tactics, they may hesitate to accept help from volunteers, avoid reporting issues at the polls, and disengage from the voting process altogether.

14) If Rhode Island discloses the unredacted voter file, this will work to normalize federal overreach into state-run elections, weakening local control and opening the door to future demands for even more intrusive data. It poses a grave threat to voter privacy and public

App. 32

confidence. This threatens the decentralized structure of U.S. elections, which Common Cause defends as a safeguard against authoritarianism.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 8ᵗʰ day of December, 2025, in Providence, Rhode Island.

_____

John Marion

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island, <br><br> Defendant. | Case No. 1:25-cv-00639 <br> (Hon. Mary McElroy) |

**DECLARATION OF CATHERINE W. SAUNDERS**

App. 35

## DECLARATION OF CATHERINE W. SAUNDERS

I, Catherine W. Saunders, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration, and this is what I would testify if called as a witness in Court.
2) I am 58 years old and am otherwise competent to testify.
3) I reside in Providence, Rhode Island with my husband and am registered to vote in Rhode Island.
4) I have been deeply involved in civic engagement issues in Rhode Island for more than two decades.
5) I am Director of the Lippitt House Museum. While I served as Curator of Education for the museum it won the Award of Excellence from the American Association of State and Local History for its Civics Program for Adult English Language Learners.
6) I am the President of the State Advisory Board of Common Cause Rhode Island. I have served on the Common Cause Rhode Island board since 2017.
7) In 2002, I was Director of Operations Vote for America-Rhode Island, a nonpartisan voter education and mobilization project.
8) Since 2020, I have served as a poll worker in Providence, Rhode Island. Prior to that I served as an Election Protection volunteer for Common Cause Rhode Island. I first volunteered for non-partisan get-out-the vote activity in my late teens, and my commitment to non-partisan access to the vote has never wavered. The right to vote is foundational to our democracy. Voting is the right upon which all others are based. Yet it can be challenging, as I have witnessed firsthand in my various roles.
9) I am concerned that the Department of Justice's request for the voter file, including highly-personal information, will be used to make voting harder for Rhode Islanders. I am worried about the manipulation of the lists to conduct amass challenges. I believe that voters already need to overcome a variety of obstacles to exercise their fundamental right.
10) I care both about the privacy of my personal data and about the security of the voting system. I believe that every eligible voter should be able to exercise their right to cast a ballot without worrying that their highly-personal information may be leaked or used for non-voting purposes.
11) I am concerned that this request for voter file information will make people afraid to register to vote and may deter eligible registered voters from voting in elections.
12) I supported Secretary of State Amore's decision to only share the publicly-available portions of Rhode Island's voter list. I believe that Rhode Island should be able to conduct its elections without interference from the federal government.

I declare under penalty of perjury that the foregoing is true and correct.

App. 36

Signed on the 8th day of December, 2025, in Providence, Rhode Island.

Catherine W. Saunders

App. 37

# Exhibit 4

App. 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island,<br><br>Defendant. | Case No. 1:25-cv-00639<br>(Hon. Mary McElroy) |

**DECLARATION OF STUART WALDMAN**

I, Stuart Waldman, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 84 years old and am otherwise competent to testify.

3) I reside in Providence, Rhode Island with my wife.

4) Until recently, I lived in New York City, where I was registered to vote. I moved to Rhode Island in May 2024 to be closer to my son and granddaughter. When I moved, I registered to vote as part of receiving a driver's license. I cast my first ballot here in the 2024 general election.

5) When I learned that the Department of Justice requested voter records from Rhode Island, including with sensitive data, I became concerned about how they might use these lists. I understand that people like me—who have moved from one state to another and were previously registered to vote in their former state—can be caught up in voter purges based

App. 39

on cross-state database matching, especially if done improperly or incorrectly. I would be outraged if I was removed from voter registration simply because I moved to a new state.

6) I care about the privacy of my personal data and am uncomfortable with the thought that my data may be distributed unnecessarily. I have been doxxed online in response to my political activity. My wife has also received a threatening phone call related to her political work. These experiences have made us very careful about our personal information.

7) I believe that we should make the electoral process more welcoming to every eligible voter and make sure that voters are not intimidated from exercising their rights. I also believe that eligible voters should not be removed from registration lists.

8) I believe strongly that voting is the foundation of democracy and helps shape the direction of the country. It is critically important to me that I vote in every election. I think of my granddaughter when I vote, and feel like I am voting for the country that she will live in.

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 8th, 2025, in Providence, Rhode Island.

Stuart Waldman

App. 40

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island, <br><br> Defendant. | Case No. 1:25-cv-00639 <br> (Hon. Mary McElroy) |

**DECLARATION OF JULIA SANCHES**

I, Julia Sanches, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 37 years old and am otherwise competent to testify.

3) I reside in Providence, Rhode Island with my partner.

4) I work as a translator of Spanish, Portuguese, and Catalan literature into English.

5) I am originally from Sao Paulo, Brazil. I came to the United States in March 1988 when I was three months old. I left the United States to live in Mexico when I was eight years old, and over the next seventeen years, lived in Mexico, Switzerland, Scotland, Spain, and the United States for various lengths of time. I returned to the United States permanently when I was twenty-five to work in publishing.

6) I can definitively say that I decided to become a naturalized citizen to be able to vote. I believe in the democratic process and civic engagement. My parents came of age during the military dictatorship in Brazil and left prior to the democratization process. As a result,

App. 42

they were not able to vote for most of their lives.  Like them, I have also spent most of my life living in places where I could not participate in civic life due to my lack of citizenship.

7) I became naturalized in July 2020, specifically to be able to vote in the 2020 election.  I was very enthusiastic to become a citizen.  My first vote was the 2020 election, and I remember feeling excited as I cast it.

8) I am concerned that the current Presidential administration will try to suppress votes.  I understand that they have publicly floated the idea of de-naturalizing citizens.  I want to exercise my rights as a citizen, but I am worried that some in power do not share my views on the rights of naturalized citizens.

9) When I learned that the Department of Justice requested voter records from Rhode Island, including with sensitive data, I became concerned about how they might use these lists.  I believe that recently-naturalized citizens like me may be more vulnerable than other groups of voters to false allegations about illegal voting.

10) I care about the privacy of my personal data and about the integrity of the electoral system.  I believe that we should make the electoral process more welcoming to every eligible voter and make sure that voters are not intimidated from exercising their rights.  I also believe that eligible voters should not be removed from registration lists.

11) I feel strongly that modern U.S. is built on immigrants, who deserve to feel like a part of the country.  Naturalized citizens are people who have chosen to live here and people for whom the right to cast a ballot here is particularly important.  They typically have more faith in the American system than many American-born citizens.  They deserve a chance to participate in civic life through voting.

App. 43

I declare under penalty of perjury that the foregoing is true and correct.


Executed December 8th, 2025, in Providence, Rhode Island.

Julia Sanches

App. 44

# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I. PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II. AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department"). The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

App. 46

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq*.

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.  PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states.  The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law.  In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact   of the issues to assist your state with curing.

2

App. 47

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.   TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.   TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.   METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

3

App. 48

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.     LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

App. 49

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.  NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.  CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

5

App. 50

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

6

App. 51

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

### X.   LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

### XI.   DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed.  When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);

2. Archive and store electronic data containing confidential information offline in a secure location; and

App. 52

3. All other data will be erased or maintained in a secured area.

**XII.    OTHER PROVISIONS.**

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

App. 53

by the parties as "confidential."  Any disclosures therefore could be made, if at all,

pursuant to applicable laws or court orders requiring such disclosures.


**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____


Requester
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

App. 54

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cv-09149-DOC-ADSx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SHIRLEY WEBER, ET AL, | ) | Thursday, December 4, 2025 |
| | ) | ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) | (12:01 p.m. to 12:58 p.m.) |
| | ) | ( 2:00 p.m. to  2:31 p.m.) |
| | | ( 2:31 p.m. to  2:33 p.m.) |

HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**                    SEE PAGE 2

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Karlen Dubon

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

App. 56

2

**APPEARANCES:**


For Plaintiff:                ERIC V. NEFF, ESQ.
                              U.S. Department of Justice
                              150 M St. NE, Suite 8-139
                              Washington, DC 20002
                              202-532-3628


For Intervenors:              GRAYCE S.P. ZELPHIN, ESQ.
                              American Civil Liberties
                              Union of Northern California
                              39 Drumm Street
                              San Francisco, CA 94111
                              530-515-8978


                              CHRISTOPHER D. DODGE, ESQ.
                              Elias Law Group
                              250 Massachusetts Ave. NW
                              Suite 400
                              Washington, DC 20001
                              202-987-4928


For Robert Page:              SUZANNE E. SHOAI, ESQ.
                              Orange County Counsel
                              P.O. Box 1379
                              Santa Ana, CA 92702
                              714-834-3300


For Defendants:               MALCOLM A. BRUDIGAM, ESQ.
                              Office of the Attorney General
                              1300 I Street
                              Suite 125
                              Sacramento, CA 95814
                              916-210-7873


                              ROBERT W. SETRAKIAN, ESQ.
                              California Department of Justice
                              300 S. Spring Street
                              Suite 1702
                              Los Angeles, CA 90013
                              213-269-6668

App. 57

3

**Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.**

(Call to Order)

THE COURT:  -- Shirley Weber.

(Pause)

THE COURT:  And, counsel, as you're seated, let me take one more matter.  Just remain seated for a moment.

(Pause)

THE COURT:  All right.  Thank you then.  I think that resolves the rest of the morning calendar.  So first of all, good morning.

MR. NEFF:  Good morning, Your Honor.

THE COURT:  This is the matter of United States v. Shirley Weber.  It's case number 25-09149.  And, counsel, you can just remain seated.  You can pretend it's state court if you want to, but make your appearances.

MR. NEFF:  Eric Neff on behalf of the United States. Good morning, Your Honor.

THE COURT:  Thank you.

MR. BRUDIGAM:  Deputy Attorney General Malcolm Brudigam on behalf of defendants Secretary of State Shirley Weber and the State of California.

THE COURT:  Okay, thank you very much.

MR. SETRAKIAN:  Deputy Attorney General Will Setrakian on behalf of defendants State of California and California Secretary of State Shirley Weber.

App. 58

Case 6:25-cv-00639-MSM-PAS Document 252 Filed 01/13/26 Page 5 of 34 PageID #: 307

4

THE COURT:  Thank you very much.  I appreciate it.

MR. DODGE:  Chris Dodge on behalf of Intervenors NAACP and Siren.

MS. ZELPHIN:  Grace Zelphin on behalf of Intervenors League of Women Voters of California.

THE COURT:  Is anybody here representing what I call the County case?

MS. SHOAI:  Good morning, Your Honor.

THE COURT:  Come on up.  What we're doing here may be of interest to you.  So we want your appearance.

MS. SHOAI:  Thank you, Your Honor.  Deputy County Counsel --

THE COURT:  No, no, wait, wait till we get a good recording of you.

MS. SHOAI:  Good morning, Your Honor.  Deputy County Counsel Suzanne Schoai on behalf of --

THE COURT:  I see.  Why don't you have a seat?  Do you have any other colleague with you today?

MS. SHOAI:  No, Your Honor.

THE COURT:  All right.  So first, I'd like to address plaintiff's motion for order to produce records pursuant to 52 U.S.C. 20701 that was filed on Monday, set for hearing today.  I appreciate the speed, but not at the expense of due process.  And although I've encouraged us to move forward as quickly as possible concerning the substantive issues, this is

EXCEPTIONAL REPORTING SERVICES, INC

App. 59

5

not the due process because there needs to be at least 28 days' notice before a date for hearing under CD California Rule 6-1.

The plaintiff is seeking to reach the ultimate question in this case regarding the production of records and thousands of voters' lives will be impacted by this case.  And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied.

Now, you can once again follow the process and procedure in terms of due process.  We'll have time potentially, but this doesn't supply the due process needed.

Second, I'd like to hear arguments if there are any on two motions regarding amicus briefs.  First, there was a motion for leave to file an amicus brief brought by 16 states. Those states are Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

The second request was to file an amicus brief and it was filed by the former secretaries of state and the proposed amicus briefs are allegedly from a bipartisan group of state secretaries for the states of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

Does any party have a statement to make regarding these amici briefs and any wisdom on your part that if I allow

App. 60

these amici briefs, whether I should then extend for some period of time the opportunity for additional briefs from interested parties, because these are the parties that have directly contacted the Court, but there may be other parties that piecemeal choose to come in, and then I'm deciding that on an almost ex-parte basis, case by case as they come to me, unless you're flying out here for every single hearing for every requested amici brief.

So I was thinking if I was going to allow these, that I should throw this open for 7 days or 14 days for the amici briefs to come in during the period of argument and try to sort through whatever the Court's opinion would be and give you that courtesy and simply extend it.  But I'm looking for your wisdom on that because you can anticipate if I'm getting these amici requests now, I promise you, as soon as you leave the courtroom, there's going to be another request.  And I don't want to do that ex parte without your wisdom on both parties' parts.

So let's start with the first group.  This motion for leave to file an amici brief by 16 states, and one of my concerns was whether this would become a bipartisan effort, for instance, of Democrats and Republicans using the Court in a sense, in a political sense, not necessarily a substantive sense.  But I noticed there are what I consider some swing states, New Mexico certainly was during the last election,

71

those records to make sure we are doing our duty as the federal

government to make sure that these federal elections remain

free and fair.

And counsel simply has to rely on both

misrepresentations of the law and our position, stating our --

for example, that our whole case relies on Lynd.  No.  This

action relies on the Civil Rights Act of 1960 and its very

clear text, which is the one thing they don't want to talk

about because it's very clear.

Privacy concerns are first not a proper concern for

this motion to dismiss but even if they were, they're

unfounded.  Privacy -- the United States is going to comply

with all federal laws.  That includes the Federal Privacy Act.

The DOJ Civil Rights Division itself has a stated policy

available on a website as to how we will comply with the

Federal Privacy Act and have before.

THE COURT:  Explain that to me.

MR. NEFF:  Yes, sure.

So we publish a series of regulations.  They're

called the SORNs that show how we tend to the data and make

sure everything is properly protected under, not just Federal

Privacy Act, but other obvious concerns when you're dealing

with large databases.

THE COURT:  Is that part of my record?

MR. NEFF:  Yes.

EXCEPTIONAL REPORTING SERVICES, INC

App. 62

72

**THE COURT:** And what would I look at that? What exhibit?

**MR. NEFF:** At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis. We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

**THE COURT:** What states are those that have shared either their DMV registrations or the social security numbers of voters?

**MR. NEFF:** Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

**THE COURT:** That's okay.

**MR. NEFF:** I'll also state the biggest one is -- so we also have an MOU that we produce at the state request. Some states request it, some don't. Some say, yes, you're entitled to this data, here you go. And we have a whole data-sharing setup ready. It's essentially the Box program, plus some

73

federal proprietary encryption technology to make sure that this is as secure as it needs to be. And we -- so Texas just told us today they're going to enter in the MOU and share us the data in the next few days. We believe many more states are going to follow just in the next few days but so we have four states that have already sent us the data. No questions asked. Probably another dozen or so states in the next week or so that are just going to sign the MOU and share with us. This really shouldn't be controversial. It's clearly stated as part of our duty under HAVA and the Civil Rights Act is clear that this is the mechanism in which we do it.

**THE COURT:** Do you think that those states with attorney generals complying with your request would be interested in filing an amicus just as other states who may be opposed to your request are filing amicus? In other words, what I want to do is make certain if we have states coming late to the table but in compliance that we're looking at the reasoning by all of the atty generals in the respective states.

And what I was worried about before, frankly, is if I had red and blue states lining up when I started to look at the amicus, I was particularly interested in the states bringing that to me.

Now, I don't know how you define what I call -- well those states that have voted for different -- in different elections in different ways. Arizona, New Mexico, Michigan,

74

Minnesota, seem to be what I call those states that traditionally doesn't go Democrat or Republican.

And then I looked down at the state secretaries for the states and if you notice, there are three states out of there on the amicus. Connecticut is in for the first time. They are not part of the amicus for the 16 states that we initially named but these are the state secretaries for the states of and Connecticut is an addition, Nebraska is an addition, Pennsylvania -- which has certainly been a swing state.

So I was a little worried and that's why I sought your wisdom about whether you all were going to stipulate to me accepting this because I didn't know the weight if I was just dealing with a party disagreement. And I'm not saying that these swing states necessarily carry greater or less weight but I want to be alert that if this is a partisan effort. And certainly the country is divided so ...

**MR. NEFF:** I would be --

**THE COURT:** ... so I've got a stipulation that I'm accepting all of these amicus briefs. I just want to pay you the courtesy if other states are coming onboard, like Texas, et cetera, that we give them a chance for those attorney generals to get this to us but by the same token, I'm going to be writing over the next couple weeks.

Is two weeks enough time for you?

**EXCEPTIONAL REPORTING SERVICES, INC**

App. 65

MR. NEFF: We can inform the states that --

THE COURT: Okay.

MR. NEFF: -- a judge has invited them to file amicus but --

THE COURT: Will you do so? In other words, for both parties. Get it out to all the states that you can and I'll docket this, et cetera. And there may even be disagreements between different courts examining this matter and different circuits.

MR. NEFF: I think the bigger picture is that the states that are complying are likely not going to see this as something that they need to delve issue.

THE COURT: But I just want to pay you the courtesy in terms of due process. Okay.

MR. NEFF: Yes. And I would say that's because this really shouldn't be a political issue. One side can make it a political issue if they want to just simply in a single position declare it that but it doesn't change the fact that the Civil Rights Act of 1960, the text is quite clear and that no one is in favor of faulty voter rolls.

THE COURT: We've also had for both parties we've had a series of state rights issues in the federal court for years. And different states have taken a perspective on what the states' rights issues are. Some are much more state-right oriented, others aren't. That's why I was interested in the

76

division.  But since you've all stipulated, I'm accepting this amicus at the present time.  I just want to make sure you've got the courtesy on both sides of any other parties coming onboard so if we need an extra week we can take it, okay?

Okay.  Won't you continue.  I'm sorry.

**MR. NEFF:**  Thank you, Your Honor.

The -- would emphasize that this data is necessary for the United States to conduct its HAVA operation -- its HAVA enforcement compliance and that is why that data is specifically cited in the statute.  It simply couldn't be clearer that it needs to be the last four digits of a social security number or the driver's license; otherwise, we are not able to make a verified finding as to the various voter roll registrations that might have problems.  In fact, we sometimes even have to follow up after that data is run.  It's rare but there's a reason that was put in the statute because it's something like we can verify it from what I've talked to our database analysts something like 99.999 percent of the time.  That's enough for us to be able to know if it's an actual person that lives in that location and is who the voter registration role says it is.

**(Pause)**

Again, with the caveat that we do not need to ever -- that we do not need to get to this.  This is essentially an OSC where we only need to state our purpose and then we are

App. 67

entitled to the records. Also under a prompt order, according to caselaw, a prompt order that this is essentially an OSC hearing.

The facts of California itself are particularly worrisome. Maybe the most worrisome state in the union.

The state is required to provide various data to the Election Assistance Commission which is a nonpartisan commission. The state -- the agency created by HAVA in order to try and keep this as neutral as possible and California doesn't provide the complete data. Their data doesn't have Los Angeles County in it. It's one-fourth the state's population. That on its own should cause concern countrywide that they've not submitted that data. It would be irresponsible of the United States to not come in at this point and say we need to see your data to ensure fair and free elections.

All of the harms that opposing counsel have pointed to are based on speculation, logical leaps and there is no concrete evidence they can point to.

That being said, with the overarching point that this is before the Court right now as essentially an order for an order to show cause, dressed up as a complaint, and that you have a dismissal that is essentially fighting that order to show cause, dressed up as a motion to dismiss, I believe the Court should act within what would be its lawful authority to issue a prompt order that California needs to turn those

records over to us that we are entitled to.

THE COURT: How do you deal with the state provisions concerning the DMV? In other words, the state is arguing to the Court that that has a -- for want of a better word -- a special category that is not subject to the Voting Rights Act of 1960 or HAVA, and that they have a privacy interest in a sense as well. What does the Court do with that?

MR. NEFF: Any state privacy interest would be trumped by federal law. It would be trumped by both the Federal Privacy Act, which we're complying with. It would be trumped by HAVA, which is a -- I repeat -- a federal minimum standards law for state compliance that specifically mentions driver's license number or last four digits of social.

The state is required to produce and provide this data under the statute. If they have some issue with the driver's license; hypothetically, if a state just said we have some real concerns about our driver's license, they comply with the statute if they provide the last four of the social security number.

Does the Court have other questions or concerns?

THE COURT: Just one moment. Let me look at a note that I made.

(Pause)

The state represents that they have offered -- and I think both in the Orange County case with the registrar -- and

79

it's represented today in the statewide case -- the names and addresses.  Has that offer in fact been made?

MR. NEFF:  Has that offer --

THE COURT:  Yes.  To you.

MR. NEFF:  Oh --

THE COURT:  Not to you but to the government, the DOJ.

MR. NEFF:  California has taken the unique in the nation position that they are -- that they -- we are permitted to come and inspect it in their offices, that data; which, (a), is not sufficient; (b), we argue is not an appropriate way of providing it in today's day and age where it's actually more secure to share this data electronically through our shared file-sharing --

THE COURT:  Kind of slow-walking you.  Kind of slow walking.

MR. NEFF:  I think --

THE COURT:  For want of a better term.

MR. NEFF:  That is the United States' interpretation of it but --

THE COURT:  How about the voter participation and the registration methods?  Have those been offered to you?  In other words, that's been argued to me but behind the scenes I don't have that record right now.  Has that been offered to you?

App. 70

80

**MR. NEFF:** It is in the back-and-forth is in the letters attached as exhibits in the filings, Your Honor; however, the United States' position is that the responses have been woefully inadequate.

**THE COURT:** Okay. So we've never gotten down to really how that information would be exchanged. It's flowing back and forth in terms of representations but as a practical matter there's a big difference between a representation and conveying the information to you.

**MR. NEFF:** Well actually in our letters we did lay out to opposing counsel our file-sharing program, how it works, that it is secure and we invite them to -- assuming they have a change of heart, to use it.

**THE COURT:** About the registration status and the contact information, has that been offered to you?

**MR. NEFF:** That, I'm not sure about. I'm not sure what the scope of their offer is.

**THE COURT:** Okay.

**MR. NEFF:** I just know that it does not include the -- for sure, does not include the driver's license number or the last four of the social as required by the HAVA statute. And in other states as well, that has always been the crux of the dispute.

**THE COURT:** In their opening arguments they'd argued that in the Benson case out of the Sixth Circuit, Bellows out

App. 71

81

of the First and <u>Long</u> case out of the Fourth, that there's an inconsistent and uniformed position taken by the government. How do you respond to that?

**MR. NEFF:** That the -- there is no inconsistency in position.

**THE COURT:** Explain that to me.

**MR. NEFF:** What there is is difference in posture of those cases. It is a true statement to say that the United States, as an agency, has yet to go to states to enforce the minimum standards of the HAVA statute. One can argue whether that was a wise or unwise decision but here we are 23 years later and the federal government has yet to do it. It is still, for certain, good law. The United States believes it is a law that should be enforced and complied with. Therefore, because of that history where this hasn't been done before, all of those cases relate to private parties trying to in some way get in.

The DOJ's position is that private parties do not have a right of action under HAVA and therefore they should not be allowed to go to states and say, I would like your driver's license or social security number. However, there are states around the country, including ones that are fighting us, that interestingly, have been willing to turn over that data to a private organization without the same protections as the United States. That's been cited in our briefing, the ERIC

App. 72

82

Organization.

So what I would say is all those cases are inapplicable. It often requires selectively quoting them to make it sound like in some way the United States government is not entitled to it. No, the United States government is uniquely mentioned in both the CRA and HAVA. And therefore just because this is the first time the United States is coming in and doing it, doesn't mean that it's not clearly what the statute states.

THE COURT: For both parties, you mentioned that California is one of the main outliers, for want of a better word, from the DOJ and the executive branch's position. Is it the position of the executive branch that there need not be any stated purpose that there's an absolute right to obtain this information per statute?

MR. NEFF: Statute requires we state a purpose. A purpose.

THE COURT: And what is the purpose here?

MR. NEFF: The purpose is for, as stated in our letters to them, for voter roll maintenance enforcement and compliance.

THE COURT: And we stated in Orange County with a limited county case involving Page. There, there were -- and I keep 13 or 17 but 17, I believe, allegations. The most notorious became the dog that voted twice.

83

Is that, out of 1.2 million voters, what's the basis, for instance, of that kind of request because of course we're always going to have error, including people who legitimately die. So what's the threshold that this stated purpose has? How should I interpret that?

MR. NEFF: Under the CRA there is no threshold.

THE COURT: Okay. Now, do you need to -- and thank you. Do you need to make any calls? You're all by yourself, you're doing -- there's nobody to consult with but do you need to make any calls? Are you satisfied with your argument?

MR. NEFF: I appreciate the offer, Your Honor, but no, we're satisfied.

THE COURT: Okay. There'll be a second round.

MR. NEFF: Yes.

THE COURT: So counsel, however you'd like to proceed then. One of you has another obligation, I don't care which order. You can take the intervenors first or the parties.

(Pause)

MR. BRUDIGAM: So there was a lot going on there, Your Honor, and so I'm going to try to be thorough in making sure I cover all of those points.

So I think the first thing I want to talk about is this notion that the complaint is just an order to show cause. And essentially what the federal government wants to do is take the Court and sideline them in this dispute and say that the

App. 74

84

Court has no room for any judicial review here. And that's just not supported by the text of the statute.

There's nothing in the Civil Rights Act that creates a special statutory procedure. The words "order to show cause" are not in the statute at all and I'll just read you the text right here.

It says that:

"The appropriate district court shall have jurisdiction by appropriate process to compel the production of such record or paper."

That's what it says, "By appropriate process." And so that's up to the Court to decide what the appropriate process is here.

And I'd also just point Your Honor to the fact that the Federal Rules of Civil Procedure contemplate what rules apply when you have a government investigative demand. I mean Federal Rule of Civil Procedure 81(a)(5) specifically says:

"The Federal Rules of Civil Procedure apply to proceedings governing demands for records by the U.S. government."

And so this idea that some other procedure applies, it's not supported by the text, it's not supported by the Federal Rules of Civil Procedure. The only thing that supports this purported procedure are these early 1960s' cases and like we've said, the federal government, they pin their hopes on

App. 75

85

this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's the one they're referring to which says that the Court shouldn't have any role here.

But that case is obviously nonbinding on Your Honor and it's really been overruled.  I would point you to the <u>United States v. Powell</u> case.

THE COURT:  I'm sorry, what -- just a moment.

MR. BRUDIGAM:  Sure.

THE COURT:  All right.  Please continue.  I've got my note.

MR. BRUDIGAM:  So the Supreme Court in United States v. Powell found that the Federal Rules of Civil Procedure, they apply to a proceeding like this.  And in that case it involved an IRS document request statute which used the very same language that we have here which is that the Court shall, by appropriate process, compel relief under that statute.  So even if Your Honor found Kennedy v. Lynd persuasive, it's obviously unbinding, that's been overruled.  So just to be clear, the Federal Rules of Civil Procedure govern this action.

THE COURT:  Well, you've cited on both parties' parts, different enactments by council, statutory provisions. I think we can all agree that we want qualified voters to vote without any chilling effect.

MR. BRUDIGAM:  I agree.

THE COURT:  Is there -- well I think we can all

86

stipulate to that.

MR. BRUDIGAM: We can.

THE COURT: And I'll use the word "qualified voters".

Is there a chilling effect in the request by the government and if so, what is that chilling effect? How would there allegedly be persons who may believe that the government has no business in the sense of getting more information.

MR. BRUDIGAM: Sure I mean I think --

THE COURT: And behind this the concern of this court eventually, besides the statutory following the law, is going to be the impact of what we write and do. And this case will probably be the first case that comes out that other circuits look at. So with that noble goal in mind of having voter participation, is there a chilling effect or not?

MR. BRUDIGAM: I think there's absolutely a chilling effect here because --

THE COURT: And I need you to define that for me.

MR. BRUDIGAM: Sure.

THE COURT: And it may not be relevant to the opinion but behind all of this, we need voters who are qualified to be able to vote.

MR. BRUDIGAM: Right.

THE COURT: Now the ease of that could be differences between different administrations and whether you have different methodologies. And I know there's a huge controversy

App. 77

87

about mail-in ballots and voter registration and drive-in, et cetera, but when we're finally done with this, we want qualified voters to vote. And if there's a chilling effect, or this privacy right that we've somewhat skipped over, I want to hear how you define that.

**MR. BRUDIGAM:** Sure. Your Honor, I think this action should make the stomach of every American turn, knowing that this executive branch is going in, state by state, collecting and vacuuming up everybody's voter registration information. It is on a scale that we have never seen before. Okay.

And what this is going to do --

**THE COURT:** It is their disparity argument. In other words, remember when I started this conversation early on, and I discussed the amicus briefs, I was particularly interested if I was getting just red and blue states. That's why I was looking to see if there were these swing states.

**MR. BRUDIGAM:** I mean I point Your Honor to --

**THE COURT:** Or is this a argument also that a particular group of states are being examined versus other states? Because here, the government has represented while California from their perception might be an outlier, they've also made inquiries of the let's say more, from their standpoint, compliant states like Kansas and -- I forget which one -- just a moment -- Indiana, and that Texas was coming onboard.

App. 78

88

**MR. BRUDIGAM:** Yeah. Well, what I would say is I mean those aren't states that are complying, they're voluntarily giving that information to the federal government.

**THE COURT:** But regardless, the government has made an inquiry so if there's an argument that the government is reaching out and being selective, if the state is voluntarily complying that doesn't seem to me to be singling out progressive states. And if you think that, then I need to hear that and hear your reasoning behind that.

**MR. BRUDIGAM:** I'm not saying they're singling out states.

**THE COURT:** Okay. Then we can pass that.

**MR. BRUDIGAM:** They're going after every state and California is by no means --

**THE COURT:** So I'm not going to have a disparity argument.

**MR. BRUDIGAM:** Right, right. I just mean in terms of the position the secretary has taken, I mean the reason they had to sue 14 different states is because nobody wants to turn this data over. The representations that Counsel just gave today, that's the first that I've heard of any state turning over that information. So we are by no means an outlier in taking this position.

**THE COURT:** Wait just a moment. For the government or DOJ, how do we validate Kansas and Indiana? What validation

App. 79

89

do I have about that?

MR. NEFF: I was actually looking that up right now, Your Honor, because --

THE COURT: Well go ahead and look it up. You've got lots of time.

MR. NEFF: And I --

THE COURT: By the way, I'm not holding you to it. I know it's in good faith but I'd like to hear what states that we have validation for turning this document over. And there may be numerous states.

MR. NEFF: It's a good-faith representation here. I am kind of a point --

THE COURT: Okay. Well now take away the good faith. I accept that. Okay, I'm asking for proof now.

MR. NEFF: Okay. Wyoming, Kansas, Indiana and Arkansas all complied voluntarily.

THE COURT: Okay. Just a moment.

MR. NEFF: Texas --

THE COURT: Kansas, Indiana, Wyoming and Arkansas ...

MR. NEFF: ... have already complied ...

THE COURT: ... voluntarily.

MR. NEFF: ... voluntarily.

THE COURT: Okay. Texas?

MR. NEFF: Texas, Virginia, Utah, Tennessee, South Dakota --

App. 80

THE COURT:  Just a moment.

MR. NEFF:  Oh it's gonna go long, yeah.  South Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama, all fall into the list of they have expressed with us a willingness to comply based on the represented MOU that we have sent them.  And so we expect full --

THE COURT:  Now apparently Nebraska can't make up its mind because of the proposed amici briefed to the Court, they have the former state secretaries of state for Colorado, Connecticut, Minnesota and guess what?  Nebraska.

MR. NEFF:  Well those are former.  And furthermore, just because some states are representing certain things in court, there are still discussions going on now that this MOU we have is fully blessed.  There are the -- I don't think it's safe at this point to go beyond those states but --

THE COURT:  Then that's fine.

MR. NEFF:  -- that's a fair representation of the state of discussions as of today.

THE COURT:  And Counsel, back to you.

MR. BRUDIGAM:  Sure.  And yeah, so all I heard there was we've heard a willingness.  It doesn't sound like those states have actually turned over any data, just to be clear.

So I want to talk a little bit about --

THE COURT:  No, I think he said that four states have actually.  Kansas --

91

MR. BRUDIGAM: Four states have actually turned over but the broader list --

THE COURT: -- Indiana, Wyoming and Arkansas.

MR. BRUDIGAM: Right.

THE COURT: The others were a purported willingness.

MR. BRUDIGAM: Right.

So Your Honor, the federal government is really leaning hard into the text of these statutes and they say that we don't want to talk about the text but that's just absolutely not true. And I want to just start with the Civil Rights Act of 1960.

There is a very clear statutory limitation in that provision and it's in Section 20703. And it says that the attorney general's demand shall contain a statement of the basis and the purpose therefore. DOJ has not satisfied this requirement and so their demand is invalid plainly under the statutory text.

THE COURT: So the plain representation by the government is too broad; and that is, they want to stop voter fraud.

MR. BRUDIGAM: Well, so they've mentioned a couple of things. It keeps changing so I want to unpack this a little bit.

So they said that the purpose is free and fair elections, clean voter rolls. Then he said up here that it's

for enforcing HAVA. So these are multiple different bases. And also it's different than the -- or than the purpose that was originally articulated in the letters to the secretary.

The original request said that it was -- they were seeking it for NVRA voter list -- list maintenance compliance. So the reason and rationale keeps shifting and changing. And that's a problem, not just because it's suspicious, it's a problem because, again, the text says, "The demand shall contain a statement of the basis and the purpose therefore. The text use of the article." 'The,' twice, in front of the basis and the purpose indicates that there is only one basis and one purpose.

And the federal government has explicitly rejected this plain text reading. They said it up here that they just need to give you any old basis and then the demand is good.

THE COURT: That's my question also to both of you; and that is, does the executive branch need to state a purpose? Your argument is that they do.

MR. BRUDIGAM: They do.

THE COURT: Counsel for DOJ puts that in broad terms.

MR. BRUDIGAM: Right. Well but again, it's not just a purpose, it's -- or not just the purpose, it's also the basis.

THE COURT: Okay.

MR. BRUDIGAM: And they have not alleged any basis

93

anywhere in their action.

Now, I also want to talk about -- and just -- you know this -- I'm sorry. I want to talk a little bit more about HAVA, which is the law that apparently now that's the main method of enforcement we're now learning today, that that's what they want to enforce and they specifically reference the requirement under HAVA that states collect social security numbers and driver's license numbers. Well let's look to the text of HAVA. What does it say?

"The state shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph in accordance with state law."

And that is -- when it says "this subparagraph," it's referring directly to the requirement that states collect that information when processing voter registration applications. So there is nothing for the federal government to enforce here. This is solely the state's domain.

And as I said in my original motion, another provision of HAVA explicitly delegates discretion of implementation of HAVA to the states. So again, we're not afraid of the text in this case, we think it strongly supports our position. And so I also want to talk about what this data could be used for.

So we've heard a lot of different reasons. I just

App. 84

94

explained why it's not relevant for HAVA.  I want to also talk about why it's not relevant for List Maintenance under the NVRA.

So the legal standard under the NVRA requires states to conduct a general program that makes a reasonable effort.  So the Sixth Circuit held this year in that <u>Benson</u> case that this just means a serious attempt, a rational, sensible approach.  It need not be perfect or optimal.  And so under this standard, getting line-by-line voter information of their social security numbers and driver's license numbers, that's entirely unrelated to whether a general program exists or whether the state is making a reasonable effort.  And so, again, at every turn, the supposed reason why they need this information, it just doesn't add up.

And then finally, I want to talk about they claimed, as they did in their brief, that California has, quote, "the most worrisome voter registration data in the nation."  That's just absolutely wrong, okay?  That's an assertion in a brief without any support.

And they also incorrectly say that in submitting data to the Election Administration Commission in response to the EACs survey, this is an election administration survey, they said the LA County didn't submit any data.  That's not true.  That's simply not true.  You can go to the survey and look at the data that LA submitted and you can look at our explanation

95

to DOJ in our letters in advance (inaudible) litigation explaining the questions they had about that survey. So to the extent that they want to rely on EACs as some after-the-fact rationalization for this demand, it just doesn't make sense. It doesn't add up.

So those are the main --

**THE COURT:** Were there inconsistent or consistent offers if you're aware of the Page case, as well as this case. In other words, when this started in Orange County, originally counsel was here, there's a representation about the registrar there making the same or similar representations about what they were willing to share with DOJ but I've never compared the two. And I don't know what the state's position is because DOJ's argument might be, we're getting inconsistent data. In other words, even when we're sharing, with the different entities promising that they'll share some amount of this data, the different counties are supplying this in different ways.

**MR. BRUDIGAM:** Sure. So I won't speak too much about that case but I would say that case is different and there isn't a problem of inconsistent data sharing because in the state case, they're saying, give us the whole list. We want every voter.

In Orange County, they said, we want a list of just the individuals that have been removed from your list because of non-citizenship, people who renounced or for whatever

App. 86

96

reason.

THE COURT: So this is much broader from your perspective in terms of protection, privacy, HAVA.

MR. BRUDIGAM: Yeah. It's not an issue of can they be reconciled.

So I do want to just back up again and just zoom out on the big picture here in this case.

You know, as we talked about -- my colleague talked about, in his motion, that the states really have the primary role in administering elections and the voter registration process. The Constitution makes that quite clear in the elections clause. And it makes sense to prioritize the state in this process because they're the ones that are closer to the voters, more accountable to the voters. And so this is an arrangement that it depends on the principle of subsidiarity where a decision should be made at the local level. And here, we don't -- there's no place for the federal government to come in and start demanding these records under that constitutional framework.

And not only are the states the default entity running elections but it's only Congress that can make or alter those rules. Here, we have the executive branch in court trying to get this information. The Constitution says nothing about the executive branch having any role in federal elections.

97

And I would just say that this is not a unique position by this administration. The president has been meddling in state election law since he came into office. And I would point Your Honor to a case in the District of Massachusetts, California v. Trump, where the executive was doing something sort of similar where they were going in under the guise of federal law and trying the change the way states administer and conduct elections and that was pursuant to an executive order the president issued. And so here, we're having another situation where the federal government is coming in under the guise of inapplicable federal laws and trying to interfere with the state's role in elections. And so I'd just say against that backdrop, it's important to keep that in mind; but even if, you know, considering all that, if you'd just go back to the text of these statutes, the federal government is not entitled to this information under those laws.

And so at this point I want to turn it over to my colleague, Will Setrakian, to just provide some rebuttal on the federal privacy laws issue.

**THE COURT:** Thank you. And once again, would you state your name because we're on CourtSmart.

**MR. SETRAKIAN:** Good afternoon, Your Honor. Will Setrakian for defendants, The State of California and California Secretary of State Shirley Weber. Just four quick points on the federal privacy statute.

Case 1:25-cv-00639-MSM-PAS Document 52-1 Filed 02/26/26 Page 1 of 20 PageID #: 612

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

COALITION FOR OPEN DEMOCRACY,
*et al.*,

    *Plaintiffs*,

    v.

DAVID M. SCANLAN, in his official capacity
as New Hampshire Secretary of State, *et al.*,

    *Defendants*.

Case No. 1:24-cv-00312-SE-TSM

**<u>PROTECTIVE ORDER</u>**

Pursuant to Federal Rule of Civil Procedure 26(c), plaintiffs, Coalition for Open Democracy ("Open Democracy"), League of Women Voters of New Hampshire ("LWV-NH"), and The Forward Foundation (together the "Organizational Plaintiffs"), and McKenzie Nykamp Taylor, December Rust, Miles Borne, by his next friend Steven Borne, Alexander Muirhead and Lila Muirhead, by their next friend Russell Muirhead, (together the "Individual Plaintiffs" and collectively the "Plaintiffs"), and defendants, David M. Scanlan, in his official capacity as Secretary of State of the State of New Hampshire, and John Formella, in his official capacity as the New Hampshire Attorney General (each a "Party"; collectively the "Parties"), hereby stipulate to and the court hereby enters this Protective Order (the "Protective Order"), which shall govern the handling of documents, electronically stored information, depositions, testimony, pleadings, exhibits, and all other information exchanged by the Parties in this action, or provided by or obtained from non-parties in this action. Unless modified by court order, the Protective Order shall remain in effect through the conclusion of this litigation.

    1.    <u>Purpose</u>. This Protective Order is the product of negotiations between the parties

App. 90

to balance the plaintiffs' interests in obtaining discoverable information, New Hampshire law's prohibition against production of New Hampshire's Statewide Voter Registration Database ("Database"), and the parties' mutual need for prompt resolution to discovery disputes. The Court has ordered the production of the Database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation. *See* May 20, 2025, Endorsed Order (the "Order"); *see also* Mot. to Compel, ECF No. 60; ECF No. 75 at 12. The parties reserve their rights with respect to the demand for and the production of the Database and the information maintained therein, as described in para. 2 below.

2.  Preservation of Rights With Respect to Database Information. The Court granted the plaintiffs' Motion to Compel production of the Database over the defendants' objections, including the defendants' objection to plaintiffs' standing. The parties request this Protective Order to ensure that sufficient safeguards are in place for compelled transfer of the Database or negotiated transfer of the information maintained therein, and to facilitate either transfer. The defendants preserve their objections to disclosure of the Database and the information maintained therein, and reserve their rights to appeal that Order, or to object to any disclosure or use of the Database or its information beyond the scope of the plaintiffs' Motion to Compel or this Court's Order. The plaintiffs neither stipulate nor agree that the defendants are entitled to any such reservation of rights. By requesting this Protective Order, the defendants do not waive their rights to raise RSA 654:45's prohibition against disclosure of the Database or the information maintained therein, in any future litigation brought in state or federal court, whether through discovery or otherwise.

3.  Schedule A. Schedule A to this Protective Order, attached hereto and incorporated herein by reference, is an integral part of this Order. All terms, conditions, and provisions set forth

App. 91

in Schedule A shall have the same force and effect as if fully set forth within the body of this Order and shall be enforceable accordingly.

      4.      <u>Definitions</u>.  As used in this Protective Order:

      A.      "Discovery and Trial Material" shall mean all documents, testimony, transcripts, pleadings, exhibits and all other material or information subject to discovery in this action, including initial disclosures, responses to requests for production of documents, answers to interrogatories, responses to requests for admissions, deposition testimony, expert testimony and reports, and all other discovery taken in this action, as well as testimony adduced at trial, trial exhibits, matters in evidence and any other information used or disclosed at trial or thereafter, and furnished, directly or indirectly, by or on behalf of any Party or third party in connection with this action.  This term shall also mean documents produced by any office or agency of the State of New Hampshire and all responses to subpoenas *duces tecum*.

      B.      "Protected Material" shall mean all Discovery and Trial Material that is designated as "Confidential Information" or "Highly Confidential Information" under the provisions of this Protective Order.

      C.      "Producing Party" shall mean any Party to this action as well as any third party who produces Protected Material, and a "Receiving Party" shall refer to any Party who receives Protected Material.

      D.      "Confidential Information" shall mean Discovery and Trial Material which the Producing Party reasonably believes is protected from disclosure by statute or that should be protected from disclosure as confidential personal information. "Confidential Information" shall be marked by the Producing Party with the legend "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER." "Confidential Information" does not include "Highly Confidential

3

Information" as defined in this Protective Order or "Anonymized Data" as defined in this Protective Order.

E.    "Highly Confidential Information" shall refer to Discovery and Trial Material that was the subject of the Court's May 20, 2025 Endorsed Order and May 27, 2025 Memorandum Order (ECF No. 76) granting Plaintiffs' motion to compel the Defendants to produce a copy of the New Hampshire statewide voter database and documents concerning the use of the statewide voter database. *See* May 20, 2025, Endorsed Order; *see also* Mot. to Compel, ECF No. 60; ECF No. 75 at 12, and which Defendants designate as "Highly Confidential Information" based on a reasonable belief that heightened confidentiality is appropriate.  Plaintiffs agreed to "enter into a reasonable protective order" governing the use of such compelled Discovery and Trial Material. *See* Mot. to Compel at 7. Highly Confidential Information includes the Statewide Voter Registration System in its current or prior forms, the data maintained therein and any copies thereof, and any system user guides, data dictionaries, user manuals or instructions, but does not include information obtained or otherwise collected from the Database that otherwise would be public information (including information and data publicly available on the voter checklist pursuant to N.H. Rev. Stat. Ann. §§ 654:25 and 654:31, III) if obtained from another source.  "Highly Confidential Information" shall be marked by the Producing Party with the legend "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS, EXPERTS & AUTHORIZED EYES ONLY." "Highly Confidential Information" does not include "Anonymized Data" as defined in this Protective Order or "Confidential Information" as defined in this Protective Order, nor does it include information previously produced by Defendants.

F.    "Anonymized Data" means aggregate summaries, compilations, charts, tables, or analyses of Database Information that do not disclose the personally identifiable information of

App. 93

any voter or otherwise contain data that would allow the public to infer the identity of any specific voter from the specific data being released.

G.    "Security Breach" means the unauthorized entry into a computer, network, or any other similar device or system on which the Database Information is or was opened, reviewed, or accessed; the unauthorized acquisition of Database Information from a computer, network, or any other similar device or system on which the Database Information is or was opened, reviewed, or accessed; and the disclosure of any Database Information to any person not authorized to receive such information under the terms of this Protective Order, regardless of whether the disclosure was accidental, inadvertent, or intentional.

5.    Designation of Protected Materials.

A.    Any Producing Party may designate Discovery and Trial Material as Confidential Information or Highly Confidential Information, as applicable, if such Party believes in good faith that such Discovery and Trial Material contains Confidential Information or Highly Confidential Information as defined in this Protective Order. The designation shall be made subject to the standards of Rule 11 and the sanctions of Rule 37 of the Federal Rules of Civil Procedure. Designations made pursuant to this Protective Order do not mean that the Protected Material has any status or protection by statute or otherwise except to the extent and for the purposes of this Protective Order.

B.    Any document that contains Confidential Information or Highly Confidential Information should be so designated by the Producing Party at the time of disclosure by placing or affixing the legend "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS, EXPERTS & AUTHORIZED EYES ONLY," as applicable, on each page of the document in a manner that will

App. 94

not interfere with the legibility of the document. The electronic file name of each document containing Confidential Information or Highly Confidential Information produced in native format shall contain the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," as applicable. Deleting or otherwise altering that phrase in the electronic file name of such a document shall be a violation of this Protective Order.

C.     Any Producing Party may designate deposition testimony as Confidential Information or Highly Confidential Information under the terms of this Protective Order by (i) stating that designation on the record during the deposition or (ii) notifying the other Parties in writing of the portions of the testimony to be so designated within ten (10) days of receipt of the official transcript. Such designation shall pertain only to those portions of testimony specifically designated as Protected Material. Any portions of deposition testimony designated as Protected Material, either on the record during the deposition or by notice to the Parties after receipt of the transcript, shall remain Protected Material until designated otherwise by waiver, agreement, or order of the Court.

D.     The Parties shall make a good faith effort to designate Discovery and Trial Material properly and with the appropriate confidentiality designation at the time of production. However, inadvertent or unintentional disclosure by any Party of Discovery and Trial Material without any, or the appropriate, confidentiality designation, or Discovery and Trial Material protected by any applicable privilege or immunity,  regardless of whether the Discovery and Trial Material was designated at the time of disclosure, shall not be deemed a waiver in whole or in part of the Party's claim of confidentiality or privilege, either as to a specific document or information contained therein, and the Parties shall, upon written notice of such inadvertent or unintentional disclosure, thereafter designate and treat such Discovery and Trial Material according to the correct

App. 95

designation and classification.  A Receiving Party shall then make a good faith effort to locate and mark appropriately any Discovery and Trial Material upon receipt of such written notice. Nothing contained within this paragraph prevents a Party from challenging such a designation of documents or information pursuant to the procedures contained in this Protective Order.

E.       If a Receiving Party believes that any information or document has been improperly designated as Protected Material, counsel for that Receiving Party shall inform the Producing Party in writing requesting withdrawal of such designation, and providing the basis for the challenge. Documents designated as Protected Materials shall remain Protected Materials subject to the protections of this Protective Order until designated otherwise by waiver, agreement, or order of the Court. If the Parties cannot agree as to the designation of Discovery and Trial Material after conferring in a good faith effort to resolve the Receiving Party's objection by agreement, the Receiving Party may apply to this court for a determination of the issue following the expiration of thirty (30) days from the date on which the Receiving Party informed the Producing Party of its objection to the initial designation.  Nevertheless, the Party asserting the confidentiality bears the burden of proving the Discovery and Trial Material constitutes Protected Material consistent with the definitions set forth in this Protective Order.

6.  Use and Disclosure of Protected Material

A.       Protected Material shall not be used or disclosed by the Parties, counsel for the Parties, or any other persons except as provided for in this Protective Order.  Protected Material shall only be used for the purposes of preparation, trial, and appeal of this action. The Parties and all other individuals permitted to view Protected Material under the terms of this Protective Order shall be informed of the restrictions of this Protective Order before any Protected Material is disclosed to them.

7

B.     Confidential Information and any information therein shall be disclosed only to the following persons:

    1.     Counsel of record in this action for any Party;

    2.     Individual plaintiffs, officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this litigation as determined by the counsel of record;

    3.     Court reporters and recorders engaged for depositions;

    4.     Vendors specifically engaged for the limited purpose of making copies of documents or organizing or processing documents;

    5.     Consultants, investigators, or experts employed by the Parties or counsel for the Parties to assist in the preparation and trial of this action;

    6.     Counsel of record and their experts in *New Hampshire Youth Movement v. Scanlan*, No. 1:24-cv-00291-SE-TSM, and their consultants, investigators, experts, and vendors, but only if they agree to be bound by the terms of this Order;

    7.     The court and court personnel; and

    8.     Any other person with the prior written consent of the Producing Party.

The persons identified in ¶ 6.B(2), (4), (5), (6), and (8) must complete the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound (the "Certification"), before any Confidential Information is released to them.

C.     Highly Confidential Information and any information contained therein shall be disclosed only to the following persons:

App. 97

1. Counsel of Record and employees of Counsel of Record in this action for any Party;

2. Consultants, investigators, vendors or Experts (and their employees or assistants) employed by the Parties or counsel for the Parties to assist in the preparation and trial of this action;

3. Counsel of record and their experts in *New Hampshire Youth Movement v. Scanlan*, No. 1:24-cv-00291-SE-TSM, and their consultants, investigators, experts, and vendors, but only if they agree to be bound by the terms of this Order;

4. Any other person with the prior written consent of the Producing Party; and

5. The court and court personnel when viewing Highly Confidential Information filed under seal as contemplated by this Protective Order.

The persons identified in ¶ 6.C(2), (3), and (4) must complete the Certification before any Highly Confidential Information is released to them. Any person receiving Highly Confidential Information must also receive a copy of N.H. Rev. Stat. Ann. § 654:31, and shall be specifically informed of the provisions of N.H. Rev. Stat. Ann. § 654:31, VI, which states in relevant part: "No person shall use or permit the use of checklist or voter information provided by any supervisors of the checklist or city or town clerk or by the secretary of state for commercial purposes. Whoever knowingly violates any of the provisions of this section shall be guilty of a misdemeanor if a natural person or guilty of a felony if any other person."

D. Counsel for the Parties and all who gain access to information pursuant and subject to this Protective Order shall make every reasonable effort to prevent unauthorized disclosure of Protected Material pursuant to the terms of this Protective Order. Counsel shall maintain the

9

App. 98

originals of the Certification signed by persons acknowledging their obligations under this

Protective Order for a period of six years from the date of signing.

E.      The foregoing restrictions on access and disclosure of Confidential Information and

Highly Confidential Information notwithstanding, counsel for the parties may disclose information

pertaining to an individual's personal voting record and data to that individual upon verifying the

identity of the individual receiving the disclosure.  If a person authorized under this Order discloses

such information, the person shall document in writing the information disclosed and the means

of confirming the individual's identity (e.g., verbally, via a driver's license or government-issued

ID, etc.).  Nothing in this paragraph shall be construed as requiring counsel to verify a person's

identity with documentation. Counsel's documentation of disclosures to an individual is not itself

protected from disclosure by any privilege or doctrine, and the documentation will be discoverable

upon request in this litigation.

F.      In the event that a party seeks to file, or reference in any filing, a document that the

filing party designated as Protected Material under this Order and the filing party seeks to maintain

the confidentiality of such document, the filing party must comply with LR 83.12 for filing the

confidential document under seal. In the event that the filing party seeks to file, or reference in any

filing, a document that the non-filing party designated as Protected Material under this Protective

order, the filing party shall first consult with the non-filing party to determine whether the non-

filing party consents to filing the document in whole or in part on the public docket. If the parties

are unable to reach an agreement, or any time a filing party seeks to file Highly Confidential

Material, the filing party shall prepare two versions of the filings, a public and a confidential

version. The public version shall contain a redaction of references to Protected Material or Highly

Confidential Material and shall be filed with the court. The confidential version shall be a full and

App. 99

complete version of the filing, including any exhibits, and shall be filed with the court provisionally

under seal pursuant to LR 83.12 indicating that the non-filing party seeks to maintain the

confidentiality of the redacted material. The party seeking to maintain the confidential status shall

file a motion to seal in accordance with Local Rule 83.12(c) within three (3) business days of the

filing. Failure to file a timely motion to seal could result in the pleading/exhibit being unsealed by

the court without further notice or hearing. Highly Confidential Material cannot be filed in this or

any other action without a request that it remain permanently sealed. Highly Confidential Material

cannot be otherwise disclosed to any person not authorized to receive such information under the

terms of this Protective Order.

G. A Party who intends to present Protected Material or information contained therein

at any hearing or at trial shall notify the Producing Party of its intent to present that Protected

Material and submit a pre-hearing or pre-trial memorandum to the court summarizing the

information contained in the Protected Material that the Party intends to present in court. That pre-

hearing or pre-trial memorandum shall not quote or otherwise contain Protected Material but may

summarize the issue contained therein that the Party intends to present at a hearing or trial. The

court may thereafter make such orders as are necessary to govern the use and protection of such

Protected Material at a hearing or trial.

H. Any court reporter or transcriber, other than an employee of the court, who reports

or transcribes testimony in this action shall keep all information designated as such under this order

confidential and shall not disclose it except pursuant to the terms of this order. Any notes or

transcriptions of such testimony (and any accompanying exhibits) will be retained by the reporter

or delivered to counsel of record.

11

App. 100

I.        All copies, electronic images, duplicates, extracts, summaries or descriptions of Protected Material, or any individual portion of such a document, shall be affixed with the appropriate confidentiality legend if that legend does not already appear on each page of the copy. All marked copies shall be subject to this Protective Order. The term "copies" shall not include indices, electronic indices, or lists of documents, provided these indices, electronic indices, or lists do not contain substantial portions or images of the text of confidential documents or otherwise disclose the substance of the confidential information contained in those documents.

J.        When electronic files or documents subject to this Protective Order are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant authorized to receive Protected Material, the Party printing the electronic files or documents shall ensure that the legend identifying the confidentiality designation applied to that document by the Producing Party is visible and evident on each page of the printed document.  No one shall seek to use in this litigation Protected Material in .tiff, .pdf or other image format version of a document produced in native file format without first (1) providing a copy of the image format version to the Producing Party so that the Producing Party can review the image to ensure that no information has been altered, and (2) obtaining the consent of the Producing Party, which consent shall not be unreasonably withheld. No one shall seek to use in this litigation a printed form of a Protected Material that was produced in native Excel file format without first (1) providing a copy of the printed version of the Excel file to the Producing Party so that the Producing Party can review the image to ensure that no information has been altered, and (2) obtaining the consent of the Producing Party, which consent shall not be unreasonably withheld.

12

K. This Protective Order does not affect or alter a Producing Party's rights to refuse to disclose information otherwise beyond the scope of discovery, including, without limitation, information protected by the attorney-client privilege or the attorney work-product doctrine.

L. Nothing herein shall be deemed to waive any applicable common law or statutory privilege or work product protection.

7. Special Considerations for Highly Confidential Information

A. All use of Highly Confidential Information shall be restricted and may only be opened, reviewed, or otherwise accessed on standalone computers that are "air gapped," meaning that the device is in no way connected to the internet, any networks (including Wi-Fi networks), or Bluetooth. The standalone computer must be disconnected from the internet or any networks (including Wi-Fi networks or Bluetooth) prior to opening, reviewing, or otherwise accessing the Database Information on that computer and must remain disconnected from the internet or any networks (including Wi-Fi networks or Bluetooth) so long as Database Information is present on or otherwise accessed on the standalone computer.

B. There shall be no more than five electronic copies of Highly Confidential Information; that number may be increased only by the prior written consent of the defendants. Each copy of the Highly Confidential Information must be encrypted. The electronic file name of each copy of Highly Confidential Information or any electronic file containing excerpts of Highly Confidential Information shall contain the phrase "HIGHLY CONFIDENTIAL." Deleting or otherwise altering that phrase in the electronic file name of such a copy shall be a violation of this Protective Order. Each the person possessing a copy of the Highly Confidential Information must track the following information: (1) the name of the person authorized to access Highly Confidential Information under the terms of this Protective Order, (2) the date on which that person

13

App. 102

received the Highly Confidential Information, (3) the date on which that person transferred the Highly Confidential Information to any other person authorized to access Highly Confidential Information under the terms of this Protective Order, and (4) the date on which the copy was returned to the defendants or destroyed in accordance with this Protective Order. Upon the destruction or return of any Highly Confidential Information, each Tracking Log shall be returned through counsel to the New Hampshire Attorney General's Office.

C.      Every movable device, including, without limitation, CPUs, laptops, and hard drives, on which Highly Confidential Information is viewed, opened, or otherwise accessed shall itself be encrypted, and, if such a device is capable of connecting to the internet, the device shall be air gapped. Nothing in this section shall restrict the number of such devices on which a person authorized to access Highly Confidential Information can store Highly Confidential Information provided that the number of electronic copies of Highly Confidential Information complies with the limits in § 7.B.  Under no circumstance shall Highly Confidential Information be transmitted via electronic mail or dropbox method of delivery over the internet or an intranet.

D.      Persons authorized by this Protective Order to receive Highly Confidential Information shall not use Database Information for any purpose other than this litigation. Database Information may not be used or cited for academic research papers or otherwise disclosed in any manner to the public.

E.      Each recipient of Highly Confidential Information is required to provide immediate written notice to the Court, the New Hampshire Attorney General's Office, and the New Hampshire Secretary of State's Office in the event that any device holding or connected to Highly Confidential Information is the subject of an actual or suspected Security Breach. Each person in possession of Highly Confidential Information shall exhaust all possible efforts to retrieve the

14

App. 103

Highly Confidential Information, to ensure the Highly Confidential Information has not been copied or otherwise duplicated in any manner, and to report in writing to the Secretary of State's Office all of the efforts and steps taken to recover that information. Each person in possession of Highly Confidential Information shall cooperate with any investigation by the defendants into an actual or suspected Security Breach and any reasonable additional efforts taken by the defendants to recover the Highly Confidential Information. The Secretary of State's Office shall subsequently provide timely written notice to every person whose private data was or may have been disclosed or compromised. The notice to individual voters whose data may have been disclosed or compromised shall, at a minimum, include (a) a description of the incident in general terms, (b) the approximate date of the Security Breach, (c) the type of personal information compromised as a result of the Security Breach, and (d) the telephonic contact information of the law firm, individual expert, or person or entity who had possession of the information that was the subject of the Security Breach.  If the Security Breach involves information on more than 1,000 voters, the responsible law firm, person, or entity shall also notify, without unreasonable delay, all consumer reporting agencies that compile and maintain files on consumers on a nationwide basis, as defined by 15 U.S.C. § 1681(p), of the anticipated date of the notification to voters, the approximate number of voters who will be notified, and the content of the notice. The plaintiffs shall bear all reasonable fees, costs, and expenses as determined by the Court associated with the Secretary of State's notification of any person whose identity and personally identifiable information has been the subject of a Security Breach of plaintiffs' or plaintiffs' agents' computers or systems of Confidential Information or Highly Confidential Information.

App. 104

8.  <u>Obligations on Conclusion of Litigation.</u>

A.  Unless otherwise agreed or ordered, the terms of this Protective Order shall remain in force as an agreement between the Parties after dismissal or entry of final judgment not subject to further appeal. Actions to enforce the terms of the Protective Order after dismissal or entry of final judgment shall be by separate legal action and not by motion for contempt or other relief filed in this action.

B.  Within thirty days after dismissal or entry of final judgment not subject to further appeal or any other order or action terminating the case, the Receiving Party shall return to the Producing Party any Confidential Information, including copies, unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the Parties agree to destruction in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the Receiving Party, that party elects to destroy the documents and certifies to the Producing Party that it has done so.  Counsel of record may retain Confidential Information which is in the good faith judgment of counsel attorney work product, including an index which refers or relates to Confidential Information, as long as that work product does not duplicate verbatim substantial portions of the text or images of information bearing that designation. The terms of this Protective Order shall continue to be binding to such work product after the conclusion of the case.

C.  Within fifteen days after dismissal or entry of final judgment not subject to further appeal or any other order or action terminating the case, any person possessing Highly Confidential Information shall either return to the Secretary of State's Office or destroy all documents designated as Highly Confidential Information and any logs or copies of logs containing Database Information. Each person possessing Highly Confidential Information must certify within fifteen

App. 105

days of termination of the case that such data or information has been returned or destroyed and that no copies of the data or information have been retained or otherwise disclosed. This certification must be in writing, signed under oath, and delivered through counsel to the Secretary of State's Office. Under no circumstances may counsel of record retain any document or copies of any document containing Highly Confidential Information.

9. <u>Order Subject to Modification.</u>

This Protective Order shall be subject to modification by the court only on its own motion or on motion of a Party or any other person with standing concerning the subject matter and only after a good faith attempt to meet and confer with respect to such modification.

10. <u>No Prior Judicial Determination.</u>

This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any documents or information designated Protected Material or Highly Confidential Material by counsel or the parties is subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the court may rule on a specific document or issue.

11. <u>Court Not Bound By Parties' Designation.</u>

Nothing in this Order or any action or agreement of a party under this Order limits the court's power to make orders concerning the disclosure of documents produced in discovery, filed with the court, or used during any hearing or at trial.

12. <u>Persons Bound.</u>

This Protective Order shall take effect when entered and shall be binding upon all counsel

App. 106

and their law firms, the Parties, and persons made subject to this Protective Order by its terms.


June 18, 2025                                      So Ordered,

                                                  _____
                                                  Samantha D. Elliott
                                                  United States District Judge


18

App. 107

**Attachment A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| COALITION FOR OPEN DEMOCRACY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:24-cv-00312-SE-TSM |
| DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, *et al.*, | |
| *Defendants*. | |

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges that he/she has read the Protective Order dated _____ in the above-captioned case and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the Local Rules of this District in matters relating to the Protective Order and understands that the terms of the Protective Order obligate him/her to use Discovery and Trial Materials designated "CONFIDENTIAL - PROTECTED" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS, EXPERTS & AUTHORIZED EYES ONLY" in accordance with the Protective Order solely for the purposes of the above-captioned case, and not to disclose any such documents or information contained therein to any other person, firm, or concern. The undersigned acknowledges that violation of the Protective Order may result in penalties for contempt of court or for other relief under the Protective Order agreement and may expose the undersigned to criminal prosecution under N.H. Rev. Stat. Ann. § 654:45, VI or other civil liability.

By: _____
Print Name:
Date:

App. 108

# EXHIBIT B

App. 109

**Schedule A**

**PREFATORY STATEMENT AND STIPULATIONS**

The Plaintiffs agree that Defendants' compliance with Paragraph E fulfills their obligations under the Court's May 20 and May 27 Orders subject to the following provisions: Plaintiffs reserve their right to request additional information, including information listed in Paragraph D of Schedule A if circumstances warrant. Defendants reserve their right to object to any such request. Plaintiffs and Defendants agree to the production of all information in paragraph B except: Defendants object to the production of birth dates, places of birth, telephone numbers, email addresses, and registration dates because they represent nonpublic voter information and for the reasons stated in their discovery response objections and in their oral and written opposition to Plaintiffs' Motion to Compel. Notwithstanding, Defendants recognize that the production of these categories has been ordered by the Court and yield to their inclusion in this Schedule A.

Additionally: the Parties stipulate:

- The Defendants will not argue that any analysis is incomplete or incorrect based on the exclusion from any data of confidential voters.

- The Defendants will not rely on any arguments related to data from DMV or DOC in this litigation unless that data is produced.

- The Defendants will not argue that any analysis is incomplete or incorrect based on any Statewide Voter Registration System ("SVRS") data, data field information, or structural aspects of the SVRS that are not previously produced to Plaintiffs as part of this agreement.

- Given the live nature of the SVRS and the static nature of the contemplated production of .csv files, the Defendants experts will not rely on discrepancies between the data

App. 110

provided to Plaintiffs and subsequent changes to the SVRS to argue that any analysis is incomplete or incorrect.

- The Plaintiffs acknowledge that the Defendants will not be conducting a search for responsive material in the SVRS. Defendants will be producing data maintained in the SVRS according to data field tables as summarized in paragraph B below.

New Hampshire's SVRS is a comprehensive election management system, the disclosure of which has been ordered by the Court over the Defendants' objections. Endorsed Order (May 20, 2025); Mem. Order ECF No. 75 (May 27, 2025) (the "SVRS Orders"). Protective Order Schedule A hereby modifies the SVRS Orders as follows:

A.  Data derived from the SVRS system, as described below, shall be designated HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS, EXPERTS, & AUTHORIZED EYES ONLY.

B.  Defendants must produce all voter registration information (for all voters in the database who had not been removed from the database prior to January 1, 2016) from January 1, 2016 to present which, at a minimum, will include the following information:

- name
- unique voter ID number
- date of birth
- place of birth
- naturalization information (name of court, city/town, state, date naturalized)
- mailing addresses
- domicile addresses
- voter histories (status changes/reasons, name changes)
- voter out-of-state driver's license two-letter state abbreviation in the election history file
- election history (which shows each election in which a voter voted, absentee ballot voting, election dates, election names, election categories, ballot types, party affiliations, and whether voter has a CVA on file with local authorities)
- QVA use for age, identity, or citizenship after 4/29/24 and QVA use for identity and citizenship before 4/29/24
- telephone numbers
- e-mail addresses
- registration date

App. 111

- 30-day letters and 10-year verifications if not reflected in voter or election histories as provided above
- type of document used to prove identity or citizenship when registering
- prior histories such as previous names, addresses, and party affiliation
- information regarding data maintenance and management (i.e., absentees, changes, voter audits, etc.)

C.   Defendants will produce the following upon Plaintiffs' request for specific individual voters:

- absentee mailing address
- voter documents (if assigned to a voter)

D.   The following SVRS information is excluded from the Court's SVRS Orders:

- voter Social Security Numbers
- confidential voter information (voters registering confidentially due to domestic violence, sexual assault, or stalking)
- absentee management information (deadlines and organization)
- election information not related to individual voters
- UOCAVA information
- local election official reminders
- ballot memos
- election management and procedures (quality control, poll worker information, polling place inventories and logistics) but to the extent any of this information pertain to QVA usage, voter qualifications, CVA use or adjudication, or other relevant information, it must be disclosed
- election result reporting protocols
- ballot specifications
- SVRS data maintenance, management, and auditing information
- geographical database address mapping
- election official/supervisor/registrar meetings
- petitions information
- voting machine information and inventories
- logs, templates, and queries
- report status queues
- draft correspondence
- candidate information
- redistricting information
- inter-agency transmission information
- modules and information managing password-like access management, authentication protocols, and permissions

E.   The Defendants must comply with this modified SVRS Order within 10 days of the Court's entry of this Protective Order

App. 112

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>GREGG M. AMORE, in his official capacity as Secretary of State of Rhode Island,<br><br>Defendant. | CASE NO: 1:25-cv-00639-MSM-PAS<br><br>CLARIFICATION OF RECORD |

## NOTICE OF CLARIFICATION

The Court heard argument in this matter on the Defendants' Motions to Dismiss and the United States' Motion to Compel Production of Documents on March 26, 2026. During argument, the Court asked the United States about what actions, if any, had been taken with the nonpublic voter registration data already in its possession.[1] The United States represented that each data set was stored separately. The United States also stated that no analysis had yet been conducted on the data. To correct and clarify the record, preliminary internal data analysis of the nonpublic voter registration data has begun. In particular, Civil Rights Division

---

[1] The language used by the Court and the following responses are paraphrased. The United States has ordered a transcript of the proceedings, however it is not available as of this filing. This filing is made without the aid of the transcript as the Court indicated a ruling would quickly issue.

App. 113

has begun the process of identifying and quantifying the number and type of

duplicate and deceased registered voters in each state.  The United States continues

to keep each data set stored separately. It also has not shared the information with

any other agency.


DATED: March 27, 2026.        Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division


/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Christopher.Gardner@usdoj.gov

2

App. 114

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Christopher.Gardner@usdoj.gov

App. 115

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * * *25-CV-639-MSM
                                 *
UNITED STATES OF AMERICA,        *
                                 *
              Plaintiff,         *
                                 *
        vs.                      *MARCH 26, 2026
                                 *
GREGG M. AMORE, in his official  *
capacity as Secretary of State   *
for the State of Rhode Island,   *
                                 *
           Defendant.            *Courtroom 2
                                 *PROVIDENCE, RI
* * * * * * * * * * * * * * * * *



BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE


(Motion to Compel)
(Motions to Dismiss)


**APPEARANCES**:

FOR THE PLAINTIFF:          ERIC NEFF
                            DOJ-Crt
                            Civil Rights Division
                            150 M St. NE, Ste 8-1807
                            Washington, DC  20002

FOR THE DEFENDANT:          JAMES J. ARGUIN
Gregg Amore                 RI Department of Attorney
                            General
                            150 South Main Street
                            Providence, RI  02903

FOR INTERVENOR DEFENDANTS:

Common Cause                ARI J. SAVITZKY
Catherine Saunders          American Civil Liberties Union
Stuart Waldman              Foundation
Julia Sanches               125 Broad Street
                            New York, NY 10004

FOR INTERVENOR DEFENDANTS:

SEIU District 1199NE        ROBERT GOLAN-VILELLA, ESQ.
Rhode Island Alliance for   Elias Law Group LLP
Retired Americans           250 Massachusetts Ave NW
Carolyn Betensky            Ste 400
Michael Zack Mezera         Washington, DC  20001


Court Reporter:             Denise P. Veitch, RPR
                            One Exchange Terrace
                            Providence, RI  02903

26 MARCH 2026 -- 10:00 A.M.

THE COURT:  We are on the record in Civil Action 25-639, and it is entitled United States of America v. Gregg Amore; it's a civil action.  Can counsel who are going to argue identify themselves for the record and identify who else is at counsel table, please.

MR. ARGUIN:  Good morning, your Honor. Special Assistant Agent Attorney on behalf of the Secretary of State for the State of Rhode Island Gregg M. Amore, and with me at counsel table is Special Assistant Attorney General Kyla Duffy.

THE COURT:  Okay.  You didn't give us your name.

MR. ARGUIN:  James Arguin.

THE COURT:  Thank you.

MR. ARGUIN:  Sorry, your Honor.

THE COURT:  That's okay.  All right.

MR. SAVITZKY:  Good morning, your Honor. Ari Savitzky on behalf of Intervenor Defendants Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches; and with me at counsel table is my colleague, Will Hughes.

THE COURT:  Okay.  Thank you.

MR. GOLAN-VILELLA:  Robert Golan-Vilella on behalf of the SEIU Intervenors.  With me at counsel

table is David Fox, and in the gallery is Miriam Weizenbaum.

THE COURT: Thank you.

For the Government.

MR. NEFF: Good morning, your Honor. My name is Eric Neff. I'm here on behalf of the United States, with my co-counsel, Christopher Gardner.

THE COURT: All right. I apologize if I get anybody's name wrong in this.

Let's just set some ground rules so we can make this a little easier for everyone. Our stenographer is valiantly trying to keep up with us so we have to make an effort not to speak quickly. I don't know if anybody here is naturally a quick talker; try to slow it down. Because it's a dialogue I will have to break in and ask questions that results in some necessary overtalk, but if we can just stop and try not to speak over each other more than necessary, I would appreciate that.

I had a request from my Clerk for an order of argument. I believe the Motions to Dismiss, that the Defendants wish to proceed first. Am I wrong about that?

MR. ARGUIN: Your Honor, we're happy with whatever order is convenient to the Court, but

certainly that would make the most sense to us, given the overlapping nature of the arguments.

THE COURT: Right. My original intent was to have the government argue its Motion to Compel, have you respond; then have you argue your Motion to Dismiss and have them respond. But rather than do a back and forth -- is that all right with you, Mr. Neff?

MR. NEFF: Yes, your Honor, and that's consistent with how most other courts have been proceeding, so I think that makes sense.

THE COURT: Okay. We don't like to do things the way -- no, I'm just kidding. That is fine.

So on behalf of the State of Rhode Island, Gregg Amore, I'll hear from you on your Motion to Dismiss, and can you also address the government's Motion to Compel which is at ECF 2 in this case.

MR. ARGUIN: Thank you, your Honor.

The Department of Justice seeks to use civil rights legislation that was enacted for an entirely different purpose to compel the production of Rhode Island's complete Voter Registration List without redaction of confidential data on nearly 750,000 active registered voters in the State. This effort goes far beyond what Congress intended when it passed the Civil Rights Act of 1960. It also is fundamentally at odds

App. 120

with the very statutes DOJ claims it seeks to enforce, which are, specifically, the National Voter Rights Act, which I'll refer to as NVRA, and the Help America Vote Act, or HAVA.  The object and purpose of those statutes is to make it easier, not harder, for eligible voters to register and exercise their right to vote.  And you can find that in the statement of Findings and Purpose in Section 20501 of the NVRA.  Those statutes also have their own enforcement provisions that can be found in 52 U.S.C. Section 21111 of the HAVA and Section 20510(a) of the NVRA.  They also, pursuant to court interpretations including from the First Circuit, allow for the redaction of confidential information relating to voters, including individual voter's Social Security numbers and driver's license numbers.

Now, DOJ tries to bypass these records by plucking a records demand provision from the Civil Rights Act, a law enacted more than 30 years before the NVRA and HAVA, to obtain the very confidential information the First Circuit and other courts have held should be redacted.

It further contends, and this is at its reply brief, ECF 33, pages eight to nine, that its authority affording to demand records under the Civil Rights Act is nonreviewable.

Case 6:25-cv-00630-MSM-PAS Document 725 Filed 03/30/26 Page 2 of 14 PageID #: 710

7

THE COURT: Well, let's address that, because they're saying they're entitled to a special process here. Address the issue of the special process, if any, that they're entitled to and how the Court is supposed to look at the fact that they filed a civil complaint in determining whether there's a special process or I should follow the basic Rules of Civil Procedure with respect to their Complaint.

MR. ARGUIN: Certainly. Let me start with the very fundamentals. This action was filed as a civil action. The Federal Rules of Civil Procedure, (1) make expressly clear that the Federal Rules of Civil Procedure apply to all civil actions except as specified in Rule 81; and Rule 81, of course, makes no mention of an action for a records demand under the Civil Rights Act. It also, according to the Complaint, seeks relief under the Declaratory Judgment Act, Section 28 U.S.C. Section 2201, which Rule 57 of the Civil Rules makes expressly clear it's subject to the Rules of Federal Civil Procedure. And it served the summons in this action on Secretary Amore under Rule 4 of the Federal Rules of Civil Procedure; and the form under Rule 4 specifically advised the Secretary that he could answer or file a Motion to Dismiss pursuant to Rule 12 of the Rules of Civil Procedure.

All of that indicates that the -- this case is no different than any other civil action. And that's also confirmed when one looks at the language of the Civil Rights Act of 1960. The provision of the statute, it makes clear that this court is not a rubber stamp to simply follow a ministerial process to approve any records demand DOJ may submit under the Civil Rights Act. In fact, Section 20703 of the Civil Rights Act imposes specific obligations on DOJ to provide a written statement of the basis and purpose for any records demand.

THE COURT: And so doesn't that get into what do you mean by basis and purpose. Are we talking factual or legal basis and factual or legal purpose; correct?

MR. ARGUIN: Both. The basis is the factual basis why, what is the reasonable suspicion, what is the factual allegation that gives rise to what they claim is a civil rights violation; and I'll come back to that in greater detail later. But the purpose is also what are you looking to achieve? And that's also a problem here, which I'll explain shortly.

But getting back to the court's jurisdiction in the summary process, Section 20705 specifically says an action for enforcement of a demand that is served under the Civil Rights Act must be -- is within this

App. 123

court's jurisdiction and must be exercised pursuant to appropriate process.

So in terms of the summary proceedings that they're talking about, the appropriate process is what's the determinant factor. And your Honor has guidance from the United States Supreme Court in its *Powell* decision on exactly what that phrase means. And, in fact, the Supreme Court in *Powell* interpreted an IRS statute that had substantively similar language to the CRA record demand provision, including the use of the phrase "by appropriate process". And like the Civil Rights Act, it also did not say anything about it was limited to a subpoena or anything else. It was an action by the federal agency to enforce a records demand or demand for inspection to get access to records that the person who was served with those records opposed.

And the Supreme Court of the United States interpreted the phrase "appropriate process" to refer to the Rules of Federal Civil Procedure. And that, of course, is consistent with the Rules I was just reviewing. But, more importantly, it also said that that appropriate process is used to ensure that the court's process is not being invoked or abused by the person seeking to compel, by the agency seeking to

App. 124

compel the production of records. And it also made clear that part of that appropriate process inquiry is to inquire into the underlying reasons of the demand.

And that brings us full circle back to the statutory language of the CRA which highlights, you know, which raises several different points of why that framework simply does not apply in this context. And let me quickly point out some reasons by that.

What DOJ is trying to do is pluck one provision from the Civil Rights Act enacted 30 years ago and read it to the exclusion of all other statutes that are applicable to the very issues in this case, including, specifically, the NVRA and the HAVA, which are the very statutes it claims it wants to enforce.

The NVRA and HAVA have specific protections for confidential information. And I already mentioned the Supreme Court's decision in *Bellows* that, that are applicable to any demand for records or any requests for production of the states' registered voter list. And what's more, in the years since the Civil Rights Act of 1960 was enacted, Congress has also recognized the need for additional protections for the privacy of data revealing personally identifiable information of citizens and Americans; and that's both in the E-Government Act and the Privacy Act.

THE COURT: So how do I read -- the government is going to argue that the Fifth Circuit case from 1960, *Lynd,* is controlling. Obviously it's not precedent, binding precedent on this circuit or this district; but how do I read *Lynd* and *Powell* together? Are you saying *Powell*, for the purposes of the inquiry that the Court can make, kind of overrules or tacitly overrules *Lynd*?

MR. ARGUIN: To the extent that *Lynd* stands for the proposition that there is no testing of the basis or the purpose of a demand under the Civil Rights Act, *Lynd* is overruled. But *Lynd* also recognizes, and its discussion is consistent with all of the Fifth Circuit 1960-era cases the DOJ relies upon invoking the Civil Rights Act. All of those cases dealt with a situation that was within the scope of the Civil Rights Act. It was specifically dealing with instances where there were efforts to intimidate or interfere with the right to vote, most commonly through racial profiling or exclusionary practices to preclude people from voting because of their race.

THE COURT: So my background is in criminal law, so I look at this as if we look at it like a search warrant, so to speak, which it's not and I understand it's completely not a good analogy. But the government

can't say we want to search every house on this block because drugs are coming from this block. They have to have some reasonable basis for suspecting that the individual establishment or house they're going to search has a nexus to drug distribution. Is that sort of -- a very wonky analogy, but is that sort of what you're saying, like they can't just come in here and say we're going to look at the voting records of every state to see if the states are doing what they're statutorily required to do, without some evidence the states are not doing what they're required to do?

MR. ARGUIN: I think your Honor is right on the right track. The purpose of the statute, the CRA has its own statutory provisions for how you obtain these records, right, and those provisions specifically say you must state the basis and the purpose, and then they also add it also must be pursuant to appropriate process; and neither of those conditions are met here.

THE COURT: The government is going to say our basis is HAVA and the National NAVA (verbatim) and our purpose is to make sure that the State of Rhode Island is complying with HAVA and NAVA.

MR. ARGUIN: But all of the cases on which they rely, again going back to *Lynd* and the other Fifth Circuit cases as examples of this, they all

App. 127

included a statement of the basis and the purpose that was far beyond the boilerplate statement that's been presented to the Secretary of State here. They actually stated that they had suspicions of racial practices in the registration process or in voting, and they narrowed that in most of those cases to circumstances that were in a particular county; not a statewide request for an entire voter registration list. They were looking at practices that interfered with the right to vote, and they specified those reasons in their decisions. There's simply nothing comparable here.

And the other, turning to the purpose that, yeah, all -- what they cite is we want to assess whether the State is complying with the list maintenance requirements imposed by the NVRA and HAVA, two entirely different statutes that have their own enforcement provisions. NVRA and HAVA give the Attorney General the right to bring a civil action -- again, not a summary process -- for if there is any suspected violation of a state of its compliance with NVRA and, with the NVRA and HAVA. And those provisions are in 52 U.S.C. 2111 and 52 U.S.C. 20510(a). The first one is HAVA; the second one is the NVRA.

There's no explanation here for why DOJ did not

App. 128

invoke those provisions, except for the fact that even in the statement of purpose and the basis that they've provided in their September 8th demand letter to the Secretary of State, that they don't have one. They just want to see what is there. They don't have and they are not alleging any violation of the State's or the Secretary of State's list maintenance responsibilities; and so they're searching for one. That kind of fishing expedition is not allowed under the ordinary Rules of Civil Procedure, and certainly it should not be allowed with respect to highly-sensitive confidential information on 750,000 active registered voters in Rhode Island. There's simply no basis for it.

And one other thing I would point out. The NVRA and HAVA, which are the listed maintenance statutes that require the Secretary of State to set up a general program for list maintenance and undertake reasonable efforts to ensure that the names of deceased voters or voters who are moved are timely removed from the active list. Those statutes expressly place that responsibility squarely on the State, and they make clear in the statutory language that that enforcement of those provisions, the reasonable efforts, the general programs are specifically within the discretion

App. 129

of the State. And that, I think, is another key point here, and that's because what DOJ is attempting to do is interfere with the State's responsibility to carry out tasks that Congress has assigned to it; and the fact that Congress assigned it to the State, not the federal government, is also consistent with Article I -- Article I, Section 4 of the Constitution which recognizes the primary role of the States in election and registration processes.

THE COURT: How do you respond to what I think the government is saying, which is how can we -- that we accept the Elections Clause does what the Elections Clause does, but it also allows Congress to sort of set some rules into place and how are we, the DOJ, supposed to enforce the Rules if we're just supposed to take it on faith that the States are doing what they're supposed to do.

MR. ARGUIN: Two things. Again, the primary responsibility, the balance that Congress struck, the balance that the Framers of the Constitution struck was to preserve local control over elections unless Congress specified otherwise. That's the preemption issue.

But here, as I've already said, the NVRA and the HAVA, which are the two statutes that deal specifically

with list maintenance responsibilities, specifically give that discretion, raw discretion to the States. There's no mention of the Department of Justice or the federal government unless and until those penalty provisions that we were just speaking of came in, where they can bring a civil action if there is a violation. But there's no violation here.

THE COURT: So looking at sort of the original intent of the Framers and the intent of Congress and the sort of the text of the statutes, it would seem that adhering closely to what's there, that the Department of Justice wouldn't have the role that it's seeking to have here. Is that correct?

MR. ARGUIN: I think that that's absolutely correct. The Department of Justice's role has to be conferred by Congress. And this gets back to one of the points I made earlier. What they're doing is cherry-picking a records demand provision from now 65 years ago and using that, to the exclusion of the very statutes they're seeking to enforce that deal specifically with the issue of voter list maintenance, and that also completely ignore the privacy protections that Congress enacted in the Privacy Act and in the E-Government Act to specifically protect the right of individual citizens to not have their personally

identifiable information swept up in some omnibus request, which your Honor well knows is not just here in Rhode Island; it's across the country.

And we still -- and going back to the statutory purpose, there is absolutely no way the Court could read, as they say, look at just the language on the page. Well, that's not true. I mean a basic rule of statutory construction is you have to understand the context in which a statute is enacted. The Civil Rights Act of 1960 was enacted for a different purpose, as we talked about, dealing with the interference with the right to vote, preventing people from voting.

The HAVA and the NVRA have a fundamentally different purpose. It's to encourage the right to vote. That's in the findings that Congress itself made. They tried to make it easier to vote, and they afford multiple protections that require the Secretary of State to proceed with caution and follow specific procedures before any person is removed from the active list. And as I've already said, they also provide protections consistent with the Privacy Act, the E-Government Act, and state law on what information can and cannot be shared with the public or in response to a request. They protect confidentiality.

THE COURT: There is anything in the Civil

Rights Act or Title III that precludes the State from redacting personally-identifying information or sensitive information?

MR. ARGUIN: There is absolutely no language in the Civil Rights Act of 1960 that would preclude it.

And the other point to keep in mind when we talk about context, and I think they cite this in support of their plain language argument, that it's only the words on the page that matter. But that case, I think it's *Buckman*, the Supreme Court decision in *Buckman* is very clear what they're talking about there is you have to interpret words according to the usage at the time. You look at the words used through the lens of what Congress intended when it enacted the law.

Now in 1960 when the Civil Rights Act was enacted, they were dealing with a very different issue. This was Jim Crow South where they were excluding people based on race. That was the purpose. And the Civil Rights Act of 1960 was intended to fill a gap in the predecessor statute of the Civil Rights Act of 1957 where records relating to these discriminatory practices and other records relevant to intimidation connected with the right to vote were being destroyed. This 1960 Act was passed specifically to make sure those records were preserved so they would be

App. 133

available in the event there were suspicions of any kind of discriminatory or other prohibited practices that interfered with the right to vote.

THE COURT:  Let's say we were in an environment that was similar to the 1960s and the Department of Justice had a belief that, you know, women were being precluded from voting in Rhode Island and they had some basis for that.  Could they then utilize the Civil Rights Act to come here and ask for those documents in order to enforce the amendment allowing women to vote, for example?

MR. ARGUIN:  If they had a proper purpose and stated a proper basis and that was presented, then I think that would comply with the Civil Rights Act. That, of course, is not the situation here.

And one other thing to note.  When we look at the statutes through the eyes of the Congress that enacted it, which is the 1960s Congress, you know, the statute, the CRA specifically says, okay, if you state a proper -- the basis and the purpose, and you follow the appropriate process, those records can be produced. But they also said what they allowed for in the statute in 2073 -- 21073 was that be allows onsite inspection and reproduction.  And why is that?  Because they didn't have electronic data being amassed by states or

private parties or the federal government. It didn't exist. That's exactly why it's wrong to just cherry-pick one statute and say it trumps from the 1960s, say it trumps all these later enactments. That's not the rule how statutes are interpreted. Statutes have to be interpreted as a whole in the context, and the court has to balance the congressional expressions in various statutes that deal with the same subject matter.

And here, we're talking about voting records, specifically registered lists, voter registration lists, but also the privacy interests that are implicated by that kind of collection of data. And it's an entirely different thing to say you can come and inspect the registered voter lists and make a copy of it than saying here is, what they want is an unredacted database with all the fields unredacted, with all of that information put out there for a purpose that is not yet clear. And let me get to the purpose issue.

THE COURT: Can I ask one more question before you do.

MR. ARGUIN: Sure.

THE COURT: Do we know in 1960 what data was contained within voting rolls?

Case: 23-1656 Document: 00118438165 Page: 139 Date Filed: 03/26/2607 Entry ID: 6627012
Case 1:25-cv-00639-MSM-PAS Document 47 Filed 03/30/2025 Page 21 of 114 PageID #: 724

21

MR. ARGUIN: Well, what we know is the obligations imposed by the HAVA and NVRA didn't exist. They didn't come until many years later.

So the records that we're talking about here could not have been in the minds of Congress when it enacted the Civil Rights Act of 1960; and, in fact, that's exactly how two other district courts in the Central District of California and the District of Oregon have interpreted this.

But getting back to the purpose, your Honor asked, well, don't they need some of this information to do whatever, whatever kind of assessment they want to do with respect to the State's list maintenance responsibility. The answer has to be categorically no. The Secretary has already offered to provide them with the publicly-available list, which includes a host of information about relative, you know, about voter, registered voters in Rhode Island, including their names, their full names, their full dates of birth, residential addresses, mailing addresses, party affiliation if they elect to provide it and, I'm sorry, there's others if I find my list. But all of that information is available. The only information --

THE COURT: When they vote; right?

MR. ARGUIN: And where they vote, how they

App. 136

registered. And it also includes, as required by HAVA, a unique identifier, voter identifier number for every active voter in Rhode Island. Unlike some states, it's not only assigned if you don't have a Social Security number or a driver's license; Rhode Island assigns a unique HAVA identifier to all registered voters. All of that information is in the public record, I mean is publicly available pursuant to Rhode Island law and also, is also made available under the NVRA through its public inspection provisions.

The only information that the Secretary of State has withheld are the last four digits of the Social Security number and individual state driver's licenses, and he did that because of the requirements of State law that say that information cannot be disclosed; and also is consistent with First Circuit's decision in *Bellows,* which other circuits, including the Fourth Circuit and other district courts have also endorsed that view, that redaction of that personally identifiable information on individual voters is absolutely appropriate.

So the other point I'll make on this is if they were to say, I think the only answer to that is they say, well, we don't know if it's the same person. But you have all this information available to you through

App. 137

the publicly-available list to do a very comprehensive comparison, if that's needed; and assuming, again, it's even proper for DOJ to engage in that sort of list maintenance responsibility, when Congress has assigned that task to the discretion of the States.

The last point I make is what we are talking about here are general programs and reasonable efforts to maintain a list. They're seeking line-by-line assessment or analysis of the registered voter lists at one point in time. That does not have anything to do with reasonable efforts or general programs.

THE COURT: So if they had come here and asked for an explanation or information about the procedure that the Secretary of State has used, and I think it's four times a year -- is that quarterly that they cull, or is it monthly?

MR. ARGUIN: It's daily, your Honor.

THE COURT: Daily.

MR. ARGUIN: Anytime -- it's hourly, actually. Any time a person walks into an office, the DMV to register to vote, the voter maintenance, the voter registration list is updated.

THE COURT: Okay. I apologize. So if they'd come in and said we want to know what procedures, are you using the ERIC system, are you using voter,

Motor Voter, I think we used to call it, system, and they had gotten about information how that system, if they had sought information about that system was implemented would they be closer to their directive under the National Voting Rights Act and the...

MR. ARGUIN: If was reason to suppose there was a violation of federal law, then perhaps. But as we put in our Motion to Dismiss, your Honor, we catalog a whole host of the reasonable efforts that the Secretary of State's Office and the Department of State are pursuing to comply with NVRA. And I think that it's very telling that in all that publicly-available information and statutory provisions, there's no response from DOJ suggesting that we're not doing what we're supposed to be doing.

THE COURT: Right.

MR. ARGUIN: And so we get back to the fishing expedition. What is the point of this and how is it consistent with the way Congress has delegated responsibility for list maintenance, and how is it possible to read a statute from now 65 years ago to the exclusion of all the protections that are afforded in these very specific laws that are far more current and far more specific to the issues of this case.

THE COURT: And a moment-in-time snapshot of the

voting lists sort of is necessarily misleading; is that not correct? If I were to die tomorrow or move to another state, preferably -- you know, to die, not to living here but to dying -- then the records of today would be inaccurate, correct, if I registered to vote, you know, in Hawaii tomorrow?

MR. ARGUIN: Absolutely, your Honor. This is the critical point. This is why the list maintenance responsibilities under HAVA and NVRA are far different from the Civil Rights Act of 1960.

These statutes are intended to promote the right to vote, and they have very specific safeguards. The Secretary of State, the Department of State cannot remove an active voter without following a notice and process to confirm that, in fact, the person is dead and that, in fact, the person has moved. That doesn't happen in a day because there's a mailing process and there's response mailings and deadlines set for how much time you have to allow for a person to say hey, I'm still here. That can't happen with a snapshot. So all you're going to get is one picture in time that, following your example, you may have already moved but maybe you're coming back and -- or maybe you have moved and you haven't yet registered.

But we need to make sure that, in fact, the

Secretary of State has to make sure that, in fact, the move actually happened before you're removed from the voter registration, from the active list of voter registration. What often happens is that there's notice of suspicion that someone has died or moved before the confirmation process, the confirmation process puts a hold, they're moved to an inactive list. But then there's a confirmation process, and if it's confirmed that they moved, then they're removed. But if it's not confirmed and they're still here, then they go back on the active list. All of that is to make sure there is no infringement to the right of vote. And without some allegation that the Secretary is applying some sort of practice or procedure that infringes the right to vote or that discriminates against voters because of race or another category, then there's absolutely no basis for relying on the CRA and certainly no basis to read it in isolation from all the other statutes that we've been discussing.

THE COURT: And don't I have to read it in conjunction with *Powell,* --

MR. ARGUIN: Absolutely.

THE COURT: -- which says that information can be redacted; correct?

MR. ARGUIN: Well, the First Circuit said --

App. 141

THE COURT: I'm sorry.

MR. ARGUIN: -- in *Bellows* says it can be redacted. And certainly all the other courts that have been confronted with this, which to date is the Central District of California, the District of Oregon, and the District of Michigan, have all dismissed DOJ's complaints for many of the same reasons we've been discussing; that they are not within the CRA, that the statement of purpose and demand is not here, and that redaction is perfectly appropriate.

And so for all those same reasons, consistent with the other courts' decisions, the Secretary of State would urge this Court to dismiss DOJ's complaint and deny the parallel Motion to Compel.

THE COURT: Okay. Thank you.

Hang on. Are we going to hear from the Intervenors first, I believe?

MR. NEFF: That makes sense, your Honor.

THE COURT: That way you don't have to argue more than once, unless you want to.

But don't -- let's not tread over ground that's already been covered. You have not been objected to as Intervenors but, you know, so your separate issues are the question here.

MR. SAVITZKY: Understood, your Honor, and may

it please the Court, Ari Savitzky from ACLU for the Common Cause Intervenors. I'll address the two issues before the Court, the two motions before the Court. Before I do I want to acknowledge Ms. Saunders, Cathy Saunders, one of the Intervenors in the courtroom today; Stuart Waldman, one of the Intervenors in the courtroom today; John Marion, the Rhode Island Director of Common Cause, the organizational Intervenors in the courtroom today.

And the reason these voters have intervened and the reason they're here today is because they're intensely concerned that the federal government is making an improper and unprecedented grab for their sensitive personal information. And they're right to be concerned because they have eyes to see and they can see when the Attorney General sends a letter to the Governor of Minnesota demanding the state's voter rolls as a condition for pulling back immigration enforcement. They can see when the Department of Justice admits that DOGE has mishandled voters' sensitive personal information with respect to the Social Security Administration and entered into agreements with outside election-related groups. They can see when former attorneys from the Civil Rights Division tell the New York Times that they were tasked

by the front office, the Department of Justice, with obtaining state voter rolls so that DOGE can look at them. And they can see the Memorandum of Understanding that has been sent to states in conjunction with these data requests that purports to allow the federal government to take charge over who gets to stay on the states' voter laws; contrary to federal law, contrary to the Constitutional order. And so the outcome here is incredibly important to the voter Intervenors and to their fellow Rhode Islanders and to our democracy.

The Court has our papers. You heard from one of the Defendants already. The most important thing I could do I think is to answer and address the questions the Court's raised. I think there are two basic questions for the Court to answer at this point: (1) What are the rules that apply here, what type of proceeding is it. That goes to the Motion to Compel. (2) Is the Complaint that was filed by the United States legally deficient such that this action should be dismissed. I'm going to address this point briefly without being repetitive of what we've going over already and while addressing the Court that the point, the points that the Court has brought up. Excuse me.

Question (1), what are the rules that apply here. The United States initiated this proceeding by

filing a civil action or this Federal Rules of Civil Procedure. Rules 1 and 81 state the Rules apply. The *United States v. Powell*, binding Supreme Court precedent, says that the Rules apply. And the CRA by using the term "appropriate process" says that the Rules apply.

What *Powell* says, and this is Footnote 18 of *Powell*, extremely clear, When a statute grants the court jurisdiction to enforce some government demand for information by appropriate process, but "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." That's the end of it.

Now, how fast an action moves, how much discovery might be needed, where -- whether the case can be resolved on summary judgment; those are all questions that are addressed under the Rules. There's flexibility under the Rules. That's what this Court does. But the bottom line is we apply the Rules and we apply Rule 12. That's the first step. We look at the Complaint, is it legally sufficient.

*Lynd*, if I can address the question the Court asked for, was not to the contrary. *Lynd* is a case where there's two years of litigation, endless motions and attempts by the state defendants to not address the

government's demand.  That's not what is happening here.

The Motion to Compel says give us these documents, give us the State's voter rolls with all the confidential personal information of Rhode Island voters, without even consideration of whether or not the demand is legally valid or whether there's an improper purpose.  And just one other point on the Motion to Compel piece.  Even -- and your Honor raised the analogy to the criminal context.  How about the analogy to the administrative subpoena context; right?

This is a full-on civil action.  They filed a Complaint.  But sometimes there'll be an administrative subpoena in another context and someone will run to federal court, the person who received the subpoena, and they'll move to quash; right?  That's also a scenario that happens.  And even in those circumstances courts apply the teaching of *Powell*.  The First Circuit does this.  One of the cases cited in the briefing is an administrative subpoena case about gender-affirming care I think at Mass General Hospital in Massachusetts, from the District of Mass last year.

Even when you go to court on a motion to quash, not a full-blown federal action filed under by Complaint, the court considers is there an improper

purpose, is there a proper legal basis for the demand; right? And in that administrative subpoena case I referred to, 800 F.Supp. 3d, it's at page 237, the relevant discussion, (Reading) When there's not an iota of suspicion of --

THE COURT: Can you slow down just a smidge; I'm sorry.

MR. SAVITZKY: When there's not an iota of suspicion of any specific or particularized wrongdoing, the court quashes. Now, again, that's in the administrative subpoena context.

And again, here we have a Complaint filed under the Rules. So there's no possible way and there's no precedent and there's no analogy when you grant a Motion to Compel without considering these questions, considering whether there's a legal basis to grant the demand. And then also considering is there improper purpose; there's plenty of evidence of that here as well.

So just to address the other question here, right, so now we're at Rule 12. We have a Complaint. Is it legally deficient? It is. We have to dismiss. Statute requires a written demand for the information that states the basis and the purpose for the request.

And it's in the briefing already so I will

address only very briefly the numerous different ways in which this demand, encapsulated by the September 8th letter sent to the Secretary, is legally deficient. First of all, did the Attorney General state the basis for the request? No. It's an easy one, there's just zero statement of the basis; and that's the ground in which the California and Oregon courts dismissed. It's not in writing, which is what's required. You state the basis in writing.

And by the way, look at that *Lynd* case; right? What did the Department of Justice under RFK think you were supposed to do when this statute was actually in use? Footnote 6, page 229 of *Lynd* --

(Court Reporter requests clarification)

MR. SAVITZKY: -- it quotes what the written demand said. (Reading) This demand is based upon information in the possession of the Attorney General tending to show the distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.

That's the basis. That's the factual basis. That was the original understanding of the basis that was required.

There's nothing like that here. Pure fishing expedition. That is all you need to hold to say that

the demand is legally deficient under the CRA.

Another independent ground, do they state the purpose. There's a conclusory sort of general statement, Oh, the purpose is to ascertain compliance with HAVA and the NVRA. There's no discussion, no pleadings, no meat on the bones.

What do HAVA and the NVRA actually require? HAVA requires states to collect a person's voter -- driver's license number, Social Security number. Rhode Island is doing that. They didn't ask, well, what do you do? Do you collect that? Did you look at the voter registration form? I brought copies. They asked for it. So if the United States simply wanted --

(Court Reporter requests clarification)

MR. SAVITZKY: If the United States wanted to simply ascertain whether that information is being collected, it doesn't need Rhode Islanders' confidential personal information to do that.

And same with the NVRA. The NVRA, and I won't repeat it because Mr. Arguin has mentioned, it tasked the states with voter list maintenance. It doesn't task the federal government with doing that. And it certainly doesn't say that the federal government should replicate the thing that the State does, let alone do it with a snapshot. So there's no purpose

that's stated as plausible and there are no pleadings to sort of flesh out what would be the plausible purpose.

And then you get to pretext. Because even if a purpose, a sort of general conclusory purpose is stated, is it the purpose. We know from the Supreme Court's decision in *Niz-Chavez* against *Garland,* which we cite in the papers, the use of the definite article matters. You need to state the purpose; not any purpose, not a purpose, not some purpose.

And here, there's plenty of evidence, massive evidence that the purpose has not been stated. I mean just look at the MOU that DOJ has offered to the states that aggrandizes for the federal government for first time ever, in violation of federal law, the role a voter list maintenance to the federal government to say the federal government can look at individual voters and demand that they be removed from the voter rolls within 45 days, which is a violation of the NVRA. And we have an extensive roundup of all this in our brief; I won't repeat it here. And I think what the Court may hear today in response are answers like we've heard in some of the other proceedings in some of the other states; and what we haven't heard in those proceedings is an unequivocal disavowal of this ulterior purpose.

In Minnesota an attorney at the Department of Justice said, I don't know the answer, to whether the Attorney General could use state voter files to look at every person who voted in the country. In Connecticut last week an attorney said, I simply can't state what the Attorney General's purpose may be at some other time.

So I would just say if you ask about that, your Honor, I would suggest listening very carefully to whether there's a true and unequivocal disavowal of that purpose, contrary to all the evidence that we see, that voters can see. And I don't think you'll hear that. I don't think you can hear that, given the representations that have been made and given the evidence that's out there. And that is also an independent ground to dismiss the Complaint, because if you don't state the purpose, you haven't complied with the statute.

On the last ground, which is the privacy, I won't address again the issues around the Privacy Act. They're in the briefing. I'll only say there are also constitutional privacy issues at stake that have to do with the chilling effects of releasing voters' confidential personal information without adequate safeguards and making that the price of the franchise:

If you want to be on the voter rolls, then you have to be okay with your personal identifying information going to DOJ and to whatever other federal agencies they share it with for whatever purposes.

That is exactly what the voter Intervenors here and what so many Rhode Islanders who care about a vibrant democracy are concerned about.

And your Honor, if the Court has no further questions, I'm happy to address any further issues. But I think there are multiple grounds to dismiss, and I think that's the right course here.

THE COURT: Thank you.

(Pause)

MR. GOLAN-VILELLE: Good morning, your Honor.

THE COURT: Good morning.

MR GOLAN-VILELLE: My name is Robert Golan-Vilelle on behalf of Intervenors SEIU District 1199NE, the Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Zack Mezera. These Intervenors are membership organizations and Rhode Island registered voters who are deeply concerned with DOJ's unprecedented efforts to obtain their and their members sensitive personal information in this lawsuit.

We, of course, agree with the State and the Common Cause Intervenors that this action must be

dismissed. I won't repeat all the points that they've made, but I'd like to add points on three specific issues that reinforce why they are correct that dismissal is required here. Those are the issue of basis, the issue of purpose, and the fact that Rhode Island is entitled to redact the sensitive information at issue here, which is the entirety of the case, given that it has already offered to disclose the public list.

First, on the issue of basis, this is the simplest and most straightforward ground on which this case can be resolved. I won't repeat everything the State has said, but the statute has two requirements: basis and purpose. They each must have independent meaning. DOJ has understood it to -- each of them to have separate meanings in all of the 1960s cases that they rely on; and all three courts to have addressed this issue today have understood "basis" to mean factual basis. And that makes sense because it is the only meaning that makes sense in the statutory scheme.

So DOJ's actual position in its briefing that is put forward here is that the Civil Rights Act itself is the basis for its Civil Rights Act demand. That simply cannot be right as a matter of law because it would automatically be satisfied in every single case and,

you know, that would render the provision meaningless; well understood that Congress does not enact meaningless statutes and that we don't read statutory language to be superfluous.

And as the State and the other Intervenors have said, the DOJ's September 8th letter simply provided no basis at all. It doesn't use the word "basis." It doesn't provide anything that could be understood as a factual basis, and this straightforwardly requires dismissal here. And the most important thing is that it requires dismissal under any level of review. You know, no matter -- even leaving aside the issue of what type of proceeding is this, are we under *Lynd* or *Powell,* even, even under the most hands off, you know, even under the most hands-off level of review, at a bedrock minimum this Court needs to assess whether a basis was provided at all; and it plainly was not here, and that is enough to dismiss this case on its own.

On the issue of purpose, I won't rehash all the ground that the State went over. We agree with them that a proper purpose under the Civil Rights Act has to deal with an individual's ability to register to vote and cast a vote freely. That is, again, what all of the 1960 cases actually involved. That is what the entire subject matter of the statute deals with. And

App. 154

I'd just like to add -- I'd just like to point the Court to one additional authority that reinforces not just why this interpretation of the statute is correct; but specifically why the purpose that DOJ has put forward here is not an appropriate one, and that case is *Kennedy v. Bruce*. The cite for that is 298 F.2d 860. This is one of the Fifth Circuit 1960s cases that DOJ relies on. And there's an extended discussion in this case about a particular county in Alabama where there are two particularly notable facts.

First, in this county, of the roughly 6,000 Black citizens of voting age, not a single one was registered to vote. And then there was also for the white citizens, there was a number that was greater than 100 percent of the white citizens who were registered to vote. And the court actually goes on to say, I'm quoting, "Obviously such a figure indicates that there have been failures to purge voters who have moved away or had died, a matter which does not bear any particular importance to the present inquiry."

And this is particularly striking because it means at that point in time, even when a court had its, had in front of its face facts that would suggest what today we would call list maintenance issues, it simply did not think that this bore any relevance to

App. 155

Title III. The court was not concerned with the more than 100 percent of white citizens who were registered to vote. It was extremely concerned with the zero Black citizens who were registered to vote and the overwhelming societal problem in (indecipherable).

THE COURT: But isn't the Department of Justice saying, well, since then HAVA and the National Voting Rights Act, NVRA, have sort of modified the landscape. Isn't that what they're saying?

MR. GOLAN-VILELLA: That is what they are saying. We don't think it's correct and because it's basically assuming their premise. It's assuming that the Civil Rights Act was meant to be a sort of all-encompassing such that any time, you know, Congress enacted a subsequent law that had anything to do with the voting, that would sort of automatically be a proper purpose under the law. But there's nothing in the Civil Rights Act that suggests that.

We agree that with, you know, what the State has said in terms of, you know, the better reading is that it should have some tether to the purposes for which the Civil Rights Act was enacted. And, you know, the *Bruce* opinion we think matters because, you know, it's the best indication of when you have the actual facts at issue that, you know, today we would call list

maintenance issues. You know, the court went out of its way to say that this has no particular relevance.

So we think all of this collectively, you know, the text and context of the law, the actual case law and past practice of how it's been used, ordinary principles of statutory interpretation, we think all of that points in favor of the State's position and in favor of the proposition that this simply was not a proper purpose here.

And then, finally, I'll move on to the issue of whether Rhode Island can redact the sensitive information at issue here. So as your Honor asked in a previous question, there is nothing in the Civil Rights Act at all that prevents redactions. Rhode Island law prohibits the disclosure of the sensitive information at issue here. I don't believe DOJ has contested that; and DOJ has the burden of showing that that law has been preempted and simply has not met that burden.

There is simply no reason to conclude that the Civil Rights Act preempts these privacy protections, for a few reasons. There's no express preemption provision. As the State I believe noted, this information was not even required to be on applications at the time; and there's an overwhelming consensus of courts that you can redact under the NVRA, including

here in the Fifth Circuit under the *Bellows* decision.

DOJ's only argument here that the Civil Rights Act contemplates the production of sensitive material is to point to 52 U.S.C. 20704, which puts limits on the further disclosure of information received under a Title III demand.

But there's simple no reason to conclude that that means Congress at that time must have contemplated that that includes sensitive information. And the best way to look at this is to look at the Privacy Act. The Privacy Act prohibits disclosures under various circumstances even when the information is public and not particularly sensitive. It just has to be contained in a system of records and be identifiably about specific people. And that's linked to the purposes of Privacy Act, which is that we think there ought to be, you know, some limits on controls on when the government and when specific arms of the government have possession of specific information.

So there is simply no reason to conclude that the Civil Rights Act preempts the Rhode Island law here, as the Oregon court also concluded as an alternative reason for dismissal in that case. And that is why, you know, even if DOJ were entitled to the list, you know, at all, Rhode Island would be able to

redact the sensitive information which, again, is the entirety of the dispute here.

So for all of these reasons and all the others in our briefing, we'd ask that you dismiss this case.

THE COURT: Thank you.

We're going to take a 15-minute break so that we can get through the government's argument without interruption, and we'll about back in 15 minutes to hear from you, Mr. Neff.

(Recess)

THE COURT: Whenever you're ready.

MR. NEFF: Good morning, your Honor. May it please the Court, Eric Neff, on behalf of the United States.

This case ask about transparency, transparency in our elections enforced with the CRA. The CRA is a sweeping bill because it is about transparency.

THE COURT: But is it? Is that what it's for? I mean isn't there transparency when the State offers you their publicly-available information? Why does the government need driver's license numbers and Social Security cards and the Social Security numbers, and what is the purpose that the federal government sees that it has? Is it in maintaining the voter list? Because that's certainly not what HAVA and the National

Voting Rights Act say, is it?

MR. NEFF:  Thank you, your Honor.  I would direct your Honor's attention to the Ford-Carter Report, the bipartisan report that was done in the wake of the 2000 election and is the Blue Ribbon Report that led to the passage of HAVA.  The Ford-Carter Report said, and I quote from Section 3, "An added identifier, an added numerical identifier is desirable, given various spellings and clerical errors that frustrate reliance only on a given name and address."  Further down, "We suggest that States obtain the last four digits of this number as an added identifier."  The Federal Election Commission has made the same recommendation.

The Help America Vote Act went further, knowing that the Social Security number implicated concerns that people might have.  It wrote directly in the statute that the SSN-4 is not a Social Security number for purposes of the Privacy Act.

THE COURT:  When you say the SSN-4, what do you mean?

MR. NEFF:  Thank you, your Honor.  The last four digits of a Social Security number.

THE COURT:  So, but back up a little bit, okay, because this report, the Carter, the Ford-Carter Report

Case: 25-1525 Document: 17 Filed: 03/30/2026 Page: 46 of 114
Case 6:25-cv-00639-MSM-RAS Document 47 Filed 02/07/2026 Page 46 of 114 PageID #: 749

46

isn't before the Court.  It's the government asking through the use of Title III to get records under HAVA and the National Voting Rights Act.  So tell me how -- forget about purpose, forget about transparency.  For a minute just tell me what your basis is for getting this information from each individual state, and do you have a factual basis?

MR. NEFF:  Our basis is the CRA.  The United States' position --

THE COURT:  You can't say the CRA requires me to give a basis and so our basis is the CRA.  That's circular logic; right?

MR. NEFF:  I would posit the United States would say no, that we're only required to state a legal basis.  However, if your Honor was inclined to require a more specific basis, it would be what the United States reviewed before it pursued the voter rolls here, and that would be the EAVS data published by the EAC, which is reviewed extensively by the Voting Section, and the EAVS report was cited in our Complaint.

For example, in the case of Rhode Island, Rhode Island self-reports to the Election Assistance Commission that they do not do eligibility audits.  That's a concern of the Voting Section.  We want to make --

THE COURT: Explain what you mean by that, because my understanding of Rhode Island's procedure as they've outlined it in their Motion to Dismiss is that they take information from the prison I think daily and cull the rolls for people who are incarcerated; that they provide the information to that ERIC system that 25 states put together that has masked identifiers for individual voters; that they received daily reports of voting. And the ERIC system compares the data with other states to make sure that somebody is not registered to vote in two jurisdictions, that they -- what's the word I'm looking for -- that they also get information from each individual Board of Canvassers in the 39 cities and towns here.

So what do you mean that they don't, they don't cull ineligible voters? What are you trying to say here? Because if they're collecting a Social Security number and a driver's, or a Rhode Island ID number, and then they're required, then those things are -- if they're required for registration then by definition the registration is an open eligible voter, isn't it?

MR. NEFF: Your Honor, the United States is not saying that Rhode Island does not cull ineligible voters.

THE COURT: What are you saying?

MR. NEFF: What we are saying is that we don't need to allege that. We -- as the *Lynd* court said, the Attorney General's, quote, right to records does not require that the A.G. show that the A.G. could win without them. We do not need to allege a violation of a specific statute.

I was only raising the lack of a particular audit and, again, this was self-reported by Rhode Island as a concern that the Voting Section had.

There are also certain numbers that raise concerns with the Voting Section, as Rhode Island self-reported having 60,000 inactive registrations. They reported having 60,000 duplicate registrations. This is out of about 800,000 registered voters. That's also a 90 percent registration rate of the adult age voting population.

THE COURT: I believe it's 700-and something thousand voters; but your point is taken.

But I guess what's the DOJ's, what horse do you have in this race? Is it that you're trying to double-check the work of all of the states, or is it that you're trying to assert an outsized role for the federal government in the running of elections?

MR. NEFF: Certainly not outsized role, your Honor.

THE COURT: It seems that way from your filings in all of these states. So what's your purpose?

MR. NEFF: The United States is in a trust but verify mode as it relates to voter list maintenance countrywide. It is --

THE COURT: So let me ask a question then because I think 11 -- well, originally three jurisdictions just provided the list to DOJ: Texas; I don't know, North or South Carolina; somebody else. What did you do with those lists?

MR. NEFF: So we kept all the lists that we received -- at this point it's been 17 states have been kept in separate compartmentalized files that only very limited people have any access to.

THE COURT: And what did you do to verify those lists?

MR. NEFF: We've not done anything yet because we've not --

THE COURT: Why not? If you need to verify those lists, if you have an oversight role why haven't you taken -- some states have said here, here's all our data. And you've gotten it, and by my understanding you got some of it back in the summer of last year. Why haven't you done anything with those states' data?

MR. NEFF: Well, we're talking as to the

App. 164

non-public lists; correct?

THE COURT: Right.

MR. NEFF: Okay. The United States is taking extra concern to make sure that we're complying with the Privacy Act in every conceivable way, and there are still a couple steps we have to go through before the United States is comfortable proceeding and comfortable representing to this Court that we're in full compliance with the Privacy Act.

THE COURT: What steps have you taken and what steps need to be taken with those states that have complied? Because to me, the states that have complied are traditionally more conservative states. Texas just gave you their list, let's say. Why not go through Texas's list to make sure that only eligible voters are on their list?

MR. NEFF: I can only go into the United States delivery of process so much, you Honor, but what I can say is that the United States is evaluating, for one, an opinion out of the D.C. Circuit that analyzed DHS's SORN, and also the United States is -- we are certainly going to be proceeding with running this, our intention is to run this against DHS's SAVE database.

THE COURT: Which database?

MR. NEFF: The SAVE database that runs, that

essentially is a, it's called like a fetching system that seeks information from other databases to cross-check whether the data set on a roll is either a deceased person or a noncitizen.

THE COURT: And what's the accuracy rate of data that you've run against that system?

MR. NEFF: The accuracy rate we've been told --

THE COURT: By whom?

MR. NEFF: -- by DHS, and it's particularly the SAVE personnel that run the system is that it is in effect 100 percent accurate.

THE COURT: That's not the reporting; right? I mean isn't the reporting that people have been run through that SAVE Act and not for voting but for other things have been kicked out as noncitizens when they were, in fact, citizens?

MR. NEFF: There's an important note that the SAVE database has been around, the SAVE Act, essentially states have been able to submit their information to SAVE for about 30 years. But SAVE has also changed drastically in the last few months. It's been I would call upgraded and the process they go through, we can go into that if your Honor wants to, but essentially when any flagged voter comes back, it's then run through a very comprehensive confirmation

process to make sure that the, quote, like problematic registration is, in fact, not just --

THE COURT: What's the process?

MR. NEFF: DHS has about 200-odd employees who are trained for a minimum of six months each and know various databases that are accessible to the federal government through use and shared agreements to be able to essentially access important naturalization files and other data that can establish whether the person is a citizen, because there are holes in the process.

THE COURT: What are the holes?

MR. NEFF: The holes, the most common hole would be when someone is -- someone who came to the United States is a parent and has children who are U.S. citizens and then naturalized; like the most common hole of that is that it's actually rather expensive to go through the full, quote, documentation process. A common, cheaper shortcut that people will just do is just go get a passport.

THE COURT: By "people," do you mean the children or the parent?

MR. NEFF: The parents, your Honor.

THE COURT: Because the children are derivative citizens under that scenario, so even if the children are born outside of the United States; correct?

App. 167

Case: 23-1525 Document: 47 Filed: 03/30/2023 Page: 53 of 114 Case 6:25-cv-00639-MSM-RAS Document 171 Filed 07/2023 Page 53 of 114 PageID #: 756 PageID 827012

53

MR. NEFF: Correct. And I'm talking about the parent in this scenario as the most common problematic scenario; that the child is not a problem. That would not come up as any issue. It's the parent that potentially would and --

THE COURT: If they're naturalized they can't vote?

MR. NEFF: Explaining to your Honor when an immigrant is naturalized, sometimes that's not immediately available in naturalization documentation databases. So what these 200 people are doing is they're going to other ways to verify that that person a citizen. One common way is going to the Department of State and confirming that they have a passport.

THE COURT: Gotcha. So what you're saying, what you're asserting here is the federal government's role in that process. That's not what the Framers envisioned, is it? The Framers gave in the Elections Clause the responsibility for maintaining elections to the individual states, with some congressional oversight or some congressional barriers or, what do you call them, check points.

But it's not a federal government role to maintain -- to run elections. It never has been. I mean we're supposed to look at what the original intent

of our Founders was when they wrote these documents, and they were pretty clear that states have the responsibility of running elections.  And actually the HAVA and National Voting Rights Act sort of reiterates that; right.

MR. NEFF:  In their own sphere, yes.  But when Congress intervenes it has preemption and, in fact, they have a stronger right to preemption than they would in any other sphere.  The Electors Clause broadens Congress's power in elections.

THE COURT:  Understood.  I understand the preemption difference with the Elections Clause.  But tell me where you get from that to this request for all this personally-identifying information that goes beyond what's publicly available for the voting lists in 50 states, when you have some of them for eight or nine months and you've done nothing with them.

MR. NEFF:  It would be right in the Help America Vote Act that says that this is the data that the states need to maintain for each registrant, --

THE COURT:  Right.

MR. NEFF:  -- and that the Attorney General is charged with enforcing that the statute.

THE COURT:  What have you done to find out whether the State of Rhode Island is maintaining or not

maintaining that, besides asking for a list of all of the voters?

MR. NEFF: That's how we are going to ensure that they have the proper identification as to each and every voter.

THE COURT: So every state is under suspicion of not doing it unless and until you verify that they've done it.

MR. NEFF: That's the Attorney General's designated role under the Help America Vote Act.

THE COURT: It's not really though. Their role is to enforce the Help America Vote Act, but the states have a role in that Act. The outsize role belongs to the states; right?

MR. NEFF: The role for executing the Rules belongs to the states, yes. The job of oversight falls on the Attorney General.

THE COURT: And what is it about -- I'm going to let you make your argument, go ahead, without asking you more questions about that.

But I want to go back to what the basis and the purpose is because I don't know that, in fact, I don't think that you've provided anything that says there's a basis individually for Rhode Island that we need these for this reason. And frankly saying, you know, we're

Case: 23-1665 Document: 47 Filed: 03/30/2026 Page: 56

Case 6:25-cv-00689-MSM-RAS Document: 174 Filed 03/07/2025 Page 56 of 114 PageID #: 759

56

going to get it from every state and hold onto it and we're going to decide whether you're in compliance or not based on putting data that is personally identifying information through yet another database that we don't know anything about, that apparently is only a couple months old, to me it says that you are asserting the role that HAVA gave to the states.

MR. NEFF: The United States respectfully disagrees, your Honor.

THE COURT: Well, tell me how I'm wrong.

MR. NEFF: The statute of HAVA itself gives the United States, the United States and the Attorney General specifically the authority to enforce the statute.

THE COURT: And how is the publicly-available information not enough for you to ascertain whether states are complying with the statute?

MR. NEFF: Going further into the problem that was identified in the Ford-Carter Report, the HAVA identifier actually protects voters because what they found was happening was that with someone with a common name was very often falling off of the rolls because he was being wrongly identified as someone that -- maybe someone reported, a John Smith reports himself to have moved out of specifically Florida where this became an

Case: 23-1565 Document: 45 Filed: 03/30/2025 Page: 57 Case 6:25-cv-00689-MSM-PAS Document 1-15 Filed 03/26/2025 Page 57 of 114 PageID #: 760

57

issue, --

THE COURT: Uh'huh.

MR. NEFF: -- and Florida then dropped a John Smith off the rolls that was not the John Smith. And so that's why Ford-Carter Commission recommended have a HAVA, what I'm calling a HAVA number; but last four of SSN or driver's license in the first order.

THE COURT: But the HAVA number, well, now I'm thinking of the ERIC number, which is a different number that's assigned to each individual voting record; right?

MR. NEFF: We are not involved in ERIC. I don't know specifically what numbers they generate or don't. That's a private organization that the states are choosing to give the states' private voter registration info too.

THE COURT: Actually it's a nonprofit that the states together have put together, right, so it's a closed loop with the other states.

MR. NEFF: Well, it is a nongovernmental organization --

THE COURT: Correct.

MR. NEFF: -- that does also I believe self-admittedly distribute it to third parties so, I mean --.

THE COURT: So, well, so you're saying trust the government, but go ahead, and not the private industry, but all right.

MR. NEFF: Well, I would say that ERIC is not mentioned in HAVA. ERIC is not mentioned in the CRA. The Attorney General is.

THE COURT: But the CRA doesn't mention HAVA because it didn't exist, and it doesn't mention databases because they didn't exist. It says go copy them at the Secretary of State's Office. Why can't you do that?

MR. NEFF: It's important to read our election statutes as in harmony, not at war with each other. That's not what was intended by them. It's right there in the National Voter Registration Act, 52 U.S.C. 20510(d)(1) says that this law is meant to be read in addition to all other rights. The NVRA expands rights; so does HAVA. HAVA merely imposes certain minimum requirements on states such that their rolls are clean. That's all the United States is interested in here. That's why we stated that as our basis and purpose. We're interested in clean rolls. We're interested in HAVA-compliant voter rolls.

THE COURT: Right. But it seems like you've jumped a bunch of interim steps, but go ahead.

App. 173

MR. NEFF: What the *Lynd* court said at pincite 226, that all that's required is a simple statement from the Attorney General to the court satisfying the elements above; and it's just have we stated a written demand, have we stated a basis and purpose, was that to an officer of election, and did the state refuse.

THE COURT: So what's the basis?

MR. NEFF: The basis is the Civil Rights Act.

THE COURT: So that circular thing again. What's the purpose?

MR. NEFF: The purpose is to ensure that Rhode Island is complying with all provisions of the NVRA and the HAVA.

THE COURT: So you're saying that the Department of Justice doesn't need any more indication than that. So if another president comes in and says, you know what, I lost this state and this state in the last election; I'm going to look at their voting rolls. You would have no objection to that.

MR. NEFF: No, your Honor; it is true that the CRA is a sweeping authority. It's a very short statute. It provides broad authority within a limited scope. And it's important for your Honor to make sure that the requests are within that scope and that they

Case: 23-1525 Document: 45 Filed: 03/30/2026 Page: 60 of 114   Case 6:25-cv-00639-MSM-RAS Document 778 Filed 03/06/2026 Page 60 of 14 PageID #: 763

60

are appropriate under the statute, however, as the *Lynd* court explained.

THE COURT:  I know, but you're talking about a Fifth Circuit case from before I was born, and I think I might be one of the oldest people in this courtroom so let's just remember that.

MR. NEFF:  I'm not trying to push upon your Honor that it is anything more than persuasive here.

THE COURT:  But I have to look at it with respect to what has happened since 1960; right?

MR. NEFF:  Yes.  And I appreciated your Honor's discussion that got right into *Powell* which followed, --

THE COURT:  Right.

MR. NEFF:  -- and *Powell* happened since and where the -- your Honor correctly characterized the Defense's argument that *Powell* tacitly overrules *Lynd*. That couldn't be further from the case.

THE COURT:  Okay.

MR. NEFF:  The only question in *Powell* was what type of review does a particular statute call for.

THE COURT:  Right.  And it uses that statute in question in that case, and I understand that it's a separate statute, but it uses the exact same language. And *Powell* says you have to have some basis that's not

just the law says I can do it so therefore I'm doing it; right?  Isn't that essentially *Powell*?

MR. NEFF:  No, your Honor, it doesn't use the same language.  And that's the sleight of hand the Defense does as well as they're committing the same error that the Oregon court did by just calling the statutes the IRS statute and the CRA substantially similar.  It's not true.  26 U.S.C. Section 7605(b) prohibits the U.S. from subjecting a taxpayer to "unnecessary examination and investigations."  Those are the words that are being examined.  Those are the words that are not -- that are in that fashion are not in the CRA.

THE COURT:  But doesn't it say that you have to have a purpose, a basis and purpose for seeking the information?

MR. NEFF:  Yes, and that is appropriate for your Honor to review.

THE COURT:  And you're saying basis and purpose not appropriate in this case?

MR. NEFF:  No, we are saying we stated -- it appears we have a difference with your Honor that we've stated a sufficient basis and purpose, but we would say that and we've specifically alleged in both our letter and the Complaint that we have stated a basis and

purpose.

THE COURT:  Okay.  And why have you -- why did you choose to file a Complaint in federal court?  Why not an administrative subpoena?

MR. NEFF:  Thank you, your Honor.  That was as part of the U.S.'s efforts towards transparency in this case.  We understand the many concerns that many parties may have and we -- what I would humbly submit is that the Defense can't have it both ways.  They can't both say you shouldn't have filed a Complaint, you surrender your right to an expedited proceeding; but then also say you can't exclude the Federal Rules of Civil Procedure in cases where it's inappropriate in this action because you're denying us procedural protections.  The *Lynd* court made clear that the Federal Rules of Civil Procedure do not apply to CRA proceedings.  That doesn't mean your Honor can't reference the Federal Rules of Civil Procedure when appropriate.

THE COURT:  I think though that if the courts had no role in reviewing anything and we're just to rubber stamp anything the Department of Justice does for any reason that they state, for any basis, for any purpose, that would render, that would read out the language of the court's, you know, reviewing or

enforcing those requests.

So what I'm wondering is where was your basis stated? Is it in the Complaint or was it in the letter, and what specific language did you use?

MR. NEFF: It was stated in the letter, your Honor. I could reference, well, I can quote the letter to which we said this is pursuant to the CRA, the purpose of this request is to -- and this would be the purpose -- ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and the HAVA. That is in the record, our Motion to Compel, declaration doc 2-2 at page 41. It's also cited in the Complaint doc 1 at page 5.

THE COURT: So your argument is you don't need a factual basis; you can just go on what the Defense is calling a fishing expedition and get everybody's list to check their work, so to speak.

MR. NEFF: Consistent with the various Fifth Circuit case law. While we understand your Honor's --

THE COURT: This isn't the Fifth Circuit. So let's talk First Circuit, because doesn't *Bellows* in the First Circuit allow for redaction?

MR. NEFF: *Bellows* was a case that involved a private party bringing an action under the NVRA. This is a much different procedural scenario.

We have the Attorney General bringing a CRA action.  It was appropriate under the NVRA for there to be redactions giving a list to a private party.  That is not applicable to the analysis here.

THE COURT:  So Department of Justice can give this list to anybody else, or no?

MR. NEFF:  No.

THE COURT:  No other department of the federal government?  So you can't give it to HHS, Homeland Security, whatever they call themselves.

MR. NEFF:  Your Honor, I meant -- to be clear, I meant to deny that it is true that we can just give the list to anybody.  That's certainly not the case.

THE COURT:  What can you do?

MR. NEFF:  We can give it for, as pursuant to uses that we've published in our systems records notices, which generally folds into law enforcement and governmental purposes.  There are routine uses that are statutory purposes given to us by Congress.

THE COURT:  But not under Title III and not under HAVA or the National Voting Rights Act; right?

MR. NEFF:  Incorrect, your Honor, because specifically the HAVA, NVRA, and CRA are mentioned in the systems of records notices as routine uses for the Voting Section to use these lists for.

THE COURT: What I'm saying is can you take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens.

MR. NEFF: In compliance with all federal laws, yes, and we intend to do so.

THE COURT: How?

MR. NEFF: We intend to first off enter a use agreement with them, which we've already done, an appropriate use agreement. Second, we intend to make sure that our SORNs are fully applicable to --

THE COURT: How? How are you going to control what they do?

MR. NEFF: Thank you, your Honor, that's a good question. In the Department of Justice we have a little-known agency, the Office of Civil Liberties and Privacy. We've had -- we've been working with them every step of the way. In fact, the head of that office, Mr. Winn, is a longtime AUSA and practiced in this field, has extended an open invitation to all the courts to even come and testify or be at counsel table if needed to explain all of Privacy Act actions that the United States is taking in preparation for properly sharing this data with DHS or SAVE, making sure that it's only being used in the proper manner and that

App. 180

everyone's privacy protections are protected.

THE COURT: So what can it be used for?

MR. NEFF: For list maintenance; for our routine uses that are described in the SORNs, which is essentially the statutes that Civil Rights Division enforces, which are listed in the CFRs, specifically Section 0.50 and 0.51.

THE COURT: So not for ICE going to people's homes and arresting them; right?

MR. NEFF: No.

THE COURT: Are you sure?

MR. NEFF: Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do. However --

THE COURT: Isn't that why Rhode Island doesn't want to give you the driver's license and Social Security numbers, because you can't promise what other people are going to do?

MR. NEFF: If that were the case, your Honor could fashion an order that would order that the data be given and be shared only in the manner that we are properly allowed to use it for.

THE COURT: What if I said you can't share it at all.

MR. NEFF: Can't share it even to run through --

THE COURT: Even within any other department of the federal government or any state or local government.

MR. NEFF: One thing I can promise for sure --

THE COURT: Or any political campaign or political entity --

MR. NEFF: One thing I can promise for sure, the Civil Rights Division is going to comply with every order this court gives, no questions asked.

THE COURT: I kind of doubt that, but okay. So -- but that's sort of the cart before the horse.

Let's go back to the basis. So even if I were to follow *Lynd* in the Fifth Circuit case, wouldn't the Defendants be able to redact the information that's personally identifying individual people before it gives you the list? Doesn't *Bellows* allow that and doesn't it require it on some level? Rhode Island law requires it.

MR. NEFF: No, on both counts, your Honor. First off, again, it's necessary to read the election statutes in harmony with each other, not as at war with each other. The HAVA specifically mentions that this is data we need to properly do our job, and furthermore that's true just as a practical matter.

As to Rhode Island law, my friends on the other

side gloss over in the law that they cite, Rhode Island statute 20-00-19.5(i), that under voter registration form and confidentiality to the extent permitted by law, this says the SSN-4 is confidential.  It falls right back into the supremacy argument.

To the extent that federal law has specified that we get this, which it has, the Rhode Island law allows for us.  And, in fact, further later down in the law in a law not -- again, not cited by Defendant, Rhode Island law 20-00-19 which states the purpose of these laws, it says that the purpose of these laws is "implementing the voter registration requirements of both federal and state laws".

THE COURT:  All right.  Let's back up.  Your basis is the CRA.

MR. NEFF:  Yes.

THE COURT:  Is there a factual basis?

MR. NEFF:  As I've explained with the EAVS data there is, your Honor.  However, we're not required to state it and it's not appropriate for this Court to review it, consistent with the same letters that --

THE COURT:  Don't I have to determine whether you have a basis or not?

MR. NEFF:  You have to determine whether we have a basis, that's correct.

THE COURT: Whether it's a lawful basis. If your basis is I don't want women voting in Rhode Island, then that's okay, I still have to give you the list; they have to give you the list?

MR. NEFF: No, your Honor. You do, you are able to review it in a facial sense. Is it facially compliant with the purposes of the CRA. Remember, the CRA is culled Federal Elections Records. The point here is falling right under Federal Elections Records is the Attorney General's duty to conduct oversight, to trust but verify as to whether these states are doing what they need to be doing, to doing things like removing 60,000 inactive registrations, like removing --

THE COURT: But Rhode Island removed 105,000 registrations or some odd number like that in the last whatever period of time that they cited in their briefing.

Why is your oversight role satisfied by a snapshot in time of the voter records?

MR. NEFF: So this is an ongoing obligation, and the United States is entering this in good faith, absolutely just wanting clean voter rolls and free and fair elections. I would agree as to the snapshot issue that the most important voter role is the one that is

Case: 25-1525 Document: 45 Filed: 03/30/2026 Page: 76 Case 1:25-cv-00639-MSM-PAS Document: 47-15 Filed 03/30/2026 Page 76 of 114 PageID #: 773

70

the snapshot right in time that is used for an actual election.

THE COURT: But isn't your role more effectively -- and I'm not going to pretend to tell the Department of Justice how to do their job. But why would you not be looking at the processes that states are using, as opposed to the list? The list gives you nothing except a snapshot in time. The process tells you whether or not they're complying with HAVA and the National Voting Rights Act.

MR. NEFF: We look at both, your Honor, and --

THE COURT: Why does the list help?

MR. NEFF: Because the United States has the capability to run these lists against other databases to be able to tell if there are bad registrations on their rolls.

THE COURT: So if I -- I'm registered to vote in Rhode Island. If I move to Oregon and register, and you get the list where I'm still in Rhode Island, then that somehow says Rhode Island's list is inaccurate, even if I never voted here after I moved.

MR. NEFF: No, your Honor. It just leads to a scenario where we can check with Rhode Island, do our constitutional and statutory duty to verify with Rhode Island they have removed you from the rolls.

THE COURT: But how do you know that I need to be removed from the rolls? What is your role in this?

MR. NEFF: Our role is oversight and so if we knew -- in your hypothetical, if we knew that you had moved to Oregon and we also knew that Rhode Island had not removed you from the rolls --

THE COURT: But you wouldn't know that based on this list because you're getting a snapshot. You're getting the day before I moved.

MR. NEFF: I understand, your Honor, and there may be, like there can be holes in list maintenance, but that's why there's oversight.

THE COURT: But that's why we have ongoing list maintenance; right? So if you don't check it every day, all 50 states, all Boards of Canvassers, every single -- and the District of Columbia every single day, then, you know, if your oversight is inaccurate; right?

MR. NEFF: No, I wouldn't concede that. It's the Attorney General's prerogative as to how she's going to go about her oversight role and how often and in what manner.

THE COURT: But then doesn't -- okay. Go ahead.

MR. NEFF: Going into the, essentially the details of Rhode Island's election process, and what

App. 186

they've done is exactly what the Fifth Circuit has warned against saying that Title III properly is purely investigative. That's *Alabama ex relatione Gallion v. Rogers*, 187 F.Supp. 848 at 854; *Coleman v. Kennedy*, 313.F.2d 867 at 868. The purpose of Title III is only looking into possible violations of a federal statute, and that that language is clear and unambiguous.

THE COURT: So what are the possible violations that you're alleging here?

MR. NEFF: The possible violations would be in noncompliance with the NVRA and HAVA, and we're back to what the letter --

(Indecipherable crosstalk)

THE COURT: -- logic then; right? We're asking because we don't have any information but we want the information so that we can figure out whether there is evidence; right?

MR. NEFF: Which is exactly what the court warned against. The Attorney General's right to records does not require that she know that she could win without them. That's why this is an investigatory tool. The whole point is for us to be able to check, and if something is wrong we need not prove that something is wrong; we need not even allege that something is wrong.

THE COURT: But I think you do. That's where you have a basis, a factual basis. We come into court all the time and you're required to have a factual basis under the Federal Rules of Civil Procedure so that you're not going on a fishing expedition. And you chose the forum here; you chose to file a civil complaint as opposed to a request for an administrative subpoena.

MR. NEFF: I'd refer your Honor, if you want more current analysis, it would be the *Benson* court's analysis in the Michigan case where --

THE COURT: You're talking about the Sixth Circuit.

MR. NEFF: Correct, where that court's analysis was that such a basis and purpose was sufficient for the purposes of the statute.

THE COURT: Also not mandatory authority; right?

MR. NEFF: Correct.

THE COURT: Okay. Go ahead.

MR. NEFF: And less persuasive than the Fifth Circuit, we would posit to you, because it is a district court, not a court of appeal.

THE COURT: Correct. But more recent.

MR. NEFF: That's true.

THE COURT: As is Oregon and the Central

District of California; correct?

MR. NEFF: Correct. And the Central District of California and Oregon rely heavily on that misreading of *Powell,* where even in *Powell* reaffirms what we're talking about here where it said that even with the language of the Internal Revenue Code that had the statute that has the, that gives the U.S. the ability to send these subpoenas or these requests for investigation; the U.S. does not depend on a case or controversy for this. It can send them even just because it wants assurances that it is not true, that a crime did not happen, that a violation did not happen.

In other words *Powell* doesn't overrule *Lynd*, doesn't even cast out on it; it reaffirms it.

*Powell* further explained that the judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine, "If the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation," which relates directly back to the language that is present in Section 7605(b) and not in the CRA, and that is preventing subjecting a taxpayer to "unnecessary examination or investigations."

Clearly if that language was in the CRA we would be in a completely different scenario.

THE COURT: But *Benson* construed the demand as an administrative subpoena and dismissed it anyway.

MR. NEFF: That's correct.

THE COURT: And so if we follow *Benson,* why is this case different?

MR. NEFF: Because the reason for the *Benson* court's dismissal was, as the court stated itself, overly pedantic and it just doesn't, it doesn't pass muster as far as the textual interpretation of the statute. The *Benson* --

THE COURT: So now we get back to textualism and the Elections Clause; right?

MR. NEFF: I would more say it's just a simple issue of statutory interpretation: What do the words mean? What does "comes into possession" mean? It's a pretty -- it's actually just a basic concept. There's nothing in the text that suggests that it matters whether the document was generated externally or internally.

THE COURT: I guess what I'm lost on here is what the government's argument seems to be is that Title III of the Civil Rights Act, as well as the HAVA Act and the National Voting Rights Act sort of empower

the federal government through rhe Department of Justice to take a second crack at maintaining voter lists for individual states; and it's sort of like why wouldn't Congress have said that in those Acts, and I think it was Justice Scalia who said Congress doesn't hide elephants in mouse holes.

Aren't you arguing that they sort of have this elephant hidden in the mouse hole and you actually have the ability to double-check not just the process, that they're complying with the process, but check their work?

MR. NEFF: No. The NVRA and HAVA are quite explicit that the Attorney General is charged with enforcing what the, the limited purpose it was attempting to accomplish.

THE COURT: Which is?

MR. NEFF: In the NVRA's case there are multiple purposes of the NVRA, but if we're going to sum it up in a few words it would be ensuring access to voter registration.

THE COURT: Okay. And how does this ensure access to voter registration?

MR. NEFF: As stated previously, when you don't have a HAVA identifier it actually poses a great risk that people will be inaccurately removed from the

App. 191

rolls.

THE COURT: But so you're saying you think Rhode Island is removing too many people from the rolls.

MR. NEFF: Again your Honor is going into breaking down whether it's actually true or not. We can't know until we have the list to be able to do our check --

THE COURT: And the elephant is in the mouse hole again. Okay. Go ahead.

MR. NEFF: And so if I were then going to give a five-word explanation of the HAVA, it would be imposing certain list maintenance requirements on the states and, again, the Attorney General is posed with enforcing that. That's -- to what extent it's been done in the past is not of concern to this court. What matters is what the law says and what it says our duty is, and is what we're doing consistent with that. And providing the HAVA number is just very clearly right there in the statute.

THE COURT: It says the Department of Justice is entitled to the HAVA number?

MR. NEFF: No. It says the State is required to maintain it and that the Attorney General is charged with enforcing the statute.

THE COURT: The State is in charge of the

numbers and the rolls, and the government is in charge of making sure that the states are doing their job.

MR. NEFF:  Yes.

THE COURT:  Not checking their work.

MR. NEFF:  Well, I think that might be a distinction without a difference.  We are making sure that they're doing the work that they're required to be doing.

THE COURT:  No, you're not, because the voting rolls that you're asking for are a snapshot in time.  If you were making sure that they were doing what they're supposed to do under HAVA, you'd be looking at the systems and the processes and you'd be auditing whether or not they're applying those systems and processes consistently across time.

MR. NEFF:  Judge --

THE COURT:  You're looking for the voting records.  You want a list of all -- is the purpose to get a national voting database?

MR. NEFF:  No.

THE COURT:  Really?  You're destroying these after you've giving them a look-over?

MR. NEFF:  Again, we have a number of laws we have to comply with.  One of them is the Federal Retention Records Act, so we have certain mandatory

Case: 23-1565 Document: 47 Filed: 03/26/2025 Page: 79 of 114 Case 1:25-cv-00639-MSN-LRV Document 15 Filed 03/07/2025 Page 79 of 114 PageID #: 782

79

requirements.  We can't just destroy them immediately. But we are going to be complying with all applicable federal laws, including privacy laws, and your Honor will be well within her authority to issue an order consistent with both the CRA and its concerns as to the protection of the data.

THE COURT:  Okay.

MR. NEFF:  I want to just make one note as far as the, my friends' briefing that says that a racially discriminatory purpose is required under the CRA; when -- first off, not only is that not in the text, but it's abundantly clear from text around it that it was purposely excluded.

First off, the title of the law is Federal Election Records.  Most importantly, one needs only look in other titles of the Civil Rights Act to see that when Congress intended to put in racial discrimination as an element, it knew how to, it knew how to use those words.  It's right there in Section 601, which is codified as amended Section 52 U.S.C. Section 10101 where it used "on account of race or color".

Furthermore, in multiple acts passed in the similar time, Title VII of the Civil Rights Act of 1964; Section 2 of the Voting Rights Act; the Fair

Housing Act, which was then part of the Civil Rights Act of 1968, all language including race and color were used as qualifiers.

It is not in Title III. That's because of what Title III is.

THE COURT: But Title III talks about poll taxes, so we have to read Title III in the time context, don't we?

MR. NEFF: Yes. But what -- it is using terms that is all acts requisite to voting, which a voter roll and maintenance of a voter roll is clearly an act requisite to voting.

THE COURT: Can't we construe the HAVA and the National Voting Rights Act as modifying to some degree --

MR. NEFF: Well...

THE COURT: -- the Title III?

MR. NEFF: Yes, but the question is in which direction. And the National Voting Registration Act specifically tells you again, Section 20510(d)(1), this is in addition to other rights. The National Voter Registration Act and the Help America Vote Act are working in congruence with each other to have a coherent scheme where the states will have clean voter rolls and have fair and accurate elections. To read

them as in conflict with each other and preventing anyone from looking at what the states do is just not consistent with the text or fair reading of the statutory scheme.

I want to emphasize again that *Lynd* specifically talked about the pleadings issue in which it said that pleadings are -- that when they're not filed the whole procedure does not have to satisfy usual notions under the Federal Rules of Civil Procedure, and that that was then was upheld by *Powell,* which even followup with Supreme Court jurisprudence to *Powell* made clear that *Powell* was not meant to impair summary enforcement proceedings because summary enforcement proceedings are different than actual action. They're -- this is purely an investigative tool that needs, and it needs to be done in short order; it's just, it follows from elections. Elections have some of the shortest time frames.

We need to get started as soon as we can to make sure that the voter rolls are accurate and maintained properly in advance of each coming election.

THE COURT: But does this get you there?

MR. NEFF: It's one step towards it, and essentially to say, well, we could be -- you could also be doing this, you could also be doing that, is to

outside what's in this case.

THE COURT: Yeah, but I'm not -- but you have to have a purpose that is met by your demand.

MR. NEFF: That's true.

THE COURT: Okay. So you're saying your purpose is to make sure that the voting rolls are accurate for the next election.

MR. NEFF: Largely, yes. And that's consistent with the list -- I want to stick to the text that we put on the letter, but your Honor is accurately describing what that entails.

THE COURT: Okay. How is that served by asking for a voter list for more than a year before the next election?

MR. NEFF: Fair question. If we can flag some now, flag some registrations now that are very distinctly problematic, we can get started now with the State to get those removed in time.

As we get closer to the election there are other limitations that come into play. You've got, first off, the election offices get more busy; second, we have Purcell issues. So there's all kinds of reasons why we have to start earlier.

THE COURT: But -- okay. All right. I understand what you're saying; I just don't think that

your request gets you there.

So what is the limit to the purpose that can support the records demand? Does it have to be related to voting records?

MR. NEFF: Yes, it would have to be related to federal election records. That's the most signification limitation that there -- the second most limitation would be the 22 months provision.

THE COURT: So fair for the State to say I'm culling everybody who's never voted in a federal election before I give you my list.

MR. NEFF: I'm sorry, I didn't hear.

THE COURT: They're pulling off everybody from the list to somebody -- people who've only voted in state elections or who have never actually voted, they don't have to give you that information.

MR. NEFF: Not if they're registered to vote in this coming election because the record is the voter registration list; it is not who, when they registered. There is a list that exists right now that Rhode Island will be using as an act requisite to vote.

THE COURT: Hasn't Rhode Island offered to give you, but for the last four of the Social Security number or the driver's license number, and you refused that; correct?.

MR. NEFF: No, we don't refuse that. They're free to upload it if they like, but we would still be here because we can't do our job without that.

THE COURT: Now, if I don't follow *Lynd*, okay, and I evaluate the basis and purpose advanced in the A.G.'s demand, and if the Court determines that the stated purpose is pretextual, shouldn't the Court dismiss the case?

MR. NEFF: No.

THE COURT: So you can have a pretext.

MR. NEFF: It would be inappropriate for your Honor to analyze whether it was a pretextual motive or not.

THE COURT: But I have to determine whether there's a basis and a purpose, and you're saying if you come here and you give me a clearly phony basis or purpose, I still have no ability to deny your request.

MR. NEFF: While that's true, I'd also say that's not -- that doesn't need to be a concern of your Honor because that's not the case here. There's not basis for it. The closest thing to a basis is the *Weber* court bringing in anonymously-sourced media articles into a judicial opinion.

There is no record here to support that the Civil Rights Division would be doing anything other

than what it states it will be doing.

THE COURT: Hasn't the Department of Justice and the President issued all kinds of statements about a national vote, you know, one of them was the Republican Party should take over the voting; but putting that aside, that the federal government should take over voting management, that all of these things that are clearly unconstitutional, and am I supposed to just ignore those and say trust me?

MR. NEFF: There have been a number of statements that have been made --

THE COURT: Correct.

MR. NEFF: -- extraneously. What I would impress on the Court is that once you look first and foremost at what the Civil Rights Division said --

THE COURT: And what are you saying? We're going to take these, we're going to look at them, and we're going to flag people we don't think should be voters in Rhode Island.

MR. NEFF: And we will then approach the states with that data.

THE COURT: Okay. And then the State is going to say to say to you I know, but that was a moment in time and we've culled our data 30 times since then. And then you're going to say?

MR. NEFF: And we've all done our jobs.

THE COURT: Have you?

MR. NEFF: Yes.

THE COURT: Because they could still have false information on there. You haven't done your job.

MR. NEFF: It's definitely trust but verify. But if they're able to show us the list that doesn't have that inaccurate registration on it, then it's good.

THE COURT: Why don't they show you the process?

MR. NEFF: Because we have to confirm that they're actually following their own processes.

Also, I want to be clear here, based on their self-reported information to EAVS, we don't believe they have been following best practices. As we -- the EAC lists five categories of audits that Rhode Island could be doing, and Rhode Island self-reports they only do two of them. I commend them for doing logic and accuracy testing and risk-limiting audits, but there are several more that can be done.

THE COURT: Such as?

MR. NEFF: Such as specifically eligibility audits, legal audits, and post-election tabulation audits.

THE COURT: Tell me what you mean by those.

MR. NEFF: For example, I mean it varies state by state, but the most -- eligibility might be, for example, submitting the data to SAVE. There's nothing stopping these states from doing it themselves, in fact, they're invited to; and SAVE will run it for them, will give it back to them and will give them the data --

THE COURT: And this is the new and improved SAVE database, not the one that was wildly inaccurate --

MR. NEFF: Correct.

THE COURT: -- six months ago.

And we're supposed to just take Department of Justice or Department of Homeland Security's word that now we're accurate?

MR. NEFF: No, your Honor. Everyone has their own role in this. And the federal -- the Civil Rights Division's role is to ensure that the lists are clean and that the states are doing what processes they should be doing to make sure that they are clean.

THE COURT: So if you find states that are making it difficult for certain classes of people to register to vote, then you're going to go right down to that state and say you have to enable people, give people the opportunity to vote.

MR. NEFF:  That would be a appropriate concern for the Civil Rights Division Voting Section, yes.

THE COURT:  How would you find that in this mechanism?

MR. NEFF:  We have an open, a decade-long process for complaint sifting.  Every complaint that's sent to us goes through a various -- goes through a review process that is then elevated.  This is what we do, your Honor.

THE COURT:  Okay.  All right.  Is there anything further?

(Pause)

MR. NEFF:  No, your Honor, absent further questions, we submit.

THE COURT:  Okay.

Any rebuttal?

MR. ARGUIN:  If I could briefly, your Honor.

THE COURT:  Sure.

MR. ARGUIN:  Thank you.  Special Assistant Attorney General James Arguin on behalf of the Rhode Island Secretary of State.

Just a few points in response to what we heard this morning.  First of all, for the first time we've heard reference to alleged discrepancies in what's called the EAVS report submitted by the State.  The

last one was done in 2024 following the last election.

THE COURT:  And just -- I don't want to interrupt you, but that wasn't cited in their demand --

MR. ARGUIN:  Absolutely, and that was my point. Absolutely not.  The September 8th, 2025 demand letter at ECF 2-2 made absolutely no mention of this.

Now, as my brother mentioned, the Complaint does make a reference to it.  It says they looked at it, and that's in some of the earlier paragraphs of their Complaint they've said they had reviewed the EAVS reports.  But they provided no conclusions that they drew from the EAVS report that could ever come close to stating a proper basis or purpose, as required by the CRA.  They just made reference to the report.

THE COURT:  So the first time that you're finding out what they think you should have done under the EAVS report is today.

MR. ARGUIN:  Is this morning.  And I think also the other point I would make about the EAVS report is what matters is not a passing reference in the Complaint.  Under the CRA what matters is the statement of the basis and purpose in the written letter; and there is absolutely nothing in the demand letter to the Secretary of State, no references at all.

And furthermore, even if that passing reference

in the Complaint were somehow sufficient, it doesn't state what they said today. And as we're (indecipherable), what we're looking at when you look at voter registration lists, which as we established during our first conversation, those are updated by the minute and there are safeguards in place specifically to make sure no one is falsely removed. So there are sometimes things captured in those reports that are subject to corrective action or are in process of being corrected pursuant to the State's obligations under the NVRA.

THE COURT: So that gets to the purpose, I think, which is the moment-in-time issue. It's a moment in time. It doesn't, my -- if the purpose is to make sure the State is complying with HAVA and the National Voting Rights Act, then I'm not sure how we get there with a moment-in-time snapshot, unless they're calling it like a minute audit; but they would have to do it every day, every minute, every hour in order to really determine, and for all 50 states.

MR. ARGUIN: Exactly. Or set up their own shadow (indecipherable).

THE COURT: Which is not permitted, which is not what the federal Elections Clause or the Elections Clause of the Constitution says. It says states -- not

the Department of Justice -- shall maintain and process.

MR. ARGUIN: That's precisely right. And I think even the Fifth Circuit cases that they referenced as support under the CRA -- and my colleague mentioned one of them. The *Bruce* case is instructive because in *Bruce* that was exactly what the court was examining, whether there was a violation of the CRA, whether, you know, that was actionable or that required the records to be (indecipherable). And it specifically distinguished the alleged violation of the CRA from the state's alleged failure to purge voters who had --

(Court Reporter requests clarification)

MR. ARGUIN: Specifically distinguished it from the list maintenance activities of purging voters who had moved away or died. It said it wasn't relevant to the CRA.

The other point that's also I think --

THE COURT: And that's a contemporaneous Fifth Circuit case, correct, the *Kennedy v. Bruce*?

MR. ARGUIN: Yeah, that was contemporaneous, you know, a year or two after the Civil Rights Act was --

THE COURT: And *Lynd*, contemporaneous --

(Indecipherable crosstalk)

MR. ARGUIN: -- the *Lynd* line of cases, and it's

cited in our materials.

The reason why I think the argument as just presented highlights the need for an accurate statement of the basis and the purpose is the assertion today -- which, again, comes as a surprise -- that DOJ does plan, in fact, to share this data with the Department of Health -- Department of Homeland Security to run it through the SAVE database for immigration checks. Again, while we heard that this is all about transparency, that was never disclosed.  And what's more, it certainly is not provided in the notice provided to the Secretary of State.

And it also conflicts with their representation to this Court in their reply at EC-33, that they said there was an affirmative duty on them not to disclose this information beyond the purposes they were requesting.  Now, the statute on which they're relying allows them to share with other agencies; but, nevertheless, this is sort of a moving target.  So what are we -- why do we need these lists, and how is this purpose of putting them through the SAVE database relevant to whether or not Rhode Island is complying with its list maintenance responsibilities?  And clearly it is not, it is a different purpose, and it's another purpose that is not within the Civil Rights

Act, which is another reason why it should be denied.

One other point that was made is this repeatedly emphasis that all we need to do is state the legal basis and not the factual basis. But again, the very cases on which they rely under the Fifth Circuit line of cases specifically rejected that. Take, for instance, *In Re: Gordon*, 218 F.Supp. 826, a 1963 case from the Southern District of Mississippi. It specifically said that the CRA is not an unlimited discovery device which may be employed and used without restraint. Then also another case from that era, *In Re: Coleman,* similarly said that requests under CRA are not made based on speculation or idle curiosity.

And let's get back to *Lynd,* the principal case on which they rely. It specifically noted that the records it was talking about were public records, and it said nothing here is confidential -- which is why they proceeded to make that express distinction that they were not talking about confidential or private information. So clearly they did not anticipate the release of Social Security numbers or state driver's license numbers.

The other point that was made is that the Ford-Carter Commission that led to the HAVA required states to provide these unique HAVA identifiers. Well,

App. 208

as we have already discussed, that is in the publicly-available information that Rhode Island has offered to provide. Those HAVA identifiers are part of the public access provision provided by state law, and they're available.

THE COURT: I want to clarify this because I think that it got a little conflated in the Department of Justice's argument.

I understood them to be arguing the last four of the Social Security number and the HAVA number were the same thing. Perhaps I misunderstood. But what the HAVA number is, is that sort of computer-generated unique identifier.

MR. ARGUIN: It's a unique identifier generated as part of the registration process. It is not the Social Security number. It is not a driver's license. It's a unique identifier that HAVA requires the states to do. Many states do it only if the other numbers aren't available; if there's no Social Security number or if there's no driver's license.

But Rhode Island assigns a HAVA, a unique HAVA identifier to every voter. But, you know, that doesn't raise the same confidentiality and privacy issues as a Social Security number, I would point out, given all the financial and other records that are associated

with Social Security numbers and driver's license numbers.  HAVA is unique to voting.

THE COURT:  And I think that since HAVA is unique to voting, it more closely aligns with the purpose that the Department of Justice is seeking. Does the court --.  So those numbers are different numbers.  They're not -- the HAVA number might be generated as a result of the Social Security number, the driver's license number, the address, the date of birth, all of those things, which are publicly available -- well, not the Social Security number and driver's license.  But all of those records create or cause the creation of the HAVA number.  Is that accurate?

MR. ARGUIN:  Well, as I understand it, your Honor, as part of the -- once the registration is submitted and the application is submitted, a unique identifier is assigned to that voter.

THE COURT:  Okay.  And then Rhode Island goes through a process too where it verifies voting information periodically.

MR. ARGUIN:  Absolutely.  Yes.

THE COURT:  Tell me about that because --

MR. ARGUIN:  Not only at the time -- it's detailed in our Motion to Dismiss, but it's certainly

App. 210

at the time one registers proof of citizenship, you know, they have to swear an attestation of citizenship, they present their residence application, proof of identification, all the material is submitted.

Periodically there are other updates done through mailings. In fact, just in 2025 the Department of State sent out a mass mailing to the active voter registration list to confirm addresses. And of course daily, you know, they're reviewing and comparing the Social Security death index, whether or not persons have died. And there's reporting also from the State Office, the Medical Board or the corner, whoever is in charge of statistics or vital statistics, the Office of Vital Statistics to confirm, to compare death records with the database, and all that information is subject to verification and processing.

And as you mentioned, the State also participates in a multi-state effort, ERIC, which is shared information with other states to reconcile discrepancies with voters who have moved to another state. So all of that information is compiled to maintain the most accurate listing.

THE COURT: But let me just ask a question. When the Secretary of State is verifying, say, vital statistics, people who have died, they don't give the

voting list to Vital Statistics; is that correct? They get the death records from Vital Statistics --

MR. ARGUIN: Exactly.

THE COURT: -- so that the integrity of the voting list is maintained by the Secretary of State.

MR. ARGUIN: Absolutely correct. They're receiving information to enter into the database. So someone who died, someone who becomes incarcerated, that information is shared by other state agencies, compared to other available information, for instance the Social Security Death Index, and the system is updated with that information on a regular basis.

The other point that's somewhat concerning is also even though we say that the Department of Justice said that they're going to run this through the SAVE Act and use it for immigration purposes; but even more problematic was the concession that the Civil Rights Division can not really promise what it's going to do with the information. Now, that is really troublesome when talking about 750,000 eligible voters in Rhode Island who all have their own concerns about privacy and informational data security. And that's --

THE COURT: I'm sorry. And Rhode Island law as well as federal law requires certain protections of that data because of the increase in online kind of

App. 212

scams and financial fraud and all of those things.

MR. ARGUIN:  The court's own electronic filing rules are clear, don't put that in a publicly filed document; and it's exactly the same reason.  These kinds of concerns about data security didn't exist in 1960s; it wasn't that prevalent.  But now data security is a fact of life, and someone gets your Social Security number or your driver's license number that's used for multiple programs and services and identification needs, it's problematic, and that's why both state and federal law protect it.

There was a passing reference that DOJ says they've complied with the Privacy Act because they've issued a bunch of SORNs.  There is a couple SORNs our there; they've cited three or four in their Complaint. None of them serves the fundamental purpose of giving any citizen adequate notice that the data that they've supplied to vote and to exercise their First Amendment rights is somehow going to now be shared with the Department of Homeland Security to run immigration checks; and perhaps who knows what else because we won't specify what it is.  That's really concerning. And I think that's exactly why there was some discussion of, well, just put a protective order in place and we'll abide by that.  That in no way

addresses the State's concerns.  The Attorney General of Rhode Island and the Secretary of State of Rhode Island have a duty to uphold public interest, which is to protect the rights of the citizens to their confidential -- to make sure their confidential and private information that is shared with the government to register to vote is not distributed without a valid and clear legal purpose.

And what's more, that right -- although it's the Secretary of State and the Attorney General who enforce it -- belongs to the citizens of Rhode Island, the 750,000 people who are going to have their personal, private information shared for what unknown or unlimited list of reasons.

And it's not speculation to say that this type of immigration check that they've only confirmed today is exactly what they're planning to do, or for some other purposes.  The Executive Order that President Trump issued, 14248 just last year, specifically says we want to obtain the voter registration list from all of the states so we can run it through the Department of Homeland Security to run immigration checks.

It's exactly consistent with what we heard today.  And what's more, that order, which has been enjoined by the District of Massachusetts, is still a

App. 214

public statement from the head of the Executive Branch disclosing that they intend to use the data not for any purpose related to the CRA and even not for any purpose related to the HAVA or the NVRA.

THE COURT: So you're saying that notwithstanding the assurances that Mr. Neff gives the Court that the Civil Rights Division of the Department of Justice is planning to use it for the limited purpose contained within the statutes; you're saying he has no control over that and the evidence is to the contrary from above his pay grade.

MR. ARGUIN: Well, with all deference to Mr. Neff, I take him at his word, but his word was equivocal: I don't know; I don't know what's planned; I don't know what will happen. And this was the point one of my colleagues made.

So I think all of that reinforces the Secretary of State's concerns relating to DOJ's failure to provide a clear and accurate statement of the basis and the purpose for its demand for an unredacted version of the State's voter registration list.

And just one more point. If your Honor reviews all of the Fifth Circuit cases, and I'm talking about *Lynd*, *Bruce*, *Coleman* that's been cited, they all had the statement of the basis and purpose. I'm not saying

App. 215

it was used in detail, but it at least related to the statutory purpose, and it wasn't something like.

THE COURT: And it didn't say my basis is the law. It gave a factual basis.

MR. ARGUIN: Absolutely correct. Absolutely correct.

And so with that, your Honor, for all those additional reasons, we request the Complaint be dismissed and the Motion to Compel be denied.

THE COURT: Is there anything further?

MR. SAVITZKY: Your Honor, if I could be heard extremely briefly, although very slowly and articulating.

THE COURT: Yes.

(Laughter in courtroom)

MR. SAVITZKY: Just again, not very much to add at all, but just on a couple of points that were raised. First of all with respect to *Powell,* there was an argument made that I don't think was in the briefing that actually *Powell* is about Section 7605 of the IRS statute and therefore it's distinguishable. That's not right. And the section of *Powell* that really controls is III, it's on page 255 of 379, United States Reports, and that's really the section that talks about what do we do where the United States District Court is given

jurisdiction by any appropriate process. And the court answers the question and says, well, when there's -- when the procedures isn't specified, you use the federal rules. And above the line that's in Footnote 18, (indecipherable) the line that says there will be a hearing and you can challenge the demand on any appropriate ground, any appropriate ground.

The idea that you could ever demand -- use government power to demand this sensitive information and there would be no substantive consideration of whether it is lawful and whether the purpose is improper is foreign to the law and inconsistent with the cases not just from the IRS. I mean the case we talked about, about the hospital in Boston last year, that's HHS. So we know that's not true.

On the merits, I want to point the Court to 52 U.S.C. 21085. This is from HAVA, it's part of HAVA. And there was a lot of discussion with counsel from the Department of Justice about the federal government's role, the designated role.

What that section of the provision says as part of HAVA is the specific choices on the methods of complying with HAVA are left to the discretion of the states. Congress -- end quote.

Congress could not have been clearer about the

discretion given to the states and the limited role of the federal government vis-a-vis the states and their process.

One other point, and I won't get into the basis and the purpose that's been discussed at length on the SAVE database specifically, and just to this point of there's been basically no disavowal this data could be shared, no attempt to cabin what other federal agencies might do.

But as I read the specific SORN, or System of Records Notice, that governs the SAVE Act and data that's put into that -- not the SAVE Act, excuse me -- the SAVE database, which is different.  As I read it, it's 90 <u>Federal Register</u> page 48954 into 55; I believe that's the cite.  But as I read that, it's contemplated when you put information into that SAVE database it is then retained for up to 10 years.  So the idea that there are any real limits on what other federal agencies are going to do with this data once the Civil Rights Division gets it, I think is belied by what you've heard today.

The Department of Justice may think it's a good policy or good idea to run the data in this way, even though it could jeopardized naturalized citizens' right to vote like Ms. Sanches, who is an Intervenor here.

Texas may think it's a good idea. But nothing in federal law requires that; nothing about ascertaining compliance with federal law means that must happen, and therefore there's no basis or purpose for this request. The Complaint should be dismissed.

THE COURT: Anything else?

MR. GOLAN-VILELLA: Nothing further from us, your Honor.

THE COURT: Mr. Neff.

MR. NEFF: Briefly, your Honor.

THE COURT: Very briefly.

MR. NEFF: Keeping my comments to what was mentioned in rebuttal, I specifically heard my friend say that there was no exclusion that this could be used for immigration purposes or check. I want to correct the record. To the extent that I gave that impression, I did not mean to. This is not being used for immigration purposes.

THE COURT: By you.

MR. NEFF: Correct. And I think this is something that is getting lost here in this rebuttal discussion. The question that is being posed by my friends -- and it's not a fair question -- is why can't you give us 100 percent assurances as to what other federal agencies will do in the future regardless of

Case: 25-1636 Document: 00118457815 Page: 223 Date Filed: 07/17/2025 Entry ID: 6727012
Case 1:25-cv-00630-MSM-PAS Document 42 Filed 06/30/26 Page 106 of 114 PageID #: 808

105

what steps you take now.  That's never a fair question. It's not an appropriate question for this Court.  The question is --

THE COURT:  But isn't it when you're asking for such extraordinary information and they're offering you most information redacted down just slightly.  Why isn't that sufficient?  It seems that in -- Rhode Island gives everyone a HAVA number.  Why doesn't that satisfy your...

MR. NEFF:  I would dispute your characterization, your Honor.  The redaction of the last four of the Social Security is what we need to do effective list maintenance.  And furthermore, no one has taken a step back here --

THE COURT:  You don't need to do list maintenance.  You need to verify that they're doing list maintenance.

MR. NEFF:  Correct.

THE COURT:  So you don't need to do list maintenance, and that's not the Department of Justice's role.  In fact, Congress specifically gave that, assigned that role to the individual states.  So that's not your role.

MR. NEFF:  Noted correction, your Honor.  That's right.  We need the SNN in order to conduct our list

maintenance oversight.

THE COURT: Why can't you use the HAVA number?

MR. NEFF: That's a good question. I think the terms are getting conflated and unhelpful here.

It's important to note that HAVA is, does not put those -- when it lists the numbers that the State is required to keep, it doesn't list it in the disjunctive; it lists them actually in an order. First the State is required to identify the voter with the driver's license number. Only if a driver's license number does not exist or is somehow not available is the State then allowed to move to the SSN-4, and, in an emergency case, issuing a HAVA-specific identification.

THE COURT: But Rhode Island specifically gives everybody a HAVA-specific ID, so why isn't that enough?

MR. NEFF: It would not be enough under the HAVA statute.

THE COURT: Why?

MR. NEFF: It would be a facial violation of the statute actually because they would not be -- if they're not attaching the driver's license to every voter.

THE COURT: They're attaching the driver's license number, but they're saying what's publicly available, what's available to you, Department of

Justice, which should serve your purpose is the HAVA number.

And unlike other states, we don't just collect the last four of the Social Security number or the driver's license number; we give everybody a HAVA number, and you can have that. Why isn't that enough?

MR. NEFF: In that case the federal government would be charged with ensuring that they are keeping the driver's license number, and so therefore it would be appropriate for the United States to ask to see the list with the driver's license number.

THE COURT: Do you have any evidence that the State of Rhode Island is not doing what it says it's doing?

MR. NEFF: We can't know what they are or aren't until we've seen the list.

THE COURT: So the answer is no.

MR. NEFF: That's correct.

THE COURT: Okay.

MR. NEFF: And I would, going back to what my question -- what I think the question needs to be, it's have we taken all necessary and prudent steps and are those steps consistent with federal law. Here, there is an MO -- let's not lose sight of the fact there is an MOU in place. I signed it myself on January 20th

with DHS that limits the use of the data to votes-specific purposes --

(Indecipherable crosstalk)

MR. NEFF:  -- maintenance.

THE COURT:  Okay.  Let's say fast-forward five years, you're not in your job anymore.  Are they bound by that MOU?

MR. NEFF:  Yes, pursuant to this data, yes.  And furthermore your Honor can bolster that.

THE COURT:  But that's not my role here.  My role is to say are you entitled to what you're seeking, which is sort of a broad swarth of personally identifying information that frankly is a lot different now than it was in 1960.  I don't know how many spam calls you get a day, but I can tell you that I get lots of them and they're, you know, all kinds of fraudulent types of calls even to my government cell phone, which I find funny.

And so, you know, it's a different landscape.  You have to acknowledge that.  Not acknowledging that is burying your head in the sand, so your purpose needs to include some understanding of that.

When you're just saying the HAVA number is not enough, I need the driver's license and Social Security number, then they're saying why, and your answer is I

don't have to tell you why, essentially.

MR. NEFF:  Far from acknowledging the new era we're in, we're embracing it.  This is just a first step to sifting down to where there are problematic registrations.  I think it would fair for someone to state that in today's day and age it's extremely hard to comply with all the provisions at the HAVA at the scale the Secretaries of the State are being asked to do right now.  We can work as a partner with them. This is only a first step to seeing where some of the problems may be; and so because of such a large number as Rhode Island themselves has said, we need to be able to do our initial check so that we can start whittling down where maybe some of the problems are.  We're not saying there are problems.  That's not what we're talking about at this phase.  We're just talking about doing the initial screening that is necessary, given the scale of a voter registration list.

THE COURT:  But the Department of Justice kind of came in hot and asked for all the information.  They didn't say, hey, let's partner, how can we help you, what are you doing?  They came in and said give us all your information because we need to verify that you're doing what you're supposed to be doing, so offering a partnership now seems a little hollow.

MR. NEFF: If they're willing to come forward -- and I would strongly suspect they're not, that's why with here -- with exactly what they've offered plus just, and I say "just" the last four digits of the Social Security number which are not --

THE COURT: But that's the issue.

MR. NEFF: -- not the Social Security number --

THE COURT: They are --

MR. NEFF: -- giving it to the federal government, then there wouldn't be an issue.

THE COURT: Ane if you were to come forward and say those records will be destroyed the day after we get them and run them through, they probably would have less of a problem with it. So we can't live -- you know, my mother-in-law used to say, If "if" were a skiff, we'd all go for a boat ride. So it's kind of a silly analogy, like to say if they were to give us this, then we wouldn't have a problem. You're asking for what they don't want to give you and that they are arguing they're not required to give you.

MR. NEFF: That goes to exactly what we're asking for your Honor to do, is to issue the order, the Motion to Compel, and then you can appropriately set a next hearing in order to fashion how that order is going to look.

App. 225

THE COURT: Why do you need the last four of the Social Security number? Why is it four?

MR. NEFF: Because it's all that's -- thankfully it's all that's needed in order for database management analysts to be able to get accurate information.

THE COURT: And can they get that information -- can somebody hack in your computer system, get that information and use it for some nefarious purpose? They don't need any more than the last four; right?

MR. NEFF: If you're talking about the Civil Rights Division, I can say Civil Rights Division goes above and beyond to ensure the security of the data that it has. We have yet to have a data breach in our history.

THE COURT: In your history of the Civil Rights Division since 1960.

MR. NEFF: That we're aware of, that's correct. I did run, I did make best efforts to where I can represent to the Court we're not aware of one and we believe we would be.

And our MOUs reflect, deal with people -- institutions are dealing with privacy issues all the time, and that includes clauses what to do if something happened. These can all fashioned, again, like consistent with we have an entire office devoted to

making sure not just that we're complying with federal law; that's not the Attorney General's only interest. The Attorney General's other interest is to make sure people's privacy are protected.

THE COURT: But if somebody has your Social Security, the last four of your Social, don't the first three and the middle two tell you date and place of birth to some degree or at least within a range?

MR. NEFF: Well, we don't -- that's why the HAVA statute specifically defined it as not a Social Security number. It's only the last four is the identifier, and that's all we need to get to essentially accuracy that makes it possible for us to do our oversight.

THE COURT: Okay. But first we have to accept the premise that you need this list to do your oversight.

MR. NEFF: Correct. Yes.

THE COURT: Okay. Is there anything else?

MR. NEFF: Thank you, your Honor. On that I would submit, unless your Honor has further questions.

THE COURT: No, no further questions.

We are in recess, and I will issue an order shortly, probably not today or tomorrow but hopefully next week.

(Adjourned)

Case: Case: 6: 25-cv-00630-MSM-PAS 781 Document 4 232 File Date 03/30/26 07/17/2026 Page 2164 of 114 PageID #: 817 27012

114

C E R T I F I C A T I O N


                I, Denise P. Veitch, RPR, do hereby certify

that the foregoing pages are a true and accurate

transcription of my stenographic notes in the

above-entitled case.


                              /s/ Denise P. Veitch_
                              Denise P. Veitch, RPR
                              Federal Official Court Reporter


                              March 20, 2026
                                 Date

App. 229

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. GREGG M. AMORE, in his official capacity as Secretary of State of Rhode Island, *Defendant*. | Case No. 1:25-cv-639-MSM-PAS |

## NOTICE OF APPEAL

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, appeals to the United States Court of Appeals for the First Circuit from this Court's Order Denying the United States' Motion to Compel and Granting Defendant's Motion to Dismiss and Intervenors' Motions to Dismiss (ECF 51) and final judgment (ECF 52) entered in this action on April 17, 2026, and April 22, 2026, respectively.

Dated: June 3, 2026

Respectfully submitted,

App. 230

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

*/s/ Christopher J. Gardner*
CHRISTOPHER J. GARDNER
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8th Floor
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Tel. (202) 812-2631
Attorneys for the United States

2

App. 231

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 3, 2026, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20002
Telephone: (202) 812-2631

App. 232

## CERTIFICATE OF SERVICE

I certify that on July 17, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
  Attorney

Date: July 17, 2026