**No. 26-1665**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

GREGG AMORE, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE STATE OF RHODE ISLAND; COMMON CAUSE; CATHERINE SAUNDERS; STUART WALDMAN; JULIA SANCHES; SEIU DISTRICT 1199NE; RHODE ISLAND ALLIANCE FOR RETIRED AMERICANS; CAROLYN BETENSKY; MICHAEL ZACK MEZERA,
*Defendants-Appellees.*

---

ON APPEAL FROM THE ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

---

# BRIEF OF APPELLEES COMMON CAUSE, CATHERINE SAUNDERS, STUART WALDMAN, AND JULIA SANCHES

---

PATRICIA YAN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

LYNETTE LABINGER
COOPERATING COUNSEL, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903

ARI J. SAVITZKY
WILLIAM HUGHES
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org

*Counsel for the Common Cause Defendants-Appellees*

## DISCLOSURE STATEMENT

Defendant-Appellee Common Cause states pursuant to Federal Rule of Appellate Procedure 26.1 that it does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


DISCLOSURE STATEMENT ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

A. Statutory Background: Title III of The Civil Rights Act of 1960 ........ 4

B. Factual Background ........ 7

C. Procedural Background ........ 15

SUMMARY OF ARGUMENT ........ 17

STANDARD OF REVIEW ........ 19

ARGUMENT ........ 20

I. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE THE SVRL IS OUTSIDE THE SCOPE OF TITLE III. ........ 20

II. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS ........ 26

A. The Federal Rules Apply in this Federal Civil Action. ........ 27

B. The United States Failed to Comply with the Statutory Requirement to Provide "a Statement of the Basis and the Purpose" for Its Demand. ......... 34

III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT. ......... 52

CONCLUSION ......... 58

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) .......... 6

*Alabama v. United States*,
371 U.S. 37 (1962) .......... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 19

*Bowman Dairy Co. v. United States*,
341 U.S. 214 (1951) .......... 42

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) .......... 57

*Butler v. Deutsche Bank Trust Co. Americas*,
748 F.3d 28 (1st Cir. 2014) .......... 41

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) .......... 7

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) .......... 37

*Coro, Inc. v. Federal Trade Commission*,
338 F.2d 149 (1st Cir. 1964) .......... 42

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......... 52

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 30

*Freeman v. Town of Hudson*,
714 F.3d 29 (1st Cir. 2013) .......... 19

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .......... 53

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......................................................... 22

*In re Administrative Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025) .................................... 35

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .............................. 7, 33, 56

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................ 7, 31, 32, 37, 38, 43, 44, 53, 56

*Lyman v. Baker*,
954 F.3d 351 (1st Cir. 2020) .................................................. 19

*National Pharmacies, Inc. v. Feliciano-de-Melecio*,
221 F.3d 235 (1st Cir. 2000) .................................................. 55

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ......................................................... 37, 52

*PA Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) ...................................... 12

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .................................................. 54

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ............................................ 46, 47

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ................................................ 54, 56

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) .................................................. 54

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) ............................................................... 57

*Schatz v. Republican State Leadership Committee*,
669 F.3d 50 (1st Cir. 2012) ................................................... 20

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 36

*State v. Trump*,
No. 1:26-cv-11581-IT, 2026 WL 1826490
(D. Mass. June 25, 2026) .......... 15

*Sugarloaf Funding, LLC v. United States Department of Treasury*,
584 F.3d 340 (1st Cir. 2009) .......... 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 20

*United States v. Adams*,
No. 26-cv-00019-CHB-EBA, 2026 WL 2123871
(E.D. Ky. July 23, 2026) .......... 16, 20, 27

*United States v. Aguilar,*
2026 WL 2364502 (D. Nev. Aug. 14, 2026) .......... 16

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......... 16, 27

*United States v. Bellows*,
No. 25-cv-468-LEW, 2026 WL 1430481
(D. Me. May 21, 2026) .......... 16, 20, 27, 44, 47

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... 16, 20, 21, 23, 25, 26, 27, 36, 45

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) .......... 16, 20, 24

*United States v. Board of Elections of the State of New York*,
No. 25-cv-1338-MAD/PJE, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) .......... 16, 20, 27

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515
(D.N.J. July 29, 2026) .......... 16, 20, 27

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) ........................................................ 6

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989 .................................................. 30, 35, 49

*United States v. Commonwealth Energy Systems & Subsidiary Companies*,
235 F.3d 11 (1st Cir. 2000) ............................................................ 25

*United States v. DeMarinis*,
No. SAG-25-3934, 2026 WL 1780586
(D. Md. June 18, 2026)......................................................... 16, 20, 27

*United States v. Evans*,
No. CV 25-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026) .............................................. 16, 20, 22, 25, 34

*United States v. Fontes*,
No. cv-26-66-PHX-SMB, 2026 WL 1177244
(D. Ariz. Apr. 28, 2026) ................................................... 16, 20, 24, 27

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026)........................... 16, 34, 36, 38, 39

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026) .................................................... 16, 20, 27, 44

*United States v. Koski*,
No. 26-cv-42-RCY, 2026 WL 2032532
(E.D. Va. July 14, 2026).................................................. 16, 20, 22, 27

*United States v. Matthews*,
No. 3:25-cv-3398, 2026 WL 2212877
(C.D. Ill. July 31, 2026)........................ 16, 20, 22, 27, 38, 39, 44, 45, 47

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964)............................................................... 4

*United States v. Oliver*,
No. 25-cv-01193-JCH-JFR, 2026 WL 2031479
(D.N.M. July 14, 2026) ........ 16, 27, 34

*United States v. Oregon*,
828 F. Supp. 3d 1092
(D. Or. 2026). ........ 5, 16, 27, 38, 39, 44, 45, 47, 50, 52

*United States v. Powell*,
379 U.S. 48 (1964) ........ 28, 29

*United States v. Scanlan*,
No. 25-cv-371-JL, 2026 WL 1864054
(D.N.H. June 29, 2026) ........ 16, 20, 22, 27, 38, 39

*United States v. Schmidt*,
No. 25-cv-01481-CB, 2026 WL 1850016
(W.D. Pa. June 27, 2026) ........ 16, 44, 50, 52

*United States v. Thomas*,
No. 26-cv-21-KAD, 2026 WL 2070437
(D. Conn. July 17, 2026) ........ 16, 20

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877
(D.W.V. July 13, 2026) ........ 16, 27, 36, 38, 39, 44, 45, 52

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ 16, 38, 39, 44, 45, 50, 52

*United States v. Wisconsin Elections Commission*,
No. 25-cv-1036-jdp, 2026 WL 1430354
(W.D. Wis. May 21, 2026) ........ 16, 20

**Docket Citations**

Order, *United States v. Simon*,
No. 25-cv-3761 (D. Minn. Aug. 17, 2026) ........ 16

Notice of Corrections to the R., *American Federation of State, County & Municipal Employees, AFL-CIO v. Social Security*

*Administration*,
No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026) ........ 13, 53

**Legislative Materials**

106 Congressional Record H5,326
(daily ed. March 11, 1960) ........ 5, 35

106 Congressional Record S6,959
(daily ed. March 30, 1960) ........ 28

House of Representatives
Report No. 86-956 (1959) ........ 4, 24

United States Commission on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959* (1959), *available at* https://www.usccr.gov/files/historical/1959/59-001-U.pdf ........ 23

**Regulations**

Executive Order No. 14,399,
91 Fed. Reg. 17125 (Mar. 31, 2026) ........ 15, 50

410 Code of Rhode Island Rules 20-00-19.5(I)(1) ........ 56

**Rules**

Federal Rule of Civil Procedure 1 ........ 29

Federal Rule of Civil Procedure 12(b)(6) ........ 19

Federal Rule of Civil Procedure 16(b) ........ 33

Federal Rule of Civil Procedure 56 ........ 33

Federal Rule of Civil Procedure 81(a)(5) ........ 30

**Statutory and Constitutional Authorities**

United States Constitution,
Article I, § 4, Clause 1 ........ 3

13 U.S.C. § 214 ........ 22

18 U.S.C. § 1703(a) ........ 22

18 U.S.C. § 654 ........ 22

26 U.S.C. § 7602 ........ 29

26 U.S.C. § 7604(a) ........ 28

28 U.S.C. § 1291 ........ 3

28 U.S.C. § 1331 ........ 3

28 U.S.C. § 1343 ........ 3

5 U.S.C. § 552(b)(6) ........ 54

5 U.S.C. § 552a(b) ........ 54

5 U.S.C. § 552a(e)(4) ........ 57

5 U.S.C. § 552a(e)(7) ........ 57

50 U.S.C. § 217 ........ 22

52 U.S.C. § 20507 ........ 51

52 U.S.C. § 20507(a)(4) ........ 26, 46, 47

52 U.S.C. § 20507(c)(1) ........ 47

52 U.S.C. § 20507(d) ........ 45, 47

52 U.S.C. § 20507(i)(1) ........ 54, 55

52 U.S.C. § 20701 ........ 2, 3, 5, 17, 21, 23, 24, 55

52 U.S.C. § 20702 ........ 26

52 U.S.C. § 20703 ........ 2, 4, 5, 6, 18, 21, 26, 34, 36, 43, 52, 55

52 U.S.C. § 20705 ........ 6, 14, 27, 28

52 U.S.C. § 21083(a)(2)(A) .......... 47

52 U.S.C. § 21085 .......... 47, 48

Rhode Island General Laws § 17-19-24.2 .......... 48

Rhode Island General Laws § 17-9.1-34(f) .......... 56

**Other Authorities**

Alexandra Berzon & Nick Corasaniti,
*Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, NEW YORK TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ .......... 12

*Basis*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/basis (last visited Apr. 16, 2026) .......... 38

Carter Walker,
*This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT, Feb. 12, 2024, https://perma.cc/HQ9C-TMT7 .......... 12

Devlin Barrett & Nick Corasaniti,
*Trump Administration Quietly Seeks to Build National Voter Roll*, NEW YORK TIMES, Sept. 9, 2025, https://perma.cc/2RGY-RCJT .......... 10

Doug Bock Clark,
*She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6 .......... 12

Emily Bazelon & Rachel Poser,
*The Unraveling of the Justice Department*, NEW YORK TIMES MAGAZINE, Nov. 16, 2025, https://perma.cc/L39A-S5VZ .......... 12

Jeremy Roebuck and Katie Bernard,
*'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*,

PHILADELPHIA INQUIRER, Nov. 1, 2024,
https://perma.cc/AMZ5-TFHQ .............................................................. 12

Jonathan Shorman,
*DOJ Is Sharing State Voter Roll Lists with Homeland Security*,
STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F .................. 11

Jonathan Shorman,
*Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025,
https://perma.cc/QXF5-PWJB.............................................................. 14

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025,
https://perma.cc/6P7X-NZXL.............................................................. 11

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice (updated August 6, 2026),
https://perma.cc/DFJ2-ERTE .......................................................... 9, 14

Kyle Cheney,
*Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO,
Jan. 20, 2026, https://perma.cc/4FTL-F7KQ ...................................... 13

Miles Parks & Jude Joffe-Block,
*Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025,
https://perma.cc/6QPB-NLZ8 .............................................................. 11

Reid Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, NEW YORK TIMES, Feb. 2, 2026,
https://perma.cc/E75W-SRZD.............................................................. 15

Rhode Island Voter Registration Form,
https://vote.sos.ri.gov/Forms/elections/Forms/VoterRegFormEng.pdf ........................................................................................ 48

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News. Mar. 26, 2026, https://perma.cc/T66C-RYRC ............................................. 11

The Federalist No. 60 (Alexander Hamilton) ........................................... 3

United States Election Assistance Commission, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025), *available at* https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf ........................................................ 46

## INTRODUCTION

The United States, through the Civil Rights Division of its Department of Justice (DOJ), is attempting to seize millions of citizens' sensitive voter data over the objection of their own state governments. In response, a unanimous array of twenty-four different federal courts has held those efforts unlawful, concluding that the Civil Rights Act of 1960 (CRA) does not authorize the Administration to requisition private, sensitive voter data or to conduct baseless fishing expeditions into state voter rolls. This Court should now join the resounding chorus.

Beginning in the Fall of 2025, the United States began demanding that states turn over complete and unredacted copies of their statewide voter registration lists (SVRLs), which contain the sensitive information of every voter in the state, such as driver's license numbers and partial social security numbers. The United States claims that Title III of the CRA, a 1960s voting rights statute passed to remedy Black voter disenfranchisement in the Jim Crow South, entitles the federal government to seize the personal identifying information of hundreds of thousands of Rhode Islanders today. It does not. This Court can affirm the district court's rejection of the CRA claim on multiple grounds.

*First*, Rhode Island's SVRL does not fall within the "records and papers" contemplated by the CRA's text. The CRA covers only those records that have "come into [the] possession" of state elections officials, like the voter registration applications submitted by Black voters in the Jim Crow South that motivated the statute's passage. 52 U.S.C. § 20701. But the SVRL is a record *created by* Rhode Island in the first place.

*Second*, DOJ failed to provide a "statement of the basis and the purpose" in writing for its demand for the SVRL as expressly required by Title III. 52 U.S.C. § 20703. DOJ stated no "basis" whatsoever for its demand (and on appeal still fails to do so), and its supposed "purpose" is nonsensical and an obvious pretext for interfering with elections and creating an unauthorized and illegal national voter database.

*Third*, the relief the United States seeks—forced disclosure of hundreds of thousands of Rhode Island voters' sensitive, protected data—would impermissibly burden voting and privacy rights, threatening to chill participation and political activity. Because the United States seeks only the unredacted SVRL, and because disclosure of the unredacted SVRL would be unlawful even if the CRA otherwise authorized it, the CRA claim fails on this ground, too.

The Framers vested states, not the federal executive, with responsibility for managing most aspects of federal elections in order to protect our democracy from "tyrants." The Federalist No. 60 (Alexander Hamilton); *see* U.S. Const. art. I, § 4, cl. 1. This Administration's unprecedented and baseless intrusion into the machinery of our elections must be rejected. No federal law entitles the United States to the private voter data it seeks. The district court correctly dismissed the Complaint. This Court should now affirm.

## **JURISDICTIONAL STATEMENT**

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES**

1. Whether a state's SVRL, which is a database created by a state's chief election official, is a "record[] . . . which come[s] into [their] possession" within the meaning of Title III of the CRA, 52 U.S.C. § 20701.
2. Whether the United States can obtain a covered record under Title III of the CRA in the absence of a "demand in writing by the

Attorney General or his representative . . . contain[ing] a statement of the basis . . . therefor," 52 U.S.C. § 20703.

3. Whether the United States can obtain a covered record under Title III of the CRA where its written "statement of the basis and the purpose therefor," 52 U.S.C. § 20703, is invalid or pretextual.

4. Whether the redaction of sensitive personal information from the Rhode Island SVRL would be required to avoid a constitutional violation or a violation of federal privacy law?

## STATEMENT OF THE CASE

### A. Statutory Background: Title III of The Civil Rights Act of 1960

Congress enacted Title III of the CRA to stop states in the Jim Crow South from denying thousands of Black citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956, at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). With Title III, Congress sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in

violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that state and local elections officials retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some members of Congress, including Florida Congressman William Cramer, were also concerned about DOJ using the powers granted by Title III for "fishing expedition[s]." 106 Cong. Rec. H5,326 (daily ed. March 11, 1960). To address these concerns, Congress adopted Representative Cramer's amendment to Title III, which added a requirement that the Attorney General's demand for records include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. H5,326 (daily ed. March 11, 1960). And Congress expressly authorized judicial review over such statements

of basis and purpose, by specifying that "[t]he United States district court for the district in which a demand is made pursuant to [S]ection 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 586–89 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (Title III investigation of registration records showed that discriminatory registration practices led to less than 10% of Black citizens being registered to vote); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (Title III investigation revealed voting registrars engaged in racially discriminatory practices resulting in only 7.5% of Black citizens being registered). And in conducting those investigations, DOJ adhered to the statutory requirement to set forth in writing "the basis and the purpose" for its records demand, 52 U.S.C. § 20703—that is, the factual basis for why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion.

*See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation. Then, in 1965, Congress passed the Voting Rights Act, which established broad new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws, federal court assessment of Title III has largely been silent since 1965. Until the past year, all jurisprudence analyzing the CRA arose during the 1960s in the former Confederate states and pertained to investigations into state and local officials unlawfully denying Black citizens the right to register to vote.

## B. Factual Background

### *1. The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data*

Half a century later, on September 8, 2025, DOJ sent a letter to Rhode Island Secretary of State Gregg Amore (Secretary Amore), demanding an electronic copy of Rhode Island's entire SVRL. App.11–12,

21–24. DOJ requested that the voter file be produced with "all fields" included. *Id.* In this September 8 letter, DOJ cited the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 et seq., the Help America Vote Act (HAVA), 52 U.S.C. § 20901 et seq., and Title III of the CRA as authority for its records request, and stated that "[t]he purpose of this request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." App.11–12, 21–24. The letter did not elaborate further in this regard or refer to any compliance deficiencies by Rhode Island with respect to those statutes' voter list maintenance requirements or any other factual basis for any concern with Rhode Island's list maintenance practices. App.11–12, 21–24.

On September 16, 2025, Secretary Amore agreed to provide a copy of Rhode Island's voter registration list, but noted that he would not provide "the personally identifiable information of Rhode Island voters," including voters' state driver's license numbers and the last four digits of their Social Security Numbers (SSN4s), without "a proper legal basis" or "a court order." App.13, 26–27. Secretary Amore also spoke to Rhode Island's list maintenance efforts, noting that "[s]ince 2023, we have

removed over 105,000 voters from our voter list, all carefully following state and federal law," and that Rhode Island is "one of the few states that conducts post-election risk-limiting audits" to further "ensure the accuracy of our elections." App.26–27.

Months later, on December 2, 2025, the United States brought a federal civil action against Secretary Amore pursuant to Title III—one of thirty-one nearly identical lawsuits DOJ has initiated against states and election officials across the country—seeking to compel Secretary Amore to hand over sensitive Rhode Island voter data. App.21–24.[1] The

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated August 6, 2026), https://perma.cc/DFJ2-ERTE. The thirty-one actions are: *United States v. McGrane*, No. 26-cv-00197 (D. Idaho filed Apr. 1, 2026); *United States v. Adams*, No.26-cv-00019 (E.D. Ky. filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-02025 (D.N.J. filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-00166 (D. Utah filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-00361 (W.D. Okla. filed Feb. 26, 2026); *United States v. Warner*, No. 26-cv-00156 (S.D. W. Va. filed Feb. 26, 2026); *United States v. Raffensperger*, No. 26-cv-00485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Koski*, No. 26-cv-00042 (E.D. Va. filed Jan. 16, 2026); *United States v. Fontes*, No. 26-cv-00066 (D. Ariz. filed Jan. 6, 2026); *United States v. Thomas*, No. 26-cv-00021 (D. Conn. filed Jan. 6, 2026); *United States v. Evans*, No. 25-cv-04403 (D.D.C. filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-03398 (C.D. Ill. filed Dec. 18, 2025); *United States v. Wisconsin Elections Comm'n*, No. 25-cv-01036 (W.D. Wis. filed Dec. 18, 2025); *United States v. Griswold*, No. 25-cv-03967 (D. Colo. filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-00522 (D. Haw. filed Dec. 11, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass. filed Dec. 11, 2025); *United States v. Aguilar*, No. 25-cv-00728 (D. Nev. filed Dec. 11, 2025); *United States v. Albence*, No. 25-cv-01453 (D. Del. filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-01193 (D.N.M. filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-00639 (D.R.I. filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-06078 (W.D. Wash. filed Dec. 2, 2025); *United States v. DeMarinis*, No. 25-cv-

Complaint did not include any counts under the NVRA or HAVA or allege any violations thereof.

#### *2. The United States Seeks to Unlawfully Construct a National Voter Database and Use It to Disenfranchise Voters.*

DOJ's requests for private, sensitive voter data from Rhode Island and other states appear to be in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to scrutinize state voter rolls and challenge voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[2] Within months of the new Administration's taking office, DOJ officials asked staffers from the new "Department of Governmental Efficiency" (DOGE) to identify supposed

03934 (D. Md. filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-00903 (D. Vt. filed Dec. 1, 2025); *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. filed Sept. 25, 2025); *United States v. NH Secretary of State*, No. 25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Simon*, No. 25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of New York*, No. 25-cv-01338 (N.D.N.Y. filed Sept. 25, 2025); *United States v. Schmidt*, No. 25-cv-01481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Bellows*, No. 25-cv-00468 (D. Me filed Sept. 16, 2025); *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. filed Sept. 25, 2026); *United States v. Oregon*, No. 25-cv-01666 (D. Or. filed Sept. 16, 2025).

[2] *E.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://perma.cc/2RGY-RCJT.

noncitizens in state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote.[3] DOJ has also been coordinating in these novel efforts with the federal Department of Homeland Security (DHS), according to reported statements from both agencies and DOJ's admissions in open court in this case. *See* App.50–51, 180–81 (admitting planned provision of voter data to DHS).[4]

Around the time that DOJ first began filing these lawsuits, one article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in these cases with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the [DHS] data and Social Security data . . . I had never before told an opposing party, Hey, I want this information and I'm saying I

[3] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

[4] *See also, e.g.*, Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News. Mar. 26, 2026, https://perma.cc/T66C-RYRC; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F.

> want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.[5]

Administration officials have also been working with outside "election integrity" advocates, apparently mishandling sensitive personal data in the process. For example, as detailed in a federal court filing by DOJ on behalf of the SSA:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze

[5] DOJ's efforts to mass-ingest private voter data are being undertaken in coordination with self-proclaimed "election integrity" advocates who have previously sought to mass-challenge voters and overturn elections. For example, Heather Honey, DHS's "deputy assistant secretary for election integrity," was involved in efforts to overturn the 2020 election, to compel states to engage in aggressive purges of registered voters, and to abuse voter data to make flawed mass challenges to disenfranchise thousands. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 599 n.1 (Pa. Commw. Ct. 2025) (dismissing complaint brought by group affiliated with Honey challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA); *see also, e.g.*, Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6; Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ; Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT, Feb. 12, 2024, https://perma.cc/HQ9C-TMT7.

> state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the R. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026), Dkt. No. 197.[6] The filing, which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicates that, around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6

Additional government documents indicate how the United States ultimately plans to use voters' sensitive personal data: to assert control over voting eligibility in the states, to order the disenfranchisement of voters, and potentially to contest the results of state-run elections.

---

[6] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://perma.cc/4FTL-F7KQ.

In particular, DOJ has asked states to execute a memorandum of understanding (MOU) in connection with its requests for states' voter data. *See* App.46–54.[7] The MOU purports to vest the United States with substantial new authority to identify supposedly ineligible voters and to compel states to remove these voters from the rolls, depriving them of the franchise. App.47, 50. Specifically, under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and then compel states to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. App.50. These removals are purportedly required by the MOU despite the procedural protections afforded by the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within ninety days of an election, 52 U.S.C. § 20507.[8] The MOU would thereby turn states' own voter rolls into a tool for unlawfully and

---

[7] In addition to the Colorado version of the MOU included in the Appendix, the copies provided to many other states are aggregated and posted in Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.1.

[8] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://perma.cc/QXF5-PWJB

improperly mass-challenging voters and interfering with the democratic process in the states.

The actions of the President and other high officials also demonstrate the Administration's aims. For example, earlier this year, President Trump announced his desire to "take over the voting" and "nationalize" elections in certain states. Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://perma.cc/E75W-SRZD. The next month, the President issued an executive order purporting to require the creation of a national voter registration list, *see* Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026), which was subsequently held unlawful. *See generally State v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490, at *14 (D. Mass. June 25, 2026).

### C. Procedural Background

As noted, the United States has now filed more than thirty lawsuits seeking to obtain state SVRLs under the purported authority of Title III of the CRA. Every court that has passed upon the validity of these actions—now twenty-four courts in all, including the Sixth Circuit—has

held that DOJ's demand is unenforceable and accordingly dismissed the United States's claims.[9]

The district court here is one of them. Add.1–14. On April 17, 2026, following full briefing on the Rule 12 motions of Defendant Secretary Amore, Intervenor-Defendants Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches (the Common Cause Intervenors), and another intervenor-defendant group, as well as on the United

[9] *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) (Add.1–14); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *Oregon*, 828 F. Supp. 3d 1092; *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026), Dkt. No. 210; *United States v. Aguilar*, 2026 WL 2364502, at *1 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. CV 25-4403, 2026 WL 2267774, at *1 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 3:25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 26-cv-00019-CHB-EBA, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 26-cv-21-KAD, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, No. 25-cv-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, No. 26-cv-42-RCY, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877 (D.W.V. July 13, 2026); *United States v. Bd. of Elections of the State of N.Y.*, No. 25-cv-1338-MAD/PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Schmidt*, No. 25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036-jdp, 2026 WL 1430354 (W.D. Wis. May 21, 2026) (and at SA1); *United States v. Bellows*, No. 25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, No. cv-26-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026).

States's motion to compel, the district court held that DOJ's demand for Rhode Island's SVRL was "facially deficient" because it did not comply with Title III's requirement to provide a written statement of "the basis" for the demand and did not provide a valid "purpose" for the demand, namely one that relates to "investigating violations of individuals' voting rights." Add.9–14. The Court concluded that "[n]either the NVRA nor HAVA authorize DOJ to conduct the kind of fishing expedition [DOJ] seeks here." Add.14.

Forty-seven days later, on June 3, the United States noticed this appeal. App.186–187.

## SUMMARY OF ARGUMENT

The United States's CRA claim is legally deficient many times over, and there are multiple independent bases on which this Court can affirm.

*First*, Title III does not reach the records the United States seeks. Title III covers only documents that "come into [the] possession" of election officials. 52 U.S.C. § 20701. Secretary Amore's office did not obtain the SVRL from some external source but rather *created* the SVRL, and thus the SVRL did not "come into his possession." *Id.* This plain-text reading interprets Title III harmoniously with the NVRA and HAVA,

which require states to create and maintain their own centralized voter lists.

*Second*, the United States failed to plead that it provided a valid statement of "the basis and the purpose" for its demand for Rhode Island's unredacted SVRL, as Title III expressly requires. 52 U.S.C. § 20703. DOJ's demand letter contained no factual basis whatsoever to think that any possible violation of any statute had occurred with respect to Rhode Island's voter list maintenance practices. Without even a scintilla of a factual basis, DOJ's demand is precisely the type of pure fishing expedition that the statute forbids.

And DOJ never provided a valid "purpose," either. The generalized purpose DOJ points to (namely, ascertaining Rhode Island's compliance with the NVRA and HAVA) simply does not match the records demanded. And even if this supposed purpose were otherwise valid, the United States's own public statements and other public records demonstrate that it is pretextual. The failure to provide a basis and failure to provide a valid purpose are each—independently and together—fatal to the United States's CRA claim.

*Finally*, the relief sought by the United States—a complete SVRL without redactions to protect the privacy of hundreds of thousands of Rhode Island voters—cannot be granted without trammeling constitutional and privacy rights, and thus cannot be granted at all. This Court can affirm the district court's dismissal order on that ground as well.

## **STANDARD OF REVIEW**

This Court reviews the grant of a motion to dismiss *de novo*. *Lyman v. Baker*, 954 F.3d 351, 359 (1st Cir. 2020). It is "free to affirm an order of dismissal on any basis made apparent from the record." *Freeman v. Town of Hudson*, 714 F.3d 29, 35 (1st Cir. 2013).

Dismissal is proper if, accepting all well-pleaded factual allegations as true, the complaint does not plausibly "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a motion to dismiss, a court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if

they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Courts can also "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiff's response to the motion to dismiss." *Id.* at 55–56 (1st Cir. 2012) (cleaned up). *Cf. Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

## ARGUMENT

### I. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE THE SVRL IS OUTSIDE THE SCOPE OF TITLE III.

This Court can affirm because the United States seeks records that are not covered by Title III in the first place.[10]

[10] Sixteen courts evaluating DOJ's demand have held that dismissal was warranted because SVRLs are not covered under Title III, *see Benson*, 179 F.4th at 480–81; *Evans*, 2026 WL 2267774, at *5, *11; *Griswold*, 2026 WL 2235374, at *4–5; *Matthews*, 2026 WL 2212877, at *3–4; *Caldwell*, 2026 WL 2186515, at *6–8; *Adams*, 2026 WL 2123871, at *4–5; *Thomas*, 2026 WL 2070437, at *7; *Koski*, 2026 WL 2032532, at *6; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *Schmidt*, 2026 WL 1850016, at *2; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, SA5; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5, *Benson*, 819 F. Supp. 3d at 770.

Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The statute then obligates officials to turn over "[a]ny record or paper required by [Section 20701] to be retained and preserved," *id.* § 20703. While "all records and papers . . . relating to any application, registration, . . . or other act requisite to voting" is broad language, Title III also provides an immediate textual limitation to those otherwise broad parameters: Only those records or papers that have "come into [the custodian's] possession" must be retained and provided in response to a valid Title III demand. *Id.* § 20701.

The SVRL falls outside the ambit of this text. The phrase "come into . . . possession" in the CRA refers to records that elections officials *obtain* or *receive*, rather than those they *create*. *See United States v. Benson*, 179 F.4th 470, 480 (6th Cir. 2026) ("Around the time that Congress enacted Title III, the phrase 'come into . . . possession,' meant to 'acquire,' 'obtain,' or 'receive,'" rather than something a state

"created . . . themselves"); *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" in interpreting terms of the Comprehensive Forfeiture Act) (internal quotation marks omitted); *accord, e.g.*, *United States v. Evans*, No. cv 25-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *3 (C.D. Ill. July 31, 2026); *United States v. Koski*, No. 26-cv-00042, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026).

Indeed, Congress regularly uses the language "comes into possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing "any information . . . which comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of money or property that "comes into [one's] possession"); 18 U.S.C. § 1703(a) (prohibiting postal employees from delaying or destroying any mail that "come[s] into [their] possession"); 50 U.S.C. § 217 (requiring all military members to report whenever abandoned property "comes into [their] possession"); *see also United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054, at *5 (D.N.H. June 29, 2026) ("Congress has consistently

employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source").

The phrase "come into . . . possession" in the CRA thus refers to records that elections officials *obtain*, rather than those they create. And because the SVRL is a continuously updated document created by state officials, it is not a record that "come[s] into [their] possession," and thus falls outside of the reach of the CRA.[11]

This reading is consistent with Title III's aims. The statute was part of an effort to force Southern registrars to accept the voter registration forms submitted by Black voters, rather than destroying them or otherwise rejecting valid registration forms. *See, e.g.*, U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959,* at 93 (1959), *available at* https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("Rejected applications were destroyed approximately 30 days after

[11] There is no dispute that the SVRL is created by state officials, nor could there be. *See* App. 8–13. DOJ may point out that the SVRL is in part based on an aggregation of materials submitted by voters, but that is of no moment. DOJ "has not requested the records or papers that [Rhode Island] obtained in creating the qualified voter file—[DOJ] has requested the qualified voter file itself," which Rhode Island created. *Benson*, 179 F. 4th at 480–81. Further, the SVRL "contains information from diverse sources, many of which have nothing to do with 'act[s] requisite to voting.'" *Id.* at 481 (quoting 52 U.S.C. § 20701).

being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. 86-956 at 7 (1959) (describing the importance of viewing materials submitted by voters to elections officials as "an essential step in the process of enforcing and protecting the right to vote"). Title III is at its heart a retention provision that aims to prevent the destruction of materials submitted by would-be voters and to allow federal enforcers to uncover evidence that would-be voters were being denied registration on the basis of race. Indeed, these aims are reflected not just in the statute's "comes into possession" language, but in Title III's subsequent language specifying that the records and papers at issue are those "relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701—all of which "refer to something that the voter submits or does as part of the registration process and thus refers to records that election officials receive, rather than create." *E.g.*, *United States v. Fontes*, No. cv-26-66, 2026 WL 1177244, at *4 (D. Ariz. Apr. 28, 2026) (quoting *Benson*, 819 F. Supp. 3d at 769).

By contrast, to read Title III as applying to *any* documents or records that an elections official *possesses*, including those the official

creates, would improperly read language out of the statute, replacing "all records and papers *which come into [their] possession*" with "all records and papers which *they possess*." But "a statute should be construed so that each part is given effect and no part is rendered inoperative or superfluous." *E.g.*, *United States v. Commonwealth Energy Sys. & Subsidiary Companies*, 235 F.3d 11, 15 (1st Cir. 2000).

Reading the statute this way would not just violate textual canons, it would defy normal rules of usage and plain common sense. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Or as another court explained in rejecting application of Title III to state SVRLs on this basis: "As a matter of common usage, one might say, for example, that the Mona Lisa 'came into the possession' of the Louvre around 1797; one would not say that the painting 'came into the possession' of Leonardo da Vinci when he completed it around 1517." *Evans,* 2026 WL 2267774, at *6. Just so.

And beyond these profound difficulties of text and usage, reading Title III to cover the SVRL would produce bizarre results that Congress could not have intended. Under the CRA, it is a criminal violation for

anyone to "willfully steal[], destroy[], conceal[], mutilate[], or alter[] any record or paper required by [Title III] to be retained and preserved." 52 U.S.C. § 20702. Yet the NVRA and HAVA affirmatively "*require* [state] election officials to alter the qualified voter file routinely as part of their 'reasonable efforts' to ensure accuracy." *Benson*, 179 F.4th at 479 (citing 52 U.S.C. § 20507(a)(4)). Accordingly, "construing [Title III] in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA," an unharmonious and even absurd result. *E.g.*, *Benson*, 179 F.4th at 480.

By far the better interpretation is the one that forecloses the United States's position: The SVRL is not covered by Title III. This Court can affirm on that exceedingly straightforward basis alone.

## II. THE CRA DOES NOT ENTITLE DOJ TO THE SVRL BECAUSE DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS.

Even if the SVRL was covered under Title III—and it is not—DOJ failed to comply with Title III's requirement to set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ's failure to fulfill these requirements of Title III provides multiple additional bases to affirm.

### A. The Federal Rules Apply in this Federal Civil Action.

The United States claims that enforcing a Title III demand constitutes "a special statutory proceeding," such that the Federal Rules do not apply, and courts may conduct no inquiry whatsoever into DOJ's compliance with Title III's "basis and purpose" requirement. U.S. Br. 14–21. This suggestion is wrong on multiple levels, as over a dozen federal courts have now expressly held.[12]

Start with the text. Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because the statute does not specify any particularized process, the process that is

[12] *See Griswold*, 2026 WL 2235374, at *3; *Matthews*, 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Adams*, 2026 WL 2123871, at *3–4; *Oliver*, 2026 WL 2031479, at *7; *Koski*, 2026 WL 2032532, at *1 n.2; *Warner*, 2026 WL 2018877, at *2; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6–7; *Scanlan*, 2026 WL 1864054, at *1 n.2; *Benson*, 179 F.4th at 483 n.2; *DeMarinis*, 2026 WL 1780586, at *3; *Bellows*, 2026 WL 1430481, at *5; *Fontes*, 2026 WL 1177244, at *1 & n.1; *Amore*, 2026 WL 1040637, at *3–4; *Oregon*, 828 F. Supp. 3d at 1102–03; *Weber*, 816 F. Supp. 3d at 1182.

"appropriate," particularly where the United States has filed a civil action, is the Federal Rules of Civil Procedure.[13]

Binding precedent so holds. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one written in terms materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id.* at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added)). DOJ now argues

[13] The legislative history of Title III, while unnecessary to interpret its plain meaning, is consistent. As Senator Hruska explained: "[Section 305] is merely a restatement of court powers which now exist. . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. S6,959 (daily ed. March 30, 1960). The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it as DOJ suggests. 52 U.S.C. § 20705.

that the precise scope of the records at issue in Internal Revenue Service (IRS) administrative summons cases is different from the scope of the records that may be sought under the CRA. *See* U.S. Br. 16 (citing 26 U.S.C. § 7602 (1954 ed.)). But that is irrelevant. The jurisdictional provisions of the IRS summons statute and the CRA that govern *the role of district courts in superintending the process* are the same.

And the *Powell* Court could not have been any clearer on that jurisdictional provision's meaning: Because it provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, the Court squarely held that "*the Federal Rules of Civil Procedure apply*." *Powell*, 379 U.S. at 57–58 & n.18 (emphasis added). The legal and factual sufficiency of the government's demand could be contested, as the Rules allow, on "any appropriate ground." *Powell*, 379 U.S. at 58. So too here.

The Federal Rules themselves are also explicit on this point. With limited exceptions inapplicable here, they "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include a claim under

Title III. *See* Fed. R. Civ. P. 81(a)(5) (expressly providing that the Rules "apply to proceedings to compel testimony or the production of documents"). Here, the United States filed a federal civil action. It cannot avoid the implications of its own decisions.

Applying the Rules here is consistent with the independent judicial function that they are designed to serve. In the years since *Powell*, the Supreme Court and this Court have time and again reaffirmed, in numerous contexts, the principle that it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements, and whether the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009); *United States v. Comley*, 890 F.2d 539, 541–42 (1st Cir. 1989). This independent judicial obligation is as important now as ever, including and especially where the United States invokes the jurisdiction of a federal court by filing a civil action against

state officials seeking new authority over the administration of our elections.

The United States never backs up its dubious assertion that this action is actually a "special statutory proceeding" that exists outside of the Federal Rules, in which federal courts may not "second-guess or probe the sufficiency or sincerity of the Attorney General's statement" of basis and purpose and are required to rubber stamp even the flimsiest executive branch demands. U.S. Br. 15, 20–22; *see also* App.199 ("T[he] C[ourt]: . . . [Y]ou're saying if you come here and you give me a clearly phony basis or purpose, I still have no ability to deny your request. [DOJ Attorney]: . . . [T]hat's true."). It points to no statutory text that provides for any such "special" process—because none exists. Rather, the United States's assertion of this "special" process is based solely on the Fifth Circuit's opinion in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), a half-century-old, pre-*Powell*, non-binding case addressing wholly dissimilar circumstances.

*Lynd* must be understood in context, as a response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating discrimination

suits against counties that refused to process the voter registrations of Black voters and stymied every effort to enforce federal law. The Fifth Circuit painted a clear picture of this recalcitrance: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Lynd*, 306 F.2d at 227. This was all despite the fact that "the factual foundation for" the Attorney General's Title III requests was utterly self-evident—massive racial disparities in registration that evidenced Jim Crow regimes' discriminatory refusal to register Black voters—and DOJ had in fact clearly stated the factual basis and purpose of its requests to local registrars. *See id.* at 226–28 & n.6. Against that backdrop, the Fifth Circuit emphasized that, after months of dilatory action, a new round of plenary "judicial review or ascertainment" of facts was not warranted; to the contrary, the statutory goal of protecting the franchise could at that point only be met with summary resolution. *See id.* at 226–28.

Moreover, *Lynd* was decided before sensitive personal identifying information such as Social Security numbers or driver's license numbers was widely required as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to personal information. *Lynd* and contemporaneous cases required production of *public* records; as the court explained: "[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Id.* at 231. And even in that very different context, federal courts applying Title III recognized there would be "exception[s]" to "[t]he right of free examination of official records" due to improper purpose. *In re Coleman*, 208 F. Supp. at 201.

*Lynd* is thus inapposite—and in any event, the United States goes far beyond *Lynd* here. It did not seek expedited summary judgment following months of litigation over a facially valid Title III demand—something that the Federal Rules would certainly allow under appropriate circumstances, *see* Fed. R. Civ. P. 16(b), 56. It instead argues that Title III prevents federal courts from any inquiry into whether a federal demand for hundreds of thousands of voters' personal identifying

information is legally valid, even where the federal government invoked the court's jurisdiction by filing a civil action. No wonder so many courts have rejected this claim: Title III's text, binding cases like *Powell* and its progeny, the Rules themselves, and basic notions of due process and judicial independence are all to the contrary.

### B. The United States Failed to Comply with the Statutory Requirement to Provide "a Statement of the Basis and the Purpose" for Its Demand.

Whatever particular form of inquiry applies, Title III's statutory requirements must be met; otherwise, DOJ's demand is fatally flawed and cannot be enforced.[14] That is the case here.

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from becoming a vehicle for DOJ to conduct baseless fishing expeditions and to provide

[14] In the end, whether the Rule 12 standard or some other standard applies here does not change the outcome in this appeal. As the district court indicated, DOJ's efforts to use Title III to obtain Rhode Island's SVRL are legally deficient regardless. Add.13 n.3; *accord Galvin*, 830 F. Supp. 3d at 125 n.3, *Evans*, 2026 WL 2267774, at *5 n.3; *see also Oliver*, 2026 WL 2031479, at *7 n.17 (holding that the Federal Rules apply but finding that "[w]ere the Court to conclude otherwise, its analysis of the dispositive issue" in the case "would be the same.").

proper notice to election officials of the nature of the federal government's inquiry. *See* 106 Cong. Rec. H5,326 (March 11, 1960) (statutory language introduced to prevent "fishing expedition[s]"). Those safeguards are consistent with the application of other federal statutes allowing federal agencies to obtain records in service of investigations, which are enforceable if, among other things, the underlying investigation has a proper purpose and there is an actual nexus between that purpose and the specific information sought. *Compare Comley*, 890 F.2d at 541–42 (upholding subpoena based on government affidavits specifying proper purpose and detailing evidentiary basis for requested information) *with In re Admin. Subpoena No. 25-1431-019,* 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing administrative subpoena against hospital where asserted basis and purpose was an internal DOJ memo directing officials "to undertake appropriate investigations"), *appeal filed*, No. 25-2092 (1st Cir.).

There are a few notable aspects of Title III's text with respect to the "basis" and "purpose" requirements. For one, Title III's use of the words "*shall* contain" demonstrates that "the requirement that the Attorney General state 'the basis'" and "the purpose" "is mandatory, not a mere

formality with which the federal government or this Court is free to dispense." *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026); *see also, e.g.*, *Benson*, 179 F.4th at 483; *United States v. Warner*, No. 2:26-cv-156, 2026 WL 2018877, at *5 (D.W.V. July 13, 2026). Such mandatory commands are "impervious to judicial discretion" and must be followed to comply with the statute. *E.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024).

Moreover, the requisite statement containing "the basis and the purpose" must be made "in writing," meaning that the basis and the purpose "must be made express." *Galvin*, 830 F. Supp. 3d at 128. In this way, "[t]he statute . . . directs the Court to the Attorney General's written demand—rather than the United States's subsequent court filings—to determine whether that demand" satisfies the basis and purpose requirements. *Id.*

In addition, the statute's language, providing that the demand "contain a statement of *the* basis <u>and</u> *the* purpose therefor," confirms that "basis" and "purpose" are two "conceptually distinct" and independent requirements. *Galvin*, 830 F. Supp. 3d at 128 (emphasis added); *see* 52 U.S.C. § 20703; *see also Benson*, 179 F.4th at 483. And by twice using the

definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The "basis" is the factual grounds for why the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains how the requested records would help the Attorney General determine if there is, in fact, a violation. In *Lynd*, for example, the Attorney General's stated *basis* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated *purpose* was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred," i.e., to investigate and establish a discriminatory

"pattern or practice" in the jurisdiction's voting registration processes. *Id.*; *see also id.* at 228 n.4.

Here, the United States's failure to articulate *either* a sufficient basis (or indeed, any basis whatsoever) or a sufficient purpose for its request for Rhode Island's unredacted SVRL invalidates its CRA claim. This Court can affirm based on either of these fatal defects of statutory compliance.

#### ***1. The United States failed to state the basis for its CRA demand.***

The "basis" for a CRA demand is a statement of why the United States believes there may be some relevant violation of law—the "information" that the demand is "based upon." *Lynd*, 306 F.2d at 229 n.6; *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis (last visited Apr. 16, 2026) ("something on which something else is established or based"). Recent federal court decisions have thus consistently held that "the 'basis' contemplated by Title III is a factual, not legal basis." *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, Add.11–13; *Galvin*, 830 F. Supp. 3d at 128–30; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

Here, the United States has consistently failed to provide *any* factual basis for its CRA demand. The Complaint does not allege that any factual basis for the demand was ever stated, *see* App.8–13, and the September 8 letter in which DOJ actually made its demand is similarly silent as to why (or even if) the United States believes Rhode Island's list maintenance procedures might violate the NVRA or HAVA, *see* App.22–24. It does not use words like "basis" or "based upon" or otherwise refer to the factual grounds for the request. There is simply no statement of any factual basis whatsoever. The total omission of any factual basis for the demand is fatal, as the district court (and numerous others) correctly concluded. Add.12–14; *accord Galvin*, 830 F. Supp. 3d at 128–30; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

Below, DOJ took the position that it had met the "basis" requirement because its demand was "based on the Attorney General's authority granted by 52 U.S.C. § 20703." U.S. Opp. to MTD, at 4, 20–21, Dkt. No. 33. That is, it claimed that merely stating the *legal* basis for the demand was sufficient to meet Title III's requirements. The district court

correctly rejected that argument as tautological and inconsistent with the statute, Add.11–12, and DOJ now abandons it on appeal by failing to re-raise it in its opening brief.

Instead, DOJ advances an argument it never made below, namely that the line in the September 8 letter that "[t]he purpose of this request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA" was sufficient to provide the required "statement in writing" of *both* "the basis" and "the purpose" of the demand. U.S. Br. 14, 23. This argument fails multiple times over.

For one, it is waived. As noted, DOJ pursued a different argument below, asserting that no factual basis was needed and that a statement of the legal basis of the CRA demand (i.e., a tautological reference to the CRA) was sufficient. It never pleaded or argued that its statement about "ascertain[ing] Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA" was a statement setting forth the factual basis for its demand. *See* App.11–12. Having completely failed to plead or argue this supposed factual basis or indeed any factual basis below, the United States may not do so now for the first time on appeal. *E.g.*, *Butler v. Deutsche Bank Tr. Co. Americas*, 748 F.3d 28, 36 (1st Cir.

2014) ("[W]e routinely deem waived arguments not timely presented before the district court.").

Nor would it matter if the argument were properly before the Court, because the statement that "the purpose of this request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA" does not offer any factual basis for DOJ's CRA demand.

DOJ's entire explanation for its new position is that, "[u]nder any reasonable interpretation of this statement the basis for the DOJ's written demand is clear—that Rhode Island's list maintenance program may violate the NVRA and HAVA." U.S. Br. 23. But . . . how? And why? What facts, at any level of detail or generality, indicate any potential NVRA or HAVA violation with respect to any of Rhode Island's voter list maintenance practices? What aspect of Rhode Island's voter list maintenance practices is or might be at issue? What reason—literally any reason at all—is there to think that there might be a violation of any statute occurring? DOJ's unadorned statement that it wishes to "ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA" does not and cannot even begin

to answer these questions. It does not provide any factual foundation—that is, any *basis*—to investigate anything. This is a glaringly obvious fishing expedition—and not the genuinely piscatorial type that Ocean Staters enjoy. *Cf. Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) ("[S]ubpoenas are not issued on bare suspicion. They are not licenses for extended fishing expeditions in waters of unknown productivity in the vague hope of 'catching the odd one.'" (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)).

The United States appears to acknowledge that one function of the CRA's "basis" requirement is to provide "notice" to election officials, U.S. Br. 23, arguing that the September 8 letter stating that DOJ wished to "ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA" sufficiently "put Secretary Amore on 'reasonable notice of the pendency of the proceeding.'" U.S. Br. 23. It is not clear what this means, or what pending proceeding DOJ might have been referring to in September 2025. But the lack of any reasonable notice here is pellucid. DOJ's general reference to NVRA and HAVA compliance does not provide even a hint of notice of any problem with any aspect of Rhode Island's list maintenance programs and procedures.

It is not supposed to be this way. Indeed, *Lynd*, DOJ's chief authority, *e.g.*, U.S. Br. 21–24, shows exactly how the statute was designed to work—and how straightforward it is when enforced in good faith. The Attorney General's written demand to the Southern registrars in that case was short—"[t]his demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction"—but, especially in context, made clear "the basis" to think there might be some violation of law occurring, and thereby provided the notice that was due on this score. 306 F.2d at 229 n.6. Title III's "basis" requirement, which was specifically designed to prevent pure fishing expeditions like the one here, mandates no more but also no less.

#### *2. The United States failed to state a valid purpose for its CRA demand.*

Title III requires a written statement of "the basis and the purpose" for the demand. 52 U.S.C. § 20703. While "the basis" refers to the factual foundation for believing there might be some violation of law, the statutorily required "purpose" is an explanation of how the requested records would help "ascertain whether or not violations of Federal

law . . . have occurred." *E.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *United States v. Bellows*, No. 1:25-cv-468-LEW, 2026 WL 1430481, at *7 (D. Me. May 21, 2026); otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

Here, DOJ's September 8 letter stated that "[t]he purpose of the request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." App.23. At least eight federal courts have held that this or a substantially similar purpose did not satisfy Title III in a request for states' SVRLs. *See* Add.13–14; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL 2212877, at *5–6; *Warner*, 2026 WL 2018877, at *6–8; *Bellows*, 2026 WL 1430481, at *7–9; *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026); *Oregon*, 828 F. Supp. 3d at 1104–05; *Weber*, 816 F. Supp. 3d at 1183–84. Here too, for multiple reasons, DOJ's stated purpose is invalid.

*First*, DOJ's stated purpose is outside the scope of Title III. The CRA and Title III were not designed "to investigate list maintenance

procedures" but rather "violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1105; *see also* Add.13–14; *Weber*, 816 F. Supp. 3d at 1183. Its purpose was to "help end voting discrimination." *Benson*, 179 F.4th at 474. Accordingly, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote." *Warner*, 2026 WL 2018877, at *7; *see also* Add.13–14; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5.

DOJ argues that the NVRA and HAVA protect individual rights. U.S. Br. 28. To be sure, it is theoretically possible for list maintenance procedures to implicate individuals' right to vote—for example, in the case of improper removal of voters close to an election, or without proper safeguards, in violation of the NVRA, *see, e.g.*, *See* 52 U.S.C. § 20507(d). But the generic statement in DOJ's September 8 letter does not indicate any such purpose. And DOJ cannot generate the frisson of a proper purpose with raw speculation about "invalid votes," especially without even a shred of evidence or suspicion that any "invalid votes" have been or will be cast in Rhode Island. U.S. Br. 28. Because DOJ's stated purpose "lack[s] any reference or relation to the purposes for which Title III was enacted," it is deficient. *Oregon*, 828 F. Supp. 3d at 1105.

*Second*, DOJ's stated purpose does not comport with the records it demands. Neither the September 8 letter nor the Complaint articulate how the unredacted SVRL, which is a static snapshot of Rhode Island's voter file, is necessary or even relevant to ascertaining the state's compliance with the NVRA or HAVA. App.8–13, 21–24. In fact, it is not.

The NVRA requires states to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4)(A)–(B). Perfect or error-free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[15] In fact, and as noted above, the NVRA explicitly *prohibits* removal of the names of some potentially ineligible registrants from the official list of eligible voters until steps are taken to

[15] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 150 (2025), *available at* https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (noting it is "inevitable" that voter lists will contain some voter records for individuals who are no longer eligible to vote).

provide notice and ensure they are not removed prematurely or unfairly.[16]

Meanwhile, HAVA, which requires the collection and use of personal identifying information and numerical identifiers in the state's SVRL, makes clear that it is *states*—not the federal government—that are principally tasked with "perform[ing] list maintenance." 52 U.S.C. § 21083(a)(2)(A). That statute expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085.

Accordingly, it is a state's *overall procedures* for voter list maintenance and how they are carried out that establish its compliance with the NVRA and HAVA, *see* 52 U.S.C. §§ 20507(a)(4), (c)(1), 21083(a)(2)(A), 21085; *see also Benson*, 136 F.4th at 624–26; *Oregon*, 828 F. Supp. 3d at 1097; *Matthews*, 2026 WL 2212877, at *1; *Bellows*, 2026 WL 1430481, at *7, *9. A snapshot of the unredacted voter file (much less the highly sensitive personal identifiers like driver's license and partial

[16] Section 8(d) of the NVRA sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a multi-year statutory waiting period. 52 U.S.C. § 20507(d).

Social Security numbers contained therein) does not; it simply cannot provide the information to determine if the state has made a "reasonable effort" to remove ineligible voters or is otherwise in compliance with the NVRA or HAVA.

DOJ never says otherwise. It discusses the ID provisions of HAVA in its brief, U.S. Br. 32–33, but omits HAVA's express limitation on the role of the federal government in superintending states' methods of compliance with those provisions. 52 U.S.C. § 21085. It claims that the SVRL will allow it to determine whether Rhode Island is accepting voter registrations that lack a driver's license number or an SSN4, U.S. Br. 31–32, but a massive digital trove of Rhode Islanders' sensitive personal identifying information is not necessary or relevant for that purpose. Rhode Island requires voters to present identification to vote, R.I. Gen. Laws § 17-19-24.2, and even if it didn't, a glance at the voter registration form shows that the state collects the forms of ID required by HAVA, *see* Rhode Island Voter Registration Form, https://vote.sos.ri.gov/Forms/elections/Forms/VoterRegFormEng.pdf. If more were needed, DOJ could review a redacted SVRL that would indicate any blank spaces in the ID number fields, or it could simply

review the file at the Secretary of State's office. DOJ also suggests that the Attorney General might wish "to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced." U.S. Br. 32–33. But DOJ has not asked Rhode Island for any registration forms, or explained why, if that was actually the goal, it could not be accomplished using the public version of the SVRL that Secretary Amore offered to provide. DOJ's shaky attempts to explain its asserted "purpose" raise more questions than they answer.

*Third*, DOJ's stated purpose is contradicted by the United States's own public statements, which provide "firm evidence" of pretextual motives and an improper purpose, an independent basis to affirm. *E.g.*, *Comely*, 890 F.2d at 542.

The United States has filed over thirty nearly identical lawsuits demanding states' complete unredacted SVRLs, including sensitive personally identifiable information. *See supra* pp. 9–13 & nn.1–5. Consistent with extensive public reporting, DOJ attorneys admitted in open court in this case that DOJ will use and share the gathered

information with agencies such as the Department of Homeland Security, thus potentially facilitating immigration investigations. App.50–51, 180–81. Immigration enforcement is nowhere mentioned in DOJ's written CRA demand. App.53–55. The Administration also has not been coy about its desire for a national voter registration list, and it only months ago issued an executive order requiring the creation of one.[17] Again, those efforts are not mentioned in the CRA demand, either.

The statements and documents in the public record reveal the Administration's intentions: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." *Schmidt*, 2026 WL 1850016, at *2; *see also Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1106, 1108. Yet the United States has repeatedly invoked only voter list maintenance as the stated purpose for its nationwide effort to seize states' voter rolls.

[17] Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026).

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* App.46–54. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," App.50, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. *See generally* 52 U.S.C. § 20507.

The MOU confirms that DOJ's actual purpose for seeking to ingest the sensitive personal information of hundreds of thousands of Rhode Island voters involves not ascertaining compliance with the NVRA and HAVA, but defying those statutes in order to unlawfully centralize control over state voter rolls in the hands of the federal executive.

The Court need not ignore public information demonstrating DOJ's failure to provide a statement of the actual purpose for its demand. It is

not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). It "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord Oregon*, 828 F. Supp. 3d at 1106–08; *Schmidt*, 2026 WL 1850016, at *2; *Warner*, 2026 WL 2018877, at *8 n.9. DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703; *see Niz-Chavez*, 593 U.S. at 165–66. The pleadings and public record show that it did not. The Court can affirm on that basis as well.

## III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT.

Even if the United States had provided a valid basis and purpose in support of a demand for records covered by Title III—which it did not—any sensitive personal voter information must be subject to redaction. Constitutional and privacy concerns prohibit disclosure of the sensitive information that the United States seeks, because requiring voters to consent to the disclosure of their uniquely sensitive information, like driver's license numbers and other unique identifier numbers, as a prerequisite to voting creates an unnecessary burden on their

fundamental right to vote. *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that making disclosure of sensitive data "a condition of [the] right to vote . . . creates an intolerable burden on that right . . . .").

Rhode Islanders would be discouraged from registering and exercising their right to vote if the sensitive information they submitted for registration could be seized by the federal executive without an opportunity to object. *See, e.g.*, App.30–33, 36. This risk of chilling voters' rights is especially serious here, where the United States has admitted to sharing sensitive personal information with outside activist groups and storing such data on unsecured, non-government servers that did not conform with agency security protocols. *See* Notice at 5–6, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026), Dkt. No. 197.

In *Lynd*, the case on which the United States repeatedly relies, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects" but "rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . ." 306 F.2d at 231. But here, DOJ

seeks sensitive private information like SSN4s, not just public records. Federal laws enacted since *Lynd* was decided acknowledges the sensitivity of such personal data in multiple ways. *See, e.g.*, 5 U.S.C. § 552(b)(6) (exempting private records from FOIA disclosure); 5 U.S.C. § 552a(b) (establishing protections for personal information held by the federal government). And today, unlike when *Lynd* was decided, there are new threats: Voter data can be electronically transferred, compounded, hacked, or run through dodgy, DOGE-run AI programs.

Courts' treatment of requests for state voter rolls under the NVRA is instructive. The 1993 NVRA includes a records provision allowing for disclosure of records specifically related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). And, as this Court and others have recognized in NVRA cases, "appropriate redaction" of voters' sensitive personal data is permitted and may even be affirmatively required to protect the fundamental right to vote as well as voter privacy. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012); *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Interpreting the NVRA to allow for

such redactions thus helps prevent any conflict between the NVRA's disclosure provisions and voters' constitutional rights and thereby "avoid[s] constitutional difficulties." *Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*, 221 F.3d 235, 241 (1st Cir. 2000).

Title III should be interpreted consistently with the later-enacted NVRA to allow and even require redactions to protect privacy and the right to vote. Both statutes use the same "all records" language. *Compare* 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection . . . *all records* concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters") (emphasis added), *with* 52 U.S.C. § 20701 ("Every officer of election shall retain and preserve, for a period of twenty-two months . . . *all records* and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .") (emphasis added). And both statutes are silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703; 52 U.S.C. § 20507(i)(1).

Resisting this straightforward approach, DOJ argues that the NVRA's disclosure provisions are available to all, whereas the CRA applies only to the federal government. U.S. Br. 29. But invasions of privacy by the federal government are no less chilling than those wrought by private actors—indeed, some would undoubtedly find the federal intrusions *more* problematic. Moreover, the limited case law considering records requests under the CRA from around the time of the statute's passage expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230; *accord In re Coleman*, 208 F. Supp. at 200, recognizing that, even in the CRA context, courts can and must protect sensitive voter information from disclosure where privacy and constitutional concerns arise. *See, e.g.*, *Bellows*, 92 F.4th at 56.[18]

[18] Rhode Island voters have an extremely strong interest in the privacy of their personal identifying information, as evidenced by the protections for such information in state law. *See, e.g.,* R.I. Gen. Laws § 17-9.1-34(f); 410 R.I.C.R. 20 -00-19.5(I)(1) (providing that the personal identifying information at issue here "shall remain confidential and shall only be available to election officials solely for election purposes"). These state laws are thus relevant not because the Common Cause Intervenors are arguing that they somehow trump federal law, as DOJ wrongly suggests, U.S. Br. 45–48, but because they help define the strong privacy interest of Rhode Island voters.

And in addition to these constitutional constraints, DOJ's attempt to obtain Rhode Islanders' sensitive data also runs afoul of the federal Privacy Act, which requires DOJ to publish a System of Records Notice (SORN) detailing their use and storage of the SVRLs before collecting them, 5 U.S.C. § 552a(e)(4), and which flat out bans the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," *id.* § 552a(e)(7), such as the right to vote, *see Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75–76 (1990).

DOJ's response is that it may bypass these constraints by relying on old, outdated SORNs from many years ago, and an "authorized law enforcement activity" exception to the ban on First Amendment Rights databases. U.S. Br. 38–41. And the breathtaking reasoning behind that position is that, in DOJ's view, *every registered voter in America is a subject of a federal criminal investigation into voter fraud* and also somehow simultaneously a victim of the fraud being investigated. *See* U.S. Br. 41 ("Persons who appear in a statewide voter registration list are '[s]ubjects of investigations,' 68 Fed. Reg. at 47,611," and also

"potential 'victims' of NVRA and HAVA noncompliance, 68 Fed. Reg. at 47,611."). That DOJ needs to characterize every registered voter in the country as the subject and/or victim of a criminal investigation to get around the requirement to simply publish a new SORN and tell the voting public what it wants to do with their private data should tell the Court all it needs to know about whether the Privacy Act's protections should apply here.

Even if the United States had properly pleaded some entitlement to Rhode Island's SVRL under Title III, voters' sensitive personal information would still need to be protected. Because DOJ demands only an unredacted SVRL containing sensitive personal identifying information that cannot be disclosed without violating the Constitution and the Privacy Act, its demand is defective and the Court can affirm on that basis as well.

## CONCLUSION

The decision below should be affirmed.

Dated: August 17, 2026 Respectfully submitted,

*_/s/_ Ari J. Savitzky*___________

PATRICIA YAN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

LYNETTE LABINGER
COOPERATING COUNSEL, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903

ARI J. SAVITZKY
WILLIAM HUGHES
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org

*Counsel for Defendants- Appellees Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches*

# CERTIFICATE OF COMPLIANCE

I certify this motion complies with the length limits set forth in Fed. R. App. P. 27(d)(2) because this brief contains 12,739 words excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 17, 2026

*/s/ Ari J. Savitzky*
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, I electronically filed the foregoing brief by using the ECF system.

I certify that the participants in the case are registered ECF users and that service will be accomplished by the ECF system.

Dated: August 17, 2026

_/s/ Ari J. Savitzky_
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches*