No. 26-1665

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

GREGG AMORE, in his official capacity as Secretary of State of Rhode Island, and the STATE OF RHODE ISLAND,

*Defendants-Appellees*

SEIU DISTRICT 1199NE, RHODE ISLAND ALLIANCE FOR RETIRED AMERICANS, CAROLYN BETENSKY, MICHAEL "ZACK" MEZERA, and COMMON CAUSE,

*Intervenors-Defendants-Appellees.*

On Appeal from the United States District Court for the District of Rhode Island
No. 1:25-cv-00639-MSM
Hon. Mary S. McElroy

# INTERVENORS-DEFENDANTS-APPELLEES SEIU DISTRICT 1199NE, RHODE ISLAND ALLIANCE FOR RETIRED AMERICANS, CAROLYN BETENSKY, AND MICHAEL "ZACK" MEZERA'S BRIEF

Amy R. Romero (1st Cir. No. 1194107)
**LAWYERS' COMMITTEE FOR RHODE ISLAND**
56 Pine Street, Suite 200
Providence, RI 02903
Tel.: (401) 238-3953 x 401

David R. Fox (1st Cir. No. 1189538)
Christopher D. Dodge (1st Cir. No. 1185553)
Branden D. Lewiston (1st Cir. No. 1224684)
Qizhou Ge (1st Cir. No. 1124619)
Tori A. Shaw (1st Cir. No. 1224637)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Tel.: (202) 948-1135

*Attorneys for Intervenors-Defendants-Appellees SEIU District 1199NE, Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Michael "Zack" Mezera*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenors-Defendants-Appellees SEIU District 1199NE and Rhode Island Alliance for Retired Americans certify that they are non-profit corporations with no parent corporations and that no public companies own any interest in them.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. The Constitution and federal law commit voter registration practices to the States. ........ 4

A. The Civil Rights Act of 1960 ........ 4

B. The National Voter Registration Act ........ 8

C. The Help America Vote Act ........ 10

II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans. ........ 12

III. DOJ sues Rhode Island to compel disclosure of its protected voter data. ........ 16

IV. The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here. ........ 16

SUMMARY OF THE ARGUMENT ........ 17

STANDARD OF REVIEW ........ 19

ARGUMENT ........ 19

I. The district court correctly held that DOJ's CRA demand is subject to meaningful judicial review. ........ 19

II. The Court should affirm because DOJ failed to state a claim. ........ 25

A. The district court correctly held that DOJ's CRA demand failed to state a legally sufficient basis for the demand as the CRA requires. ....25

B. The district court correctly held that DOJ's claimed purpose of investigating Rhode Island's list maintenance program is not a proper purpose for a CRA demand. ....28

C. The Court should alternatively affirm because Rhode Island's statewide voter list is not a record within the scope of the CRA. ....35

D. The CRA does not preempt Rhode Island's voter privacy protections. ....43

III. DOJ has not complied with the Privacy Act. ....45

IV. If the Court reverses, it should remand for additional proceedings. ....48

CONCLUSION ....49

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) .......... 6

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 31

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .......... 14

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937) .......... 40

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 4

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .......... 11, 14

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 3, 33, 34

*Bond v. United States*,
572 U.S. 844 (2014) .......... 35

*Bufkin v. Collins*,
604 U.S. 369 (2025) .......... 25

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683, 690 (D.C. Cir. 2017) .......... 22, 23, 25

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .......... 44

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) .......... 35

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 23, 24

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 40

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 31, 32, 34

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .......... 8

*Foster v. Love*,
522 U.S. 67 (1997) .......... 4, 34

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 31

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 27

*Iselin v. United States*,
270 U.S. 245 (1926) .......... 32

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 7, 24, 27, 33

*League of Women Voters v. DHS*,
No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .......... 45

*League of Women Voters v. DHS*,
No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) .......... 15, 45

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) .......... 32, 34

*Lozano v. Montoya Alvarez*,
572 U.S. 1 (2014) .......... 39

*LULAC v. Exec. Off. of the President*,
No. 1:25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .......... 46

*Malone v. White Motor Corp.*,
435 U.S. 497 (1978)....................................................................................44

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) .........................................................................19

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946)....................................................................................22

*Pa. State Conf. of NAACP v. Sec'y of Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024)..........................................................................6

*PILF v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ..................................................... 9, 41, 43, 45

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026)......................................................................9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................................................................................30

*Ramos–Pinero v. Puerto Rico*,
453 F.3d 48 (1st Cir. 2006) .......................................................................19

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)....................................................................10

*Rucho v. Common Cause*,
588 U.S. 684 (2019)....................................................................................38

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005) ....................................................45

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) .................................................................39

*Smiley v. Holm*,
285 U.S. 355 (1932)....................................................................................34

*Source for Pub. Data, L.P.*,
903 F.3d 456 (5th Cir. 2018).....................................................................23

*State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*,
580 U.S. 26 (2016) .......................................................................................30

*United States v. Adams*,
No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026) ......................12

*United States v. Aguilar*,
No. 3:25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026).....12

*United States v. Ahlers*,
305 F.3d 54 (1st Cir. 2002) ...........................................................................27

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026).....................................................................12

*United States v. Bd. of Elections*,
No. 1:25-CV-1338-MAD-PJE,
2026 WL 1999921 (N.D.N.Y. July 10, 2026) ......................................................12

*United States v. Bellows*,
No. 1:25-CV-00468-LEW,
2026 WL 1430481 (D. Me. May 21, 2026) ...................................... 12, 14, 29, 39

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)....................................................................... *passim*

*United States v. Caldwell*,
No. 3:26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ............................12

*United States v. Clarke*,
573 U.S. 248 (2014)...........................................................................................48

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) ...................................................................... 22, 23

*United States v. DeMarinis*,
No. 1:25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026) .........................12

*United States v. Evans*,
No. 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026) ........... 12, 36, 37

*United States v. Fontes*,
No. 2:26-CV-00066-PHX-SMB,
2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ....................12

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .................... 12, 26

*United States v. Gertner*,
65 F.3d 963 (1st Cir. 1995) ....................21

*United States v. Griswold*,
No. 25-CV-03967-PAB-TPO, 2026 WL 2235374 (D. Colo. Aug. 3, 2026).........12

*United States v. Koski*,
No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026)............ 12, 39

*United States v. Matthews*,
No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026)....................12

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950).................... 22, 23, 27

*United States v. Oliver*,
No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026) .......12

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. Feb. 5, 2026).................... 12, 21, 26, 49

*United States v. Powell*,
379 U.S. 48 (1964).................... 17, 20, 21, 22

*United States v. Scanlan*,
No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026) ............ 12, 39, 40

*United States v. Schmidt*,
No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026) ..............12

Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026),
ECF No. 210 ....................13

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996) ....................27

*United States v. Thomas*,
No. 3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026) .. 12, 40, 43

*United States v. Walker*,
665 F.3d 212 (1st Cir. 2011) ....................27

*United States v. Warner*,
No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026) ....................12

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026).................... *passim*

*United States v. Wis. Elections Comm'n*,
No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ....................12

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)....................9

*Watson v. Republican Nat'l Comm.*,
146 S. Ct. 2165 (2026)....................41

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................35

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)....................35

*Wis. Cent. Ltd v. United States*,
585 U.S. 274 (2018)....................42

*Yates v. United States*,
574 U.S. 528 (2015)....................38

**STATUTES**

5 U.S.C. § 552a .................... 4, 46, 48

28 U.S.C. § 1291 ....................3

28 U.S.C. §§ 1331, 1345 .......... 3

52 U.S.C. § 10101 .......... 7

52 U.S.C. § 20501 .......... 8

52 U.S.C. § 20507 .......... *passim*

52 U.S.C. § 20510 .......... 9

52 U.S.C. § 20701 .......... *passim*

52 U.S.C. § 20702 .......... 40

52 U.S.C. § 20703 .......... *passim*

52 U.S.C. § 20705 .......... 3, 20

52 U.S.C. § 21083 .......... 10, 11, 12, 40

52 U.S.C. § 21085 .......... 11

52 U.S.C. § 21111 .......... 10

**RULES**

Fed. R. Civ. P. 1 .......... 20

Fed. R. Civ. P. 81 .......... 20

**REGULATION**

410 R.I. Code R. § 20-00-19.5 .......... 4

**OTHER AUTHORITIES**

106 Cong. Rec. 5086 (1960) .......... 33

106 Cong. Rec. 6392 (1960) .......... 34

106 Cong. Rec. 7767 (1960) .......... 35

68 Fed. Reg. 47610 (Aug. 11, 2003) .......... 46, 47

7 *Oxford English Dictionary* (1933) .......... 37

*An Act to Enforce Constitutional Rights and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. (1960) .......... 6

Antonin Scalia & Brian A. Garner, *Reading Law* (2012) .......... 30

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) .......... 15

*Black's Law Dictionary* (12th ed. 2024) .......... 37

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. (1959) .......... 5

H.R. Rep. No. 107-329 (2001) .......... 11

H.R. Rep. No. 86-956 (1959) .......... 6

Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. (1929) .......... 43

Kaylie Martinez-Ochao, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information .......... 12

Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://abcnews.go.com/Politics/system-dhs-urging-states-assess-voter-rolls-return/story?id=134863557 .......... 15

Pub. L. No. 85-315, 71 Stat. 634 (1957) .......... 5, 33

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002 ....................................15

Rep. of the U.S. Comm'n on C.R. 87-88 (1959) ............................................ *passim*

Video posted by AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795..................................15

*Webster's Third New International Dictionary* (1961) ...........................................37

*Webster's Third New International Dictionary* (1966) ...........................................37

## INTRODUCTION

The Department of Justice has embarked on an unprecedented campaign to collect the voter-registration data of nearly every American. DOJ sent letters to election officials across the nation demanding each State's full, unredacted statewide voter registration list ("SVRL"). Most States agreed to provide public, redacted versions of their list that withheld sensitive personal information protected by law. But DOJ rejected such offers, demanding sensitive personal identifiers for millions of Americans. When most officials still refused, DOJ sued 30 States and the District of Columbia to force them to surrender these lists. In a remarkable feat, DOJ has lost every case to date: 24 courts—including the Sixth Circuit, the district court below, and 22 other district courts—have rebuffed DOJ's demands to seize SVRLs. Not one court has ruled for DOJ.

In demanding Rhode Island's unredacted SVRL, DOJ relied exclusively on Title III of the Civil Rights Act of 1960 ("CRA"), a 66-year-old statute providing for the preservation and inspection of "records and papers which come into [election officers'] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in recent elections. 52 U.S.C. § 20701; *see also id.* § 20703. But the CRA has never been held to cover SVRLs, let alone where no factual basis for such a claim was alleged or pleaded.

The district court was correct to rebuff DOJ's CRA demand. DOJ failed to comply with the CRA's requirement that its pre-suit demand "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. As the district court correctly held, DOJ's demand to Rhode Island stated no basis at all, and its stated purpose is improper. DOJ claims to be using the CRA to assess compliance with the National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA"), but those statutes together create a comprehensive scheme that sets forth DOJ's enforcement options when it comes to a State's list maintenance practices. DOJ cannot repurpose the CRA to provide it pre-suit inspection powers to assess compliance with the NVRA, when Congress conspicuously declined to give DOJ such powers in the NVRA or HAVA.

Moreover, as the Sixth Circuit and numerous district courts have held, SVRLs are not covered by the CRA because they are state-created databases that election officials continuously possess and revise, not voter-provided records that "come into [election officials'] possession," *id.* § 20701, like the application, registration, and poll-tax payment records that the CRA requires election officials to preserve and make available for inspection. And DOJ has failed to show either that the CRA preempts Rhode Island's voter privacy laws, nor that DOJ has complied with its obligations under the Privacy Act.

Courts have a long-recognized duty to review the lawfulness of intrusive federal investigations and demands. They should greet a federal agency's newfound claim to "extravagant statutory power" with a healthy "measure of skepticism." *Biden v. Nebraska*, 600 U.S. 477, 516 (2023) (Barrett, J., concurring) (citation omitted). The district court properly fulfilled that duty by dismissing for failure to state a claim. This Court should affirm.

## JURISDICTIONAL STATEMENT

DOJ's jurisdictional statement is incomplete. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1345, and 52 U.S.C. § 20705, because DOJ alleges a violation of the Civil Rights Act of 1960, 52 U.S.C. § 20703. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on April 22, 2026, Add.15, based on an Order dismissing the complaint on April 17, 2026, Add.1-14. The United States filed a timely Notice of Appeal on June 3, 2026. App.230-33.

## STATEMENT OF THE ISSUES

1. Whether DOJ made a valid demand for production of Rhode Island's SVRL under Title III of the Civil Rights Act of 1960, even though DOJ provided no "statement of the basis" for the demand and sought the records for a legally invalid "purpose." *See* 52 U.S.C. § 20703.

2. Whether Title III of the Civil Rights Act of 1960 requires Rhode Island to give DOJ a copy of Rhode Island's SVRL, even though it is a state-created, frequently-changing database that does not "come into [election officials'] possession" and that by law must be constantly updated, rather than being preserved unaltered. *See* 52 U.S.C. §§ 20701-20703.

3. Whether DOJ's demand for Rhode Island's complete, unredacted SVRL as part of a national campaign to assemble voter lists from every State and territory violates the federal Privacy Act or Rhode Island's voter privacy laws. *See* 5 U.S.C. § 552a; 410 R.I. Code R. § 20-00-19.5(I).

## STATEMENT OF THE CASE

### I. The Constitution and federal law commit voter registration practices to the States.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). And while Congress may preempt state regulations of federal elections, such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case.

#### A. The Civil Rights Act of 1960

Congress enacted Title III of the Civil Rights Act of 1960 to address problems of proof that emerged from Southern resistance to the Civil Rights Act of 1957. In

particular, the U.S. Commission on Civil Rights, created by the Civil Rights Act of 1957, was charged with "investigat[ing] allegations … that certain citizens of the United States are being deprived of the right to vote." Pub. L. No. 85-315, § 104(a)-(b), 71 Stat. 634, 635 (1957). As part of its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission revealed that election officials in Southern States often imposed tests on Black applicants from which White applicants were exempt, *see Rep. of the U.S. Comm'n on C.R.* 87-88 (1959) ("*Comm'n. Rep*."), and denied registration to Black applicants "because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[1] The Commission thus concluded that reviewing voter "application forms" was essential to any investigation of denials of the right to vote." *Id.* at 137.

Yet the Commission found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, in response to the 1957 Act, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before*

---

[1] The Commission Report is available at https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

*Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) ("*Hearings*") (statement of Att'y Gen. Rogers);[2] *see also Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 n.4 (M.D. Ala. 1960) (recounting officials' efforts to "destroy" voter applications). Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring that election officials retain applications to vote and allow DOJ to inspect them. *Comm'n. Rep*. at 137-38. DOJ likewise told Congress that comparing the voter applications of Black and White voters was essential to its civil rights work, explaining that "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 6 (1960) (statement of U.S. Att'y Gen. William P. Rogers).[3] "Congress responded by passing the Civil Rights Act of 1960." *Pa. State Conf. of NAACP v. Sec'y of Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Schwartz, J., dissenting).

---

[2] Available at: https://perma.cc/ET26-FKD9.

[3] Available at: https://perma.cc/46G6-GQZB.

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence that DOJ and the Commission had identified as necessary to investigate voting rights violations. As explained by a principal drafter of the CRA, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *Hearings* at 700 (statement of Rep. William M. McCulloch).[4] The CRA thus "enable[s] the Attorney General to determine whether § 1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[5] To that end, the CRA contains several interlocking provisions that collectively permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The core provision of the CRA requires officials to "retain and preserve" the records most critical to a voting rights investigation:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] . . . all records and papers which come into his possession relating to any

[4] Available at: https://perma.cc/ET26-FKD9.

[5] Section 1971, now codified at § 10101, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. § 10101(a)(1).

> application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701. The CRA criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, threatening "imprisonment" for "[a]ny person who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* § 20702. The CRA allows DOJ to inspect covered records after it makes a compliant pre-suit demand:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having made custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

### B. The National Voter Registration Act

Three decades after the enactment of the CRA, Congress passed the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The statute's requirements are aimed at ensuring "simple means are available to register for federal elections and [that these] means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). The NVRA also requires covered States to take steps to ensure their voter rolls are reasonably up to date. *See* 52 U.S.C. § 20507(a)(4). But in doing so,

the NVRA reaffirms the principal role of States in managing registration lists, requiring only that States "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either (1) "the death of the registrant" or (2) "a change in the residence of the registrant." *Id.* The NVRA also tempers this modest list-maintenance obligation with a series of safeguards designed to prevent erroneous or rushed cancellation of voters' registrations. *Id.* § 20507(a)(3), (b)-(e).

The NVRA expressly addresses enforcement and disclosure of records related to state compliance. It requires covered States to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i). Courts hold either that this inspection provision does not reach States' voter lists, *e.g.*, *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 678-83 (9th Cir. 2026), *petition for cert. pending*, No. 26-98 (July 17, 2026), or, as this Court has, that it permits States to redact sensitive personal information on voters before disclosing voter lists, *e.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *PILF v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). The NVRA also authorizes DOJ and private enforcement actions to address alleged violations. *See* 52 U.S.C. § 20510.

### C. The Help America Vote Act

A decade after the NVRA, and more than four decades after the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." *See* 52 U.S.C. § 21083(a)(1).

The list is dynamic by design. For instance, HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* § 21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information." *Id.* § 21083(a)(1)(A)(vii). Likewise, HAVA requires that the list "shall be coordinated with other agency databases within the State." *Id.* § 21083(a)(1)(A)(iv). HAVA also requires States to take steps to ensure that "voter registration records" are "accurate and … updated regularly." *Id.* § 21083(a)(4). In other words, HAVA charges States with regularly changing its SVRL so that it reflects the current snapshot of the State's registered voters.

HAVA gives DOJ authority to sue to address violations of the statute, *see id.* § 21111, but it does not grant DOJ the right to demand SVRLs or otherwise empower

DOJ to superintend or audit States' voter list maintenance practices. To the contrary, HAVA reaffirms the preeminent role of States in managing voter lists, instructing that each State's list be "defined, maintained, and administered at the State level," *id.* § 21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] to the discretion of the State," *id.* § 21085. The absence of any inspection provision in HAVA is a feature, not a bug—Congress viewed state authority over voter registration as central to preserving our democratic system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate now elections will be run, and thereby be able to control the outcome*. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Rather, HAVA ports over the NVRA's list maintenance requirements to the computerized statewide voter registration list, charging NVRA-covered States with "perform[ing] list maintenance" of their computerized voter lists "on a regular basis" consistent with the requirements of the NVRA. 52 U.S.C. § 21083(a)(2)(A). HAVA also requires that state law "include provisions" geared

toward ensuring voter lists are "accurate and … updated regularly." *Id.* § 21083(a)(4).

## II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans.

Last year, DOJ launched an unprecedented campaign to collect States' SVRLs, which include sensitive information about each registered voter. DOJ sent demands to at least 48 States, but most refused to turn over their unredacted lists.[6] DOJ thus sued 30 States and the District of Columbia to compel disclosure.

DOJ's legal theories have shifted over the course of these lawsuits. DOJ initially framed the matter largely in terms of the NVRA and HAVA. *See* Complaint, *United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 1. But in its more recent suits, including this one, DOJ rested exclusively on the CRA. *See* App.13. Each district court that has addressed DOJ's CRA claim to date has dismissed them,[7] and the Sixth Circuit affirmed the Michigan district court's

[6] *See* Kaylie Martinez-Ochao, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[7] *See United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. argued May 19, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. argued May 19, 2026); *United States v. Fontes*, No. 2:26-CV-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026), *appeal docketed*, No. 26-3609 (9th Cir. June 4, 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 9, 2026); *United*

decision dismissing DOJ's claims. *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *petition for rehearing en banc denied* (Aug. 14, 2026).

DOJ has also recast its factual allegations. In its early complaints, DOJ alleged that its demands were prompted by state-specific concerns with voter list

---

*States v. Bellows*, No. 1:25-CV-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026), *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. Wis. Elections Comm'n*, No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026), *appeal docketed*, No. 26-2217 (7th Cir. June 5, 2026); *United States v. DeMarinis*, No. 1:25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026), *appeal docketed*, No. 26-018781 (D. Md. July 13, 2026); *United States v. Schmidt*, No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026), *appeal docketed*, No. 26-2684 (3d Cir. July 7, 2026); *United States v. Scanlan*, No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); *United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections*, No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026), *appeal docketed*, No. 26-2060 (2d Cir. July 24, 2026); *United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026), *appeal docketed*, No. 26-2126 (10th Cir. July 27, 2026); *United States v. Koski*, No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026), *appeal docketed*, No. 26-2002 (4th Cir. July 29, 2026); *United States v. Thomas*, No. 3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July 24, 2026); *United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026), *appeal docketed*, No. 26-5657 (6th Cir. July 24, 2026); *United States v. Caldwell*, No. 3:26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026), *appeal filed*, No. 3:26-cv-2025 (D.N.J. Aug. 17, 2026); *United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026), *appeal filed*, No. 25-CV-3398 (C.D. Ill. Aug. 17, 2026); *United States v. Griswold*, No. 25-CV-03967-PAB-TPO, 2026 WL 2235374 (D. Colo. Aug. 3, 2026), *appeal filed*, No. 25-CV-03967-PAB-TPO (D. Colo. Aug. 17, 2026); *United States v. Evans*, No. 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026), *appeal filed*, No. 25-4403 (RDM) (D.D.C. Aug. 17, 2026); *United States v. Aguilar*, No. 3:25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026), ECF No. 210.

maintenance statistics. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 5-4. Here, however, DOJ abandoned the pretext that its demands were prompted by individualized concerns with Rhode Island's list maintenance program and instead argued that CRA demands require no factual basis at all. Add.11.

DOJ has also struggled to keep its story straight on the purpose of its demands. While DOJ has generally claimed that it seeks unredacted voter lists to assess States' compliance with list maintenance under the NVRA and HAVA, when moving to expedite this appeal, DOJ raised the "specter" of noncitizens on voter rolls, an issue absent from its Complaint. *See* Mot. to Expedite at 3, 15; *see also* App.7-14. DOJ now omits the supposed noncitizen concern from its merits brief, perhaps because it is irrelevant: the federal statutory list maintenance obligations DOJ claims to be enforcing require only a "program" that takes "reasonable" steps to remove voters who moved or died. *See* 52 U.S.C. § 20507(a)(4); *see also Bellitto*, 935 F.3d at 1194-95 (explaining the NVRA "requires a reasonable effort to remove only those voters who become ineligible because of death or a change of address"); *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017) (similar).

DOJ's actions betray its true purpose: to take federal control of state voter list maintenance. The head of DOJ's Civil Rights Division has confirmed that DOJ's

goal is to purge "hundreds of thousands of people" from voter rolls.[8] To that end, DOJ intends to run the voter lists it seizes from States through the Department of Homeland Security's notoriously unreliable Systematic Alien Verification for Entitlements ("SAVE") database to identify suspected noncitizens and then demand States remove them from voter rolls.[9] DHS Secretary Mullin has threatened election officials with withheld grants, fines, and even criminal prosecution if they do not meet the administration's voter-removal demands.[10] Those threats come even though a federal court recently blocked the federal government's efforts to use SAVE for voter removals, finding that agencies "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and that using SAVE for voter verification would risk removing "United States citizens from voter rolls based on inaccurate information." *League of Women Voters v. DHS* ("*LWV II*"), No. 25-cv-3501, 2026 WL 1784297, at

---

[8] Video posted by AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

[9] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1, 5-7); Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://abcnews.go.com/Politics/system-dhs-urging-states-assess-voter-rolls-return/story?id=134863557.

[10] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002.

*1 (D.D.C. June 22, 2026), *appeal docketed*, No. 26-5243 (D.C. Cir. June 29, 2026).

## III. DOJ sues Rhode Island to compel disclosure of its protected voter data.

On September 8, 2025, DOJ sent a letter to Secretary Amore demanding "a copy of Rhode Island's statewide voter registration list," including each voter's "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." App.22. DOJ claimed the purpose of the demand was to "to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA," though DOJ provided no reason to believe that Rhode Island may be out of compliance with those obligations. App.22. On September 16, 2025, Secretary Amore offered to give DOJ "a copy of the publicly available voter registration list," but objected to the request for driver's license numbers and partial social security numbers, which are protected from disclosure by state law. App.26-27. DOJ filed this suit on December 2, 2025, without any further attempt to engage Secretary Amore's office.

## IV. The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here.

DOJ's suit sought to compel Secretary Amore to produce an unredacted copy of Rhode Island's SVRL under the CRA. App.7-14. But the district court rejected this claim after a thorough analysis of DOJ's demand letter, as well as the statutory text. Specifically, the court found DOJ's CRA demand facially inadequate because it failed to contain any factual basis and because the stated purpose did not "relate

to … investigating violations of individuals' voting rights." Add.11-14. The court emphasized that DOJ's demand letters contained no allegations that "Rhode Island may be violating the list maintenance requirements of the NVRA and HAVA, let alone the CRA." Add.12-13. The court likewise rejected DOJ's request that it be permitted leave to send a "curing elaboration letter" to address its failure to state any factual basis in its demand (which DOJ never sent in any event), because doing so would not change the fact that DOJ's asserted purpose was improper. Add.13-14.

Because the court dismissed DOJ's complaint on these grounds, it had no need to address the other independent grounds for dismissal the parties argued below, including that the CRA does not preempt Rhode Island's privacy laws and that DOJ did not comply with the Privacy Act. *See* D.C. ECF Nos. 28, 36.

## SUMMARY OF THE ARGUMENT

1. DOJ's CRA claim is subject to meaningful judicial review under the Federal Rules of Civil Procedure. Nothing in those Rules or the CRA exempts CRA claims from review in the ordinary course, and the United States Supreme Court has made clear that courts have the duty to ensure government document demands, at a minimum, are issued for legitimate purposes and follow all statutory requirements. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964).

2. The Court should affirm because DOJ failed to state a claim under the CRA. The district court correctly held that DOJ failed to comply with the CRA's

requirement that it issue a pre-suit demand stating "the basis" for its inspection. 52 U.S.C. § 20703. DOJ provided no factual basis at all for its demand here. And DOJ's stated purpose—to assess Rhode Island's compliance with the NVRA and HAVA—is not a proper purpose for a CRA demand. The NVRA and HAVA together enact a comprehensive scheme regulating SVRLs. Congress granted DOJ certain pre-suit and enforcement powers as part of that scheme but conspicuously declined to give DOJ the power to inspect a State's unredacted SVRL outside the context of civil discovery. Fundamental principles of statutory interpretation preclude DOJ from repurposing the CRA to empower it to do what Congress chose not to authorize in the NVRA or HAVA. The Court should alternatively affirm because the CRA covers only external records—like voter applications—that "come into" the possession of election officials. *Id.* § 20701. An SVRL is not a record that "comes into" the possession of election officials—it is a database that is created, maintained, and continuously revised by those election officials. Dictionary definitions, common usage, and statutory context confirm that "come into" possession refers to receiving something from an outside source. The Court should alternatively affirm because nothing in the CRA suggests Congress intended to preempt state privacy laws.

3. The Court should alternatively affirm because DOJ failed to comply with the notice requirements of the federal Privacy Act, which are triggered

whenever a federal agency seeks to maintain or collect a system of records, as DOJ undoubtedly seeks to do here.

4. If the Court reverses, the proper next step would be to remand and allow for discovery on, among other things, whether DOJ's stated purpose is pretextual.

## STANDARD OF REVIEW

This Court "review[s] the dismissal of a complaint under Rule 12(b)(6) de novo." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). The Court must disregard legal conclusions and conclusory allegations and ask whether the "[n]on-conclusory factual allegations in the complaint" state "a plausible, not merely a conceivable, case for relief." *Id.* at 12 (citation modified). The Court is not limited to the district court's reasoning and "may affirm an order of dismissal on any basis made apparent by the record." *Ramos–Pinero v. Puerto Rico*, 453 F.3d 48, 51 (1st Cir. 2006).

## ARGUMENT

### I. The district court correctly held that DOJ's CRA demand is subject to meaningful judicial review.

The district court properly subjected DOJ's CRA demand to meaningful judicial review. Relying almost entirely on a Fifth Circuit case from 1962, *Lynd*, DOJ argues "litigation tools ordinarily available under the Federal Rules of Civil Procedure" may not be used to challenge its CRA claim; indeed, DOJ asserts its claim is "not a proper subject for review." Br.16, 20. But nothing in the Federal Rules

or the CRA itself supports DOJ's demand for an exemption from run-of-the-mill Rule 12(b)(6) analysis, and the Court should treat this appeal as it would any other.

Start with the Federal Rules, which "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is just such an action. While Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—none involve the CRA. *See* Fed. R. Civ. P. 81(a).

Nor does anything in the CRA support the exemption DOJ seeks. The statute merely provides that federal district courts "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. That unremarkable jurisdictional language cannot be read to insulate CRA claims from routine judicial review or displace the Federal Rules.

Just two years after *Lynd*, the Supreme Court construed a statute with materially identical language ("appropriate process") and held that, because it "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. DOJ appears to recognize this: Despite suggesting the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. *See* Br.12.

*Powell* also held that judicial review of government document demands has teeth. It held that courts have the duty to ensure a demand is related to a "legitimate purpose, that the inquiry may be relevant to the purpose," and "that the administrative steps required" have been followed. 379 U.S. at 57-58. That more than authorizes the judicial review conducted below. And courts evaluating DOJ's recent CRA demands have consistently held "[t]he Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *Oregon*, 828 F. Supp. 3d at 1102; *see also Benson*, 179 F.4th at 483 n.2 (rejecting *Lynd* as "60-year-old out-of-circuit caselaw" and holding that "subsequent binding precedent from the Supreme Court and this court carves out a role for the courts in reviewing civil investigative demands" (citing *Powell*, 379 U.S. at 58)).

DOJ's arguments to the contrary fail. *First*, it claims *Powell* only allows judicial inquiry into whether an agency acted with "nefarious reasons having no bearing on law enforcement at all," but not any inquiry into whether the agency "may have overreached in its understanding of its legitimate law enforcement powers." Br.20. This gloss on *Powell* does not work. The question is "whether the federal judiciary's imprimatur should be impressed" on DOJ's demand. *United States v. Gertner*, 65 F.3d 963, 966 (1st Cir. 1995). Because DOJ's authority "is created solely by statute," *CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*ACICS*"), 854 F.3d 683, 690 (D.C. Cir. 2017) (citation omitted), DOJ exceeds its statutory power

if its demand is not made pursuant to a "proper purpose authorized by Congress." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989); *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946) (agency investigations must be for "a lawfully authorized purpose"). The Court cannot endorse DOJ acting beyond its power—it must ensure that DOJ acts "within the authority of the agency." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). By granting courts jurisdiction to enforce DOJ's demands, the CRA necessarily "entrusts courts with the authority and duty not to rubber-stamp" such demands "but to adjudge their legitimacy." *ACICS*, 854 F.3d at 689 (affirming quashal of civil investigative demand). After all, "[i]t is the court's process which is invoked" here, and "a court may not permit its process to be abused." *Powell*, 379 U.S. at 58.

*Powell*'s charge that courts must ensure "administrative steps required" have been followed, *id.*, also forecloses DOJ's contention that courts cannot assess whether DOJ complied with the CRA's requirement that it state "the basis and the purpose" for its demand. 52 U.S.C. § 20703. Courts have not hesitated to assess statutorily-required statements of purpose for other civil investigative demands. *ACICS*, 854 F.3d at 691-92 (affirming quashal of civil investigate demand that contained a "catch-all" statement of purpose with "no mention" of how the records sought "relate to [the agency's] investigation"); *see also CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018). To insulate its statement of basis and

purpose from judicial review, as DOJ urges, would "effectively write out of the statute all of the notice requirements that Congress put in." *ACICS*, 854 F.3d at 692; *see also Comley*, 890 F.2d at 541 (explaining a subpoena is enforceable only if "statutory procedures are followed in the subpoena's issuance").

*Second*, DOJ argues that, despite *Powell*, courts should not limit CRA demands to records that are "relevant" to DOJ's stated purpose. Br.16-17. DOJ hangs its hat on the CRA's lack of language explicitly limiting inspection to relevant records. Br.16-17. But DOJ fails to locate *any* case—in this Circuit or elsewhere—holding that the government may demand irrelevant records, under any statutory authority. As the Supreme Court has long held, a government document demand "unrelated to the matter properly under inquiry" would "exceed the investigatory power" of the agency. *Morton Salt*, 338 U.S. at 652. That is because agencies are "not afforded unfettered authority to cast about for potential wrongdoing." *ACICS*, 854 F.3d at 689 (citation modified).

*Third*, DOJ claims that *Lynd* is "consistent" with the Supreme Court's decision in *Donaldson v. United States*, 400 U.S. 517 (1971). But *Donaldson* held the "Civil Rules, of course, have an application" to suits to enforce governmental demands. 400 U.S. at 528. And DOJ fails to cite any authority explaining how the ordinary application of Rule 12(b)(6) should be modified here. Instead, DOJ vaguely alludes to a "special statutory proceeding" that, ironically, is not spelled out in the CRA or

any other statute. Br.9, 25. *Donaldson* offers DOJ no aid: the Court confirmed that Rule 24(a)(2) of the Federal Rules—regarding intervention—continues to apply in a civil action to enforce a tax summons, even though it affirmed the Fifth Circuit's conclusion that a putative intervenor failed to satisfy Rule 24's substantive terms. 400 U.S. at 540-41.

As for *Lynd*—it simply never addressed the issues here. The Fifth Circuit recognized courts must be "open for … determination" if there were a "genuine dispute" about whether a "particular paper or record" fell under the CRA. 306 F.2d at 226. There is certainly such a dispute here. *See infra* § II.A. And the Fifth Circuit had no reason to doubt that DOJ invoked the CRA for a valid purpose andf complied with the statute's demand requirements, unlike here. As that court explained, the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights," 306 F.2d at 228, and "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration and voting," *id.* at 229 & n.6. *Lynd* therefore never considered any of the issues currently before this Court.

Finally, DOJ suggests judicial review is improper because the CRA contains no "meaningful standards" against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. Br.21-22. But the CRA itself

provides the standard—it requires that DOJ state "the basis and the purpose" for sending the demand, and it specifies what records fall within its scope.

## II. The Court should affirm because DOJ failed to state a claim.

### A. The district court correctly held that DOJ's CRA demand failed to state a legally sufficient basis for the demand as the CRA requires.

The district court correctly concluded that DOJ's demand letter is facially defective. The CRA requires the Attorney General to make a "demand in writing," and specifies that "[*t*]*his demand* shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphases added). The inclusion of the word "shall" "imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). Requiring DOJ to articulate a factual basis for *why* it seeks the information it demands is an important check against bad-faith investigations. *See ACICS*, 854 F.3d at 691 (quashing civil investigative demand that failed to "adequately state 'the specific conduct under investigation'"). Because DOJ failed to state the "basis" for its request in its demand letter, DOJ has not satisfied the CRA's plain requirements.

DOJ alleges that its September 8, 2025 letter was its CRA demand. App.13. That letter stated that the "*purpose* of the request is to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA," but it included nothing at all about DOJ's *factual basis* for its demand. App.23 (emphasis added). DOJ does not attempt to argue that it provided a factual basis, nor can it: DOJ's letter is entirely silent on Rhode Island's list maintenance procedures. App.22-

24. Unlike its demands in *Bellows* and *Galvin*, where DOJ at least tries to cobble together supposed concerns with Maine's and Massachusetts's responses to an election administration survey to serve as its factual basis, Br. of United States at 23-25, *United States v. Galvin*, No. 26-1657 (1st Cir. July 17, 2026); Br. of United States at 26-27, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026), DOJ identifies *nothing* in its demand here that it even tries to construe as suggesting something may be amiss with Rhode Island's list maintenance program. Nor could it. The demand does nothing more than cite the NVRA, HAVA, and the CRA. App.22-24.

As a result, here DOJ resorts to arguing that the CRA does not require it to state any facts at all and that its statement that it intends to assess Rhode Island's compliance with the NVRA and HAVA was sufficient to comply with the basis requirement. Br.21-24. But as the district court recognized, reading the CRA to require no statement of factual basis "would conflate that requirement with the required statement of the demand's 'purpose.'" Add.11 (citing *Weber*, 2026 WL 118807, at *9; *Oregon*, 2026 WL 318402, at *8-9; *Galvin*, 2026 WL 972129, at *4). DOJ's argument therefore fails as a matter of basic statutory interpretation. After all, courts "presume that Congress intended all words and provisions contained within a statute to have meaning and effect." *United States v. Ahlers*, 305 F.3d 54, 58 (1st Cir. 2002). The conjunctive "and" in the CRA requirement that DOJ state both "the basis

*and* the purpose" for its demand indicates that they are distinct. *See United States v. Walker*, 665 F.3d 212, 224 (1st Cir. 2011).

Having no answer to this, DOJ instead argues that its lack of basis is not judicially reviewable. But that cannot be squared with the Federal Rules or binding case law prescribing judicial review for government document demands. *See supra* Argument § I. The cases DOJ points to all contemplate a factual basis under the CRA, and they in fact reveal that DOJ originally understood the CRA to require it to state its factual basis. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6 ("This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (similar). By contrast, DOJ's demand to Rhode Island ignores this requirement.

Moreover, DOJ's purported basis is disconnected from the information it seeks. A government document demand must also be "reasonably relevant" to the matter under investigation. *Morton Salt*, 338 U.S. at 652; *see also United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). But obtaining Rhode Island's unredacted SVRL would shed little light on in whether Rhode Island complied with its list-maintenance obligations, which only require "reasonable effort[s]" to remove voters who died or moved. 52 U.S.C. § 20507(a)(4). The SVRL is just a snapshot of

registered voters that becomes immediately outdated; it says next to nothing about Rhode Island's *programs* to *remove* voters from the list. If DOJ was indeed interested in Rhode Island's procedures for list maintenance, it could have asked questions or asked for records concerning its process for identifying and removing ineligible voters—demands it chose not to make. The unredacted list is thus not "reasonably relevant" to DOJ's purported list-maintenance investigation.

### B. The district court correctly held that DOJ's claimed purpose of investigating Rhode Island's list maintenance program is not a proper purpose for a CRA demand.

The district court also correctly held that DOJ had no lawful purpose for its CRA demand. DOJ's alleged purpose was "to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." App.11. But investigating Rhode Island's compliance with its list maintenance obligations under those laws is not a permissible purpose under the CRA, which Congress enacted to aid DOJ in the enforcement of civil rights laws (and specifically the Civil Rights Act of 1957). It makes little sense to allow DOJ to use the CRA to investigate compliance with separate statutes—the NVRA and HAVA—with detailed enforcement regimes of their own that do not include similar inspection authority. "The United States' undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce is in direct contravention" of foundational principles of statutory interpretation. *Bellows*, 2026

WL 1430481, at *8. When DOJ "wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes—which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of [] state election official[s]." *Id.*

#### 1. Congress enacted the NVRA and HAVA—not the CRA—to govern voter list maintenance by States.

A core problem with DOJ's invocation of the CRA as a tool for disclosure of list maintenance records is that Congress has spoken to that issue but in a different statute. The NVRA grants DOJ the right to inspect "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). DOJ is well aware of this inspection tool because it originally invoked it as the primary basis for its demand. App.22-24. But it immediately omitted that claim when it filed suit, effectively conceding that the NVRA does not mandate the disclosure of the sensitive voter information DOJ seeks—a conclusion this Court reached before DOJ even issued its demand. *See PILF v. Bellows*, 92 F.4th at 45-49.

Dissatisfied with the reach of the inspection tool Congress provided, DOJ argues that an unrelated statute—the CRA—provides it more far-ranging authority. Br.11. But DOJ cannot supplant the tools Congress *did* provide for federal list maintenance supervision—including an inspection provision—with the one DOJ

*wishes* Congress provided. Allowing DOJ to invoke another statute's disclosure tool because it finds the NVRA unsatisfactory would result in "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In such cases it is "[t]he terms of the specific authorization [that] must be complied with." *Id.*; *see also* Antonin Scalia & Brian A. Garner, *Reading Law* 164 (2012) (explaining the general provision is "suspended" as "to cases covered by the specific provision").

DOJ resists this conclusion by insisting that Congress enacted the NVRA and HAVA against the backdrop of the CRA, and therefore must simply have assumed DOJ enjoyed unlimited authority to demand state voter rolls. *See* Br.27-28. But that is implausible. Both the NVRA and HAVA speak *expressly* to DOJ's specific enforcement powers, including those not shared by the broader public. *See* 52 U.S.C. §§ 20510(b), 21111. If Congress intended DOJ's exclusive powers to include an inspection tool on par with Title III, it could have easily said so or cross-referenced the CRA itself. "Congress knew how to draft the kind of statutory language that" DOJ wishes "to read into" the NVRA and HAVA but chose not to. *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26, 36 (2016) And Congress's "express provision of one method of enforcing" the NVRA and HAVA "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

Further, the NVRA and HAVA take pains to maintain state primacy over voter rolls. If Congress meant to disrupt that deliberate balance by granting DOJ *carte blanche* access to state voter rolls, it would not have done so silently. "The idea that Congress gave the Attorney General such broad ... authority through an implicit delegation ... is not sustainable." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (explaining Congress does not delegate authority of "political significance to an agency in so cryptic a fashion"). The Court should therefore reject DOJ's argument that Congress silently enlarged a pre-existing statute like the CRA by *declining* to place a similar provision in either the NVRA or HAVA.

Lurking beneath DOJ's argument is the misguided assumption that Congress surely *meant* to afford it such a far-ranging inspection tool. Br.30. That is wrong for a host of reasons. For one, there is nothing remarkable about granting DOJ limited enforcement powers in two statutes meant to preserve state primary in list maintenance. *See supra* Statement §§ I.B–I.C. The enforcement tools Congress *did* grant DOJ are considerable and afford multiple avenues for obtaining state records. In addition to the NVRA's public-inspection provision, DOJ can obtain the fruits of civil discovery through NVRA and HAVA enforcement actions—so long as it can plead a plausible violation of those laws. That reflects Congress's judgment that DOJ must be able to make some preliminary showing—enough to satisfy Rule 12(b)(6),

at least—before it can seek records beyond what Section 20507(i) provides. While DOJ might desire "an enlargement" of its NVRA and HAVA powers "by the Court," to "supply [such] omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926).

#### 2. Congress enacted the CRA to facilitate investigations into the denial of the right to vote and violations of civil rights laws.

DOJ alternatively contends that there is "no language limiting Title III to violations of individuals' voting rights," such that the provision encompasses "investigating possible violations of [any] Federal statute." Br.26. The CRA's overall text and context foreclose that expansive claim. Courts do not read isolated fragments of statutory text to find previously undiscovered wellsprings of federal power. *See Brown & Williamson*, 529 U.S. at 132 (explaining "a reviewing court should not confine itself to examining a particular statutory provision in isolation"). "Textualists—like all those who use language to communicate—do not interpret words in a vacuum. Instead, we use context, including '[b]ackground legal conventions,' 'common sense,' and 'constitutional structure,' to ascertain a text's 'most natural meaning.'" *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 672 (2026) (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515).

The relevant statutory and historical context for the CRA is not seriously disputed. *See supra* Statement § I.A. Congress enacted the CRA to bolster

enforcement of a closely related statute, the Civil Rights Act of 1957. *See* Pub. L. No. 85-315, 71 Stat. 634. As DOJ's own preferred case acknowledges, Title III's "purpose is to enable the Attorney General to determine whether [§ 10101] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. But it was also undisputed that "[i]t [was] not the purpose of title III to supervise State elections." *Hearings* at 700 (statement of Rep. William M. McCulloch, a principal drafter of Title III). Rather, the "purpose of Title III" is to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Id.* at 600 (Attorney General Rogers explaining Title III is meant to facilitate investigations into "complaints that qualified persons have been denied the right to vote in violation of Federal law"), 106 Cong. Rec. 5086 (1960) (explaining Title III "requires the preservation of voting records and gives the Justice Department power to inspect them in enforcing the 1957 act" (Statement of Sen. Saltonstall)). Indeed, Representative Cramer, who proposed the relevant basis and purpose language, did so to ensure that any demand "have some relationship to the title and purpose of the bill, the title of the bill being 'to enforce constitutional rights.'" 106 Cong. Rec. 6392 (March 23, 1960) (statement of Rep. Cramer).

Buttressing this historical context are important "'[b]ackground legal conventions,' 'common sense,' and 'constitutional structure.'" *Learning Res.*, 146 S.

Ct. at 672 (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515). The Constitution, in the first instance, "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69. The Elections Clause empowers States to "provide a complete code for congressional elections, not only as to times and places, but in relation to . . . registration." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). And both the NVRA and HAVA supply important "background legal conventions" reinforcing that voter registration remains principally a state matter. *See supra* Statement §§ I.B-C. These foundational principles reinforce that Congress did not grant casually DOJ authority to demand inspection of unredacted state voter rolls on a whim and for any conceivable purpose.

The Court also "must be guided to a degree by common sense," which reinforces that Congress did not haphazardly grant DOJ a power of such "political magnitude" in a six-decade old civil rights law that no court has ever applied outside of voting rights investigations. *Brown & Williamson*, 529 U.S. at 133. In recent years, the Supreme Court has emphatically rejected the notion that Congress accidentally grants sweeping power to the Executive Branch through obscure or opaque statutory provisions. Rather, it demands "clear congressional authorization," not "a merely plausible textual basis," whenever an agency like DOJ claims previously "unheralded" power. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022).

Congress, after all, "does not hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

DOJ claims to have discovered just such an elephant, but DOJ fails to grapple with the context, history, statutory framework, and constitutional presumptions above. Nor does DOJ advance any principled limitation on the permissible scope of CRA demands. DOJ quotes legislative statements to the effect that the CRA may be marshaled for the purpose of "investigating *possible* violations of a Federal statute." Br.20 (quoting *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating))). But in that same colloquy, Senator Keating made clear that Title III was intended "to add essential features to the laws already on the statute books toward ending discrimination in the voting privileges of our citizens." 106 Cong. Rec. at 7767. This Court should decline to endorse DOJ's "boundless reading" of the CRA, particularly given the "basic principles of federalism" at issue in the voter registration context. *Bond v. United States*, 572 U.S. 844, 858-59 (2014) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" the "usual constitutional balance of federal and state powers." (citation omitted)).

### C. The Court should alternatively affirm because Rhode Island's statewide voter list is not a record within the scope of the CRA.

In the alternative, the Court should join the Sixth Circuit and over a dozen district courts in holding that the CRA does not cover SVRLs because they are not

records that "come into" the possession of election officials. *Benson*, 179 F.4th at 479; *Evans*, 2026 WL 2267774, at *5 (collecting cases). Rather, SVRLs are dynamic lists created and continuously maintained and updated by election officials, quite unlike static and discrete records such as voter application forms covered by the CRA.

#### 1. Rhode Island's SVRL was created by election officials and therefore did not "come into" their possession.

The CRA requires election officers to "retain and preserve … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Only records that "come into" election officials' possession within the meaning of Section 20701 are subject to inspection upon a proper demand by the Attorney General. *Id.* § 20703.

The CRA does not define what it means for a record to "come into" possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession of something with acquiring, obtaining, or receiving the thing. *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something); *Receive*, *Webster's Third*

*New International Dictionary* 1894 (1961) ("to come into possession of: acquire"). And this same understanding endures 66 years later. *See, e.g.*, *Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source").

Common usage confirms what the dictionaries make clear. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "come into" possession of a cake she baked with those ingredients. *Id.* By the same principle, "an ordinary English speaker would not say" that Rhode Island came into possession of an SVRL that it "created." *Id.*; *see also Evans*, 2026 WL 2267774, at *6 (drawing similar analogy).

Additional textual indicators reinforce that Congress used the ordinary meaning of "come into possession." The surrounding text of Section 20701 explains that the relevant "records" are those "relating to any application, registration, payment of poll tax, or other act requisite, to voting in such election." *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) ("[A]ccompanying words" are key context because "a word is known by the company it keeps . . . ."). Those are the sort of records that officials "obtain from … third parties," such as a prospective voter, rather than create themselves. *Benson*, 179 F.4th at 479. As the

Sixth Circuit recounted, even the reference to records related to "payment of poll tax" reveals the narrow category of documents captured in this language. *Id.* When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.* The CRA thus required that officers "would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

The CRA also "draw[s] meaning from related provisions." *Rucho v. Common Cause*, 588 U.S. 684, 716 (2019). Echoing language in the CRA, the materiality provision in the Civil Rights Act of 1964 prohibits denial of the right to vote based on "an error or omission on *any record or paper relating to any application, registration, or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also id.* § 20701. The materiality provision concerns "errors or omissions on … application forms," *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), just as the 1960 CRA concerns applications forms and similar materials submitted by voters.

If Congress had intended for the CRA to cover dynamic documents created by election officials, such as SVRLs, it had "obvious alternative" language at its disposal. *Bellows*, 2026 WL 1430481, at *6 n.10 (quoting *Lozano v. Montoya*

*Alvarez*, 572 U.S. 1, 16 (2014)). It could have written the CRA to simply encompass "all records" that met the subsequent statutory criteria, without any qualifier regarding possession, as it did in the NVRA. *Koski*, 2026 WL 2032532, at *5 (quoting 52 U.S.C. § 20507(i)(1)). Or "Congress could have required the retention and production of all election-related records and papers '*in* the possession of' the state election official." *Bellows*, 2026 WL 1430481, at *6 n.10 (emphasis added). But Congress "chose not to use this broader formulation in Section 20701 and, having done so, the court must give meaning to the words 'come into.'" *Scanlan*, 2026 WL 1864054, at *6.

**2. Applying the CRA to Rhode Island's SVRL would require it to be preserved without alteration, but federal law requires constant updates.**

The CRA's preservation requirement confirms that it does not apply to Rhode Island's SVRL. Any record covered by the CRA must be "retain[ed] and preserv[ed]" and may not be "alter[ed]." 52 U.S.C. §§ 20701-20702. If Section 20701 is read to cover Rhode Island's SVRL, it would "effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the state, would be 'impractical to the point of impossible.'" *Scanlan*, 2026 WL 1864054, at *5 (quoting representations from the State of New Hampshire). It is implausible that "Congress

was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The command to preserve and retain covered records is paired with Section 20702's criminal penalties for those who willfully "alter" them. 52 U.S.C. § 20702. HAVA, however, *requires* States to establish a dynamic SVRL that "is constantly being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." *Thomas*, 2026 WL 2070437, at *6; 52 U.S.C. § 21083(a)(1). Adopting DOJ's interpretation of the CRA would create an unavoidable clash with HAVA, and by extension, place election officials in the impossible bind of choosing which statute to honor—at risk of criminal penalty. Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). In particular, earlier-adopted statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2177 n.8 (2026) (emphasis added) (citation omitted). This Court should join the Sixth Circuit and numerous district courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

### 3. DOJ's interpretation of the CRA should be rejected.

Despite the growing consensus among courts throughout the country that the CRA does not extend to SVRLs, DOJ ignores the issue entirely in its brief. And DOJ's contrary arguments in parallel litigation, including the parallel *Bellows* appeal, are meritless.

*First*, DOJ has cited decisions—including this Court's decision in *PILF v. Bellows*—holding that the NVRA extends to redacted voter lists to suggest the CRA must as well. *See* 92 F.4th 36. But *PILF* undercuts DOJ's reading of the CRA. *PILF* held that the NVRA's inspection provision extends to (redacted) SVRLs because they "concern the implementation of programs and activities" relating to list maintenance. *Id.* at 47-48 (quoting 52 U.S.C. § 20507(i)). That language in the NVRA is targeted at internal, state-generated records about the "implementation" of state programs concerning SVRLs—quite unlike the CRA, which is focused on discrete and static records received from voters. Indeed, the phrase "come into . . . possession" does not appear in the NVRA, 52 U.S.C. § 20507(i), so it only makes sense that the scope of records covered would be different too. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'" (citation omitted)).

*Second*, DOJ has advanced a "temporal" reading under which "come into" possession cabins an election official's liability to documents received "*during her*

*tenure*." Br. of United States at 45, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) (quoting *Benson*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting) (emphasis added)). This interpretation is untethered from the CRA's text, which does not contain the additional phrases that DOJ relies upon: "during her tenure" and "in the course of administering" an election. Br. 45. As a result, the phrase "come into" does nothing, in the context of the CRA's text, to support a restriction to documents received during an official's service. The only temporal language in the statute is the reference to the twenty-two months after a federal election. To the extent that "comes into" imposes any temporal restriction, it would therefore limit the CRA to records first acquired during that 22-month period, which would bizarrely exclude records received during the two months immediately before election day, when the relevant records are most likely to be received. DOJ does not defend such an argument.

*Third*, DOJ has speculated that the "context" in which the CRA was enacted supports its view. Br. of United States at 47-48, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026). In fact, the context supports the opposite conclusion, showing why the CRA is keyed to discrete documents submitted by voters to election officials. The Civil Rights Commission found its investigation thwarted by Jim Crow officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep.* 93, and it determined that comparing such applications to

accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137.

By contrast, unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Evans*, 2026 WL 2267774 at *10 (emphasis added). Regardless, voter lists (although not SVRLs, with their detailed personal identifying information) were *already* available to DOJ in most states even before the CRA, because "voter rolls have long been treated as public records, which are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* It is no surprise that Congress drafted the CRA to cover the records that were *not* already available, rather than the ones that were.

### D. The CRA does not preempt Rhode Island's voter privacy protections.

Rhode Island law mandates that voters' driver's license numbers and partial social security numbers "shall remain confidential." 410 R.I. Code R. 20-00-19.5(I). DOJ does not appear to contest that Rhode Island law prohibits the disclosure of such information, and now appears to concede that it will accept some redactions to

the SVRL. *See* Br.39. Because DOJ has failed to demonstrate that the CRA preempts Rhode Island's voter privacy laws, it is not entitled to Rhode Island's full, unredacted SVRL.

Nothing in the CRA's text specifically extends to sensitive voter information, and the early case law confirms it was not meant to. As *Lynd* recognized, the CRA was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231. Indeed, since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), Congress's purpose in enacting the CRA could not possibly have extended to requiring disclosure of such information. *See also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) ("[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." (citation modified) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978))). Further, as this Court has held, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in [state voter files]." *PILF v. Bellows*, 92 F.4th at 56. Just like the NVRA, the CRA is devoid of any language prohibiting redactions.

## III. DOJ has not complied with the Privacy Act.

The Court should also affirm because the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F. Supp. 3d at 1192-93 (dismissing DOJ's demand for California's unredacted voter list on this ground); *see also LWV II*, 2026 WL 1784297, at *21-28 (finding DHS violated the Privacy Act in seeking to run voter lists through SAVE).

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). One such requirement is that before an agency may "establish or revise any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records.'" *Id.* at *2 (quoting 5 U.S.C. § 552a(e)(4)). The System of Records Notice or "SORN" must specify the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. 5 U.S.C. § 552a(e). DOJ does not appear to contest that Rhode Island's voter list, which contains the names and other identifying information of all registered voters, qualifies as "system of records" under the Act. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ must, therefore, issue a compliant SORN "before" it engages in activity covered by the Act. *LULAC v. Exec.*

*Off. of the President*, No. 1:25-cv-0946, 2026 WL 252420, at *54-55 (D.D.C. Jan. 30, 2026).

DOJ points to a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." Br. 53-54. But this SORN fails to support DOJ's attempt to collect voter data here several times over. *First*, it does not disclose what DOJ intends to do with the voter data it collects—indeed, it does not even *mention* the NVRA, HAVA, or the CRA. DOJ seeks to excuse this omission because the SORN refers to the Civil Rights Division's website, which in turn mentions the statutes, Br. 54 n.6, but the Privacy Act requires information in the SORN to be "published in the Federal Register"—not on an agency's webpage. 5 U.S.C. § 552a(e)(4). And the Division's website merely lists the statutes enforced by the Voting Section—it does not disclose the intended "routine uses" of the mass data collection DOJ seeks here, and so does not satisfy the Privacy Act. 5 U.S.C. § 552a(e)(4)(D).

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists that this language covers its demand here because every registered voter in Rhode Island is simultaneously a "subject" and "victim" in its "investigation into voter fraud." Br. 54-55. Rhode Island's voters would be aghast to learn that DOJ views each and every one of them as a "subject"—a term that, as DOJ

recognizes, means that the individual's conduct is "under investigation," *id.*, a designation serious enough that it would normally trigger a well-advised recipient to seek criminal defense counsel. And it is similarly implausible to call every registered voter in Rhode Island a "victim" in an investigation purportedly about the sufficiency of Rhode Island's processes and programs to maintain its voter rolls. Reading those terms as capaciously as DOJ urges would make a mockery of the Privacy Act's notice requirements.

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47611. While this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's full, unredacted voter list.

For all these reasons, this SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F. Supp. 3d at 1193. "Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot

collect the sensitive, unredacted voting records of millions of" Rhode Island residents. *Id.*[11]

## IV. If the Court reverses, it should remand for additional proceedings.

Even if the Court were to reverse, it should reject DOJ's audacious request to "remand with instructions to order Secretary Amore to immediately produce the requested unredacted SVRL" and to immediately issue its mandate. Br.49. The appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking Rhode Island's SVRL was pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). The CRA requires DOJ to state "the purpose" for its demand, so it matters whether the asserted purpose is the true one.

As multiple federal courts have noted, there is reason to doubt DOJ's stated purpose in seeking SVRLs. *See, e.g.*, *Weber*, 816 F.Supp.3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F.Supp.3d at 1107 (similar). DOJ's actual purpose

[11] The "law enforcement" exception DOJ references only means that DOJ is not *categorically* barred from collecting First Amendment information. *See* 5 U.S.C. § 552a(e)(7). There is no law enforcement exception to the Act's SORN requirement. *Id.* § 552a(e)(4).

appears to be to run Rhode Island's SVRL through DHS's SAVE database and to then pressure States to remove flagged registrants, notwithstanding SAVE's demonstrable unreliability when it comes to flagging noncitizens. *See supra* Statement § II. But, as noted, that endeavor has nothing to do with DOJ's stated purpose here—and DHS is currently enjoined from using SAVE to facilitate voter removals in any event. *Id.*

DOJ also invites remand proceedings on its compliance with the Privacy Act: "Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand." Br.39. But that argument itself is incompatible with DOJ's request for an order directing Secretary Amore to "immediately" produce Rhode Island's SVRL. Br.49. This is yet another reason why the Court should decline DOJ's request to enter a rubber-stamp judgment on remand.

## CONCLUSION

The decision below should be affirmed.

August 17, 2026

Respectfully submitted,

*/s/ David R. Fox*
David R. Fox (1st Cir. No. 1189538)
Christopher D. Dodge (1st Cir. No. 1185553)
Branden D. Lewiston (1st Cir. No. 1224684)
Qizhou Ge (1st Cir. No. 1224619)
Tori A. Shaw (1st Cir. No. 1224637)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
dfox@elias.law
cdodge@elias.law
blewiston@elias.law
age@elias.law
tshaw@elias.law

Amy R. Romero (1st Cir. No. 1194107)
**LAWYER'S COMMITTEE FOR RHODE ISLAND**
56 Pine Street, Suite 200
Providence, RI 02903
Tel.: (401) 238-3953 x 401
amy@lawyerscommitteeri.org

*Attorneys for Intervenors-Defendants-Appellees SEIU District 1199NE, Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Michael "Zack" Mezera*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 11,964 words, excluding parts of the brief exempted by Federal Rules of Appellate Procedure 27(d)(2) and 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ David R. Fox*
David R. Fox

**CERTIFICATE OF SERVICE**

I certify that on August 17, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David R. Fox*
David R. Fox