**No. 26-1665**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

GREGG AMORE, in the official capacity as Secretary of State of Rhode Island; COMMON CAUSE; CATHERINE SAUNDERS; STUART WALDMAN; JULIA SANCHES; SEIU DISTRICT 1199NE; RHODE ISLAND ALLIANCE FOR RETIRED AMERICANS; CAROLYN BETENSKY; and MICHAEL ZACK MEZERA,

*Defendants-Appellees*

On Appeal from the United States District Court for the District of Rhode Island

# BRIEF OF BIPARTISAN FORMER SECRETARIES OF STATE AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

John B. Hill
Samantha Y. Suman
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
ssuman@citizensforethics.org

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTERESTS OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. DOJ's demand for Rhode Island's full voter rolls violates separation of powers principles. .......... 2

A. The U.S. Constitution mandates the states' role in regulating and administering elections. .......... 2

B. The Constitution prioritizes the states' accountability to voters. .......... 4

C. The NVRA and HAVA confirm states' authority over voter roll list maintenance. .......... 6

II. DOJ's demands for states' full voter rolls violate the Privacy Act. .......... 9

III. Sound policy reasons support barring DOJ from collecting the personal identifying information in state voter files. SION .......... 13

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 1, 2

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 3, 5, 7

*Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) .......... 4

*Bellville v. Town of Northboro*,
375 F.3d 25 (1st Cir. 2004) .......... 14

*Branti v. Finkel*,
445 U.S. 507 (1980) .......... 10

*Bush v. Gore*,
531 U.S. 98 (2000) .......... 6

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) .......... 3, 4

*Commc'ns Ass'n v. Frey*,
471 F. Supp. 3d 318 (D. Me. 2020) .......... 14

*Fish v. Kobach*,
189 F. Supp. 3d 1107 (D. Kan. 2016) .......... 6

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) .......... 14, 15

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) .......... 4

*In re Gordon*,
218 F. Supp. 826 (S.D. Miss. 1963) .......... 15

*Harkless v. Brunner*,
545 F.3d 445 .......... 4

*League of United Latin Am. Citizens v. Exec. Off. of President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 3, 5

*Sandusky Cnty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) .......... 6

**Cases—continued**

*Smiley v. Holm*,
285 U.S. 355 (1932) ... 3

*Storer v. Brown*,
415 U.S. 724 (1974) ... 5

*Thornhill v. Alabama*,
310 U.S. 88 (1940) ... 13

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) ... 3

*United States v. Gradwell*,
243 U.S. 476 (1917) ... 4, 5

**Statutes, Rules & Regulations**

5 U.S.C.
§ 552a(a)(3) ... 11
§ 552a(a)(5) ... 11
§ 552a(e)(4) ... 11
§ 552a(e)(4)(C) ... 12
§ 552a(e)(7) ... 10
§ 552a(e)(1) ... 11
§ 552a(e)(11) ... 11

52 U.S.C.
§ 20507(i) ... 13
§ 20507(a)(4) ... 6
§ 20507(a)(4)(A) ... 8
§ 20510(A) ... 8
§ 20701 ... 14
§ 20702 ... 14
§ 20703 ... 14
§ 20704 ... 14
§ 20705 ... 14
§ 20706 ... 14
§ 21083 ... 8, 14
§ 21083(a)(1)(A) ... 6
§ 21083(a)(4)(A) ... 6
§ 21083(a)(5)(A) ... 13
§ 21111 ... 8

**Statutes, Rules & Regulations—continued**

28 C.F.R. 0.50(a) ........ 12

68 Fed. Reg. 47610 (Aug. 11, 2003) ........ 12

70 Fed. Reg. 43904 (July 29, 2005) ........ 12

82 Fed. Reg. 24147 (May 25, 2017) ........ 12

**Other Authorities**

Confidential Mem. of Understanding between DOJ and Alaska Div. of Elections at 5, (Dec. 19, 2025) ........ 8

*The Federalist* No. 59 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........ 5

Mem. Op. for the Assistant Attorney General, Civil Rights Division, *Authority to Obtain and Share Statewide Voter Roll Data* (May 12, 2026) ........ 7

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025) ........ 13

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act (2016) ........ 12

3 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ........ 4

S. Comm. on Gov;t Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 - S. 3418 (Pub. L. No. 93-579), Source Book on Privacy (1976) ........ 9, 10

U.S. Const. art. I, § 4, cl. 1 ........ 3

**Other Authorities—continued**

U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.) ........ 9

William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993*, The American Presidency Project (May 20, 1993) ........ 7

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are a bipartisan group of former state secretaries of state.[2] As another court concluded in granting *Amici* leave to file a similar amicus brief in election-related litigation there, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin Am. Citizens v. Exec. Off. of President*, No. 25-cv-946 (D.D.C. Apr. 24, 2025).

## INTRODUCTION

Amici faithfully oversaw elections across the "laboratories" of electoral democracy—the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states authority to enact election laws and administer elections, as

[1] All parties have consented to the filing of this brief amicus curiae. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] Amici are (1) Mary Estill Buchanan, former Republican Secretary of State for Colorado, (2) Miles Rapoport, former Democratic Secretary of State for Connecticut, (3) Ben Ysursa, former Republican Secretary of State for Idaho, (4) Joan Anderson Growe, former Democratic Secretary of State for Minnesota, (5) John Gale, former Republican Secretary of State for Nebraska, (6) Phil Keisling, former Democratic Secretary of State for Oregon, (7) Kathy Boockvar, former Democratic Secretary for Pennsylvania, and (8) Sam Reed, former Republican Secretary of State for Washington.

set forth in the Elections Clause of the U.S. Constitution. This is since "deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (citation modified).

Here, the United States seeks an order directing the Secretary of State of Rhode Island to turn over to the U.S. Department of Justice a computerized voter registration list of over 600,000 registered voters, inclusive of "all fields." ECF 1 (Complaint ("Compl.")) ¶ 20. That would upend our constitutional framework and interfere with Rhode Island's election administration duties. The Government's demand is contrary to the federalism and separation of powers principles codified in the Constitution's Elections Clause and contrary to federal law. Amici respectfully request that the Court affirm the District Court's judgment.

## ARGUMENT

### I. DOJ's demand for Rhode Island's full voter rolls violates separation of powers principles.

#### A. The U.S. Constitution mandates the states' role in regulating and administering elections.

The Constitution explicitly gives states, not the federal government, the primary responsibility to enact election laws and administer elections. The Elections

Clause establishes: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added). The Constitution thus empowers the states with "sweeping" authority to enact election laws, subject only to other provisions of the Constitution and preemption by Congress. *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 780 F. Supp. 3d 135, 158 (D.D.C. 2025).

The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 8-9 (2013) (emphases added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *California v. Trump*, 786 F. Supp. 3d 359, 372 (D. Mass. 2025), *appeal filed*, No. 25-1726 (1st Cir. Aug. 1, 2025) (same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [and 2] upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S. at 8 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995)). "In other words, only

Congress has the power to adjust state election rules." *California*, 786 F. Supp. 3d at 379.

In addition to assigning states the primary responsibility to regulate elections, the Elections Clause also "places the burden of administering federal elections on the states." *Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008 (quoting *Edgar*, 56 F.3d at 796); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures."), *aff'd sub nom. ITCA*, 570 U.S. 1. In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," subject only to Congress' power "to regulate such elections . . . by positive and clear statutes." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

**B. The Constitution prioritizes the states' accountability to voters.**

The Elections Clause reflects the Framers' view that, given state officials' accountability and proximity to local needs, states are well-situated to regulate and administer federal elections, subject only to Congressional preemption. As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787* 391 (Max

Farrand ed., 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." *The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 780 F. Supp. 3d at 159. Although the Constitution allows Congress to act as a check on a runaway state legislature's regulation of elections, nowhere does it authorize the President to do so without clear authorization from the legislative branch. *See generally Gradwell*, 243 U.S. at 484-85.

In practice, the Elections Clause creates a regime in which state officials, like Amici, possess unique expertise in local election procedures that the federal government, including the President, does not have. Unlike the federal government, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Consequently, state and local officials—*i.e.*, those charged with developing and enforcing those comprehensive election

codes—possess the "expertise" necessary to implement such complex systems. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

### C. The NVRA and HAVA confirm states' authority over voter roll list maintenance.

Under both the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), the states—not federal agencies—are responsible for voter roll list maintenance. The text of each is unequivocal: *States* are responsible for voter roll list maintenance. The NVRA provides that "each ***State*** shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). The same is true regarding HAVA, which requires states to define, maintain, and administer voter lists. 52 U.S.C. §§ 21083(a)(1)(A), (a)(4)(A).

Because the text of the NVRA and HAVA makes clear that states are charged with voter roll list maintenance, any interpretation to the contrary must be rejected. Further, "[n]owhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004). The NVRA, which primarily achieves its objectives by "creating national registration requirements for federal elections," *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1113 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016), likewise authorizes, and relies on, the states to implement and

facilitate its provisions. Specifically, the very "purpose of the federal [voter registration] form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993*, The American Presidency Project (May 20, 1993), https://perma.cc/AHT3-H4S8 (describing NVRA's "implementation by States").

### D. Countenancing DOJ's proposed use of states' voter rolls here would violate the separation of powers.

According to DOJ, it is seeking full voter rolls from Rhode Island to ascertain the state's compliance with the requirements of the NVRA and HAVA. Compl. ¶ 20.

And if DOJ's review of the voter roll "reveals that an alien unlawfully has registered to vote or voted in an election, the [Civil Rights] Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both." Mem. Op. for the Assistant Attorney General, Civil Rights Division at 5, *Authority to Obtain and Share Statewide Voter Roll Data* (May 12, 2026), https://perma.cc/VRJ2-4PPF. Indeed, DOJ has executed Memoranda of Understanding with at least three states providing that DOJ will notify the state of "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns [] the Justice Department found when testing, assessing, and analyzing your state's VRL [voter registration list] for NVRA and HAVA

compliance, i.e., that [the] state's VRL only includes eligible voters," and purporting to commit the states, "within forty-five (45) days of receiving the notice from the Justice Department" to "remov[e]" putatively ineligible voters. *See*, *e.g.*, Confidential Mem. of Understanding between DOJ and Alaska Div. of Elections at 5, (Dec. 19, 2025) https://perma.cc/5N8N-3H8J.

DOJ's representations in the district court below likewise confirm that DOJ intends to "run these lists against other databases to be able to tell if there are bad registrations on their rolls." Hr'g Tr. at 70:12-2, *United States v. Amore*, No. 25-cv-639 (D.R.I. March 26, 2026). If DOJ identifies a voter with a purportedly "bad registration," DOJ will contact the states to "verify . . . they have removed [that voter] from the rolls." *Id.*

Neither the Elections Clause, the NVRA, HAVA, nor any other statute contemplates DOJ conducting voter roll list maintenance on behalf of the states. And to the extent that the NVRA and HAVA permit DOJ to play a supervisory role, it may enforce states' programmatic list maintenance obligations through litigation, not by fly-specking states' voter registration lists. *See* 52 U.S.C. §§ 20507(a)(4)(A), 20510(A) (under the NVRA, permitting DOJ to bring litigation for declaratory or injunctive relief to carry out states' obligation to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters"); 52 U.S.C. §§ 21083, 21111 (under HAVA, permitting DOJ

to bring litigation for declaratory or injunctive relief to carry out states' obligation to "implement . . a single, uniform, official, centralized, interactive computerized statewide voter registration list" and "perform list maintenance with respect to the computerized list on a regular basis"). Permitting DOJ to sift through and line-edit Rhode Island's entire voter registration list would not only violate the Elections Clause, but also the voter roll list maintenance regime the states and Congress have erected pursuant to their Constitutional prerogative.

## II. DOJ's demands for states' full voter rolls violate the Privacy Act.

The Privacy Act of 1974 restricts a state's ability to share sensitive information with federal agencies. Passed in response to the Watergate and Counterintelligence Program (COINTELPRO) scandals, the Privacy Act was designed to "address what at the time was seen as an existential threat to American democracy" by placing "limits upon what the Government can know about each of its citizens" U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE.

To that end, the Privacy Act sought to prevent the federal government from creating "formal or *de facto* national data banks" or "centralized Federal information systems" that would consolidate sensitive personal data of Americans stored at separate agencies. S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 –

S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE. Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." *Id.* at 884, 217.

DOJ's efforts to maintain and use Rhode Island's voter data contravene many of the Privacy Act's requirements. First, the Privacy Act forbids federal agencies like DOJ from collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7).[3] Here, DOJ explicitly requested "all fields" from Rhode Island's electronic Voter Registration List. Compl. ¶ 20. This includes each voter's party affiliation—one way in which an individual exercises rights guaranteed by the First Amendment. *See Branti v. Finkel*, 445 U.S. 507, 519 (1980). The request thus

[3] Although § 552a(e)(7) includes an exception for collecting records "pertinent to and within the scope of an authorized law enforcement activity," nothing in DOJ's complaint identified such a specific "authorized law enforcement activity." To the contrary, the complaint made clear that the purpose of the demand under the CRA was to "ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 20.

violated the Privacy Act.

Second, the Privacy Act imposes procedural guardrails on what federal agencies must do prior to establishing or modifying a "system of records." 5 U.S.C. § 552a(a)(5). Any time the federal government "maintain[s], collect[s], use[s], or disseminate[s]" such, records, it *must* abide by notice-and-comment requirements and safeguards against data misuse, and follow information-security mandates. *Id.* § 552a(a)(3), (e)(1)-(12). Critically, when an agency establishes or revises any system of records, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records," *id.* § 552a(e)(4), called a System of Records Notice ("SORN"). At least 30 days *prior* to such publication, an agency must publish a "notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Issuance of a SORN is not mere window-dressing. SORNs "shall include" nine categories of information, *id.* § 552a(e)(4), providing much needed transparency about how the federal government is protecting both the information in the system of records and how it intends to use the information. And publishing a SORN is mandatory. Guidance issued contemporaneously with the Privacy Act is unequivocal: "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal*

*Register* publication." Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67. Moreover, agencies "shall" not only solicit but also review any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* Taken together, this "allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering agency accountability through public notice." *Id.* at 5.

Here, DOJ has not published a SORN nor any other notice describing how it intends to use the state voter roll data it is attempting to collect. In its opening brief, DOJ confirmed it is compiling the voter data in a system of records at the Civil Rights Division titled "JUSTICE/CRT – 001, Central Civil Rights Division Index File and Associated Records". DOJ Br. 39-40. DOJ cited three pertinent SORNs for that system: 68 Fed. Reg. 47610, 47611 (August 11, 2003), 70 Fed. Reg. 43904 (July 29, 2005), and 82 Fed. Reg. 24147 (May 25, 2017). DOJ contends "the SORN covers the NVRA, HAVA, and the CRA as statues for routine use" because the SORN states that "[t]he records in the system of records are kept. . .in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division]," including enforcement of "all Federal statutes affecting civil rights, including those pertaining to elections and voting." DOJ Br. 40 (citing 28 C.F.R. 0.50(a)). That insufficiently identifies the "the categories of records maintained in the system," 5 U.S.C.

§ 552a(e)(4)(C), *i.e.*, millions of Americans' confidential voter data. Failure to issue such a notice is, itself, a Privacy Act violation.

### III. Sound policy reasons support barring DOJ from collecting the personal identifying information in state voter files.

Federal law requires that every voter registration application for registration in a federal election contain *at least* the voter's driver's license ("DL") number, the last four digits of the voter's social security number ("SSN"), or other unique identifying information. 52 U.S.C. § 21083(a)(5)(A). In addition, voter files commonly include voters' addresses, phone numbers, birth dates, and full SSNs. *See, e.g.*, National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/emnvjnj5. States have an interest in protecting such sensitive nonpublic information from disclosure, *see, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) ("[T]he duty of the State" to protect privacy of its residents "cannot be doubted."), and many states have enacted statutes either prohibiting disclosure of confidential information contained in the voter file or limiting the use of such information.

Moreover, there is nothing in the NVRA or HAVA that supersedes or conflicts with these state confidentiality rules. The NVRA's public disclosure provision contains no mention of confidential information and no requirement that such information be disclosed. *See* 52 U.S.C. § 20507(i). Nor does HAVA conflict with state confidentiality rules. That statute does not even contain a public disclosure

requirement, let alone a requirement that state agencies turn over confidential voter information to the federal government. *See generally* 52 U.S.C. § 21083. Thus, states can comply with their obligations under the NVRA and HAVA without acceding to federal demands for confidential information.

Similarly, states need not disclose confidential information about their voters to comply with the Civil Rights Act of 1960 ("CRA"). The CRA allows the United States Attorney General to request inspection of state voter rolls for the purpose of investigating "alleged discriminatory practices." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also* 52 U.S.C. §§ 20701, 20703 (retention and inspection provisions of the CRA). But the federal government did not allege any discriminatory practices. Even assuming the Attorney General can request inspection of voter rolls in these circumstances, nothing in the text of the CRA's records provisions preempts state privacy protections, and preemption is not implied. *See generally* 52 U.S.C. §§ 20701-20706. There is "a strong presumption against implied federal preemption of state law," which is strongest "in fields of traditional state regulation." *ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citation omitted). "Privacy regulation is just such a field." *Id.*; *see also Bellville v. Town of Northboro*, 375 F.3d 25, 31 (1st Cir. 2004) ("The states, of course, are free to accord their citizens rights beyond those guaranteed by

federal law.").

The CRA and voter confidentiality protections are not contradictory and are properly read in harmony. The purpose of the CRA was to allow the Attorney General to investigate the alleged disenfranchisement of voters based on race. *Gallion*, 187 F. Supp at 854. It does not give federal officials an unfettered right of access to confidential information about voters in general. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("It is . . . a mistaken view to assume that [an] investigation of [state voting] records is an unlimited discovery device which may be employed and used without restraint . . . ."). As courts have repeatedly recognized in other contexts, states can comply with the CRA while also protecting confidential voter information. *See, e.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (allowing redaction of sensitive personal information in voter file when complying with disclosure requirements of NVRA). This principle applies here as well, allowing states to comply with appropriate inspection requests by the Attorney General while also redacting or withholding confidential information in the voter file in accordance with state privacy rules.

## CONCLUSION

For the reasons stated above, Amici respectfully request that the Court affirm the District Court's judgment of dismissal.

Dated: August 24, 2026

*/s/ John B. Hill*
John B. Hill
Samantha Y. Suman
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
ssuman@citizensforethics.org

*Attorneys for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 3,600 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 24, 2026 *<u>/s/ John B. Hill</u>*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of August, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using its CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 24, 2026 *\/s/ John B. Hill*